**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

J. DANIEL LUGOSCH, III; ROBERT L. UNGERER; JOHN A.
BERSANI; EDWARD A. KELLOGG; JOHN C. CHARTERS;
PETER C. STEINGRABER; RICHARD K. ASKIN; WILLIAM
TAPELLA,

Plaintiffs


- v -          Civ. No. 1:00-CV-0784
                                              (NAM/RFT)


ROBERT J. CONGEL, Individually and as General Partner of
Woodchuck Hill Assoc., Riesling Assoc., Madeira Assoc., and
Moselle Assoc.; PYRAMID COMPANY OF ONONDAGA;
EKLECCO, L.L.C.; WOODCHUCK HILL ASSOC.; RIESLING
ASSOC.; MADEIRA ASSOC.; MOSELLE ASSOC. JAMES A.
TUOZZOLO; ROBERT BRVENIK; MARC A. MALFITANO;
SCOTT R. CONGEL,

Defendants.
_____


IN RE THE HERALD COMPANY and CAPITAL NEWSPAPERS
DIVISION OF THE HEARST CORPORATION,

Proposed Intervenors.
_____


**RANDOLPH F. TREECE**
**U.S. MAGISTRATE JUDGE**


T<small>ABLE OF</small> C<small>ONTENTS</small>

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-18
    A. The April 15th and June 24th 2005 Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-4
    B. The Second Circuit Mandate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-11
    C. The Expedited Briefing Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11-18

II. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18-68
    A. Nature of the Instant Application to Intervene . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18-22
    B. Admissibility of Summary Judgment Documents . . . . . . . . . . . . . . . . . . . . . . . . . .  22-25
    C. Analysis Under Second Circuit Mandate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25-48
        1. Attorney-Client Privilege . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25-30
        2. Work Product Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30-33

3. Waiver of Attorney-client Privilege and Work Product Doctrine . . . . . . . . 34-48
   a. Third Party Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34-37
   b. Business Structure and Waiver Issue . . . . . . . . . . . . . . . . . . . . . . . . 37-42
   c. At Issue Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-48
D. Specific Review of Subject Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-68
   1. Bonwit Teller and the Shearman and Sterling Opinion Letter . . . . . . . . . . 49-57
   2. Crossgates Mall Tax and Tenant Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-59
   3. Previous Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59-61
   4. Audits and Other Business Related Documents . . . . . . . . . . . . . . . . . . . . . . 61-68

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67-69

APPENDIX A–List of Documents Considered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-10
APPENDIX B–Confidentiality Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-6
   Ex. A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
APPENDIX C–Summary of Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-10

## <u>REPORT RECOMMENDATION and ORDER</u>[1]

### I.  INTRODUCTION

Proposed Intervenors, The Herald Company, publisher of <u>The Syracuse Post-Standard</u>, and Capital Newspapers Division of the Hearst Corporation, publisher of the <u>Albany Times Union</u>, ("Proposed Intervenors" or "Newspapers"), move, via Order to Show Cause, to intervene in the above action for the limited purposes of (1) unsealing and obtaining immediate public access to and permission to copy the Summary Judgment Motion papers filed by the parties under seal; (2) directing that no additional or future summary judgment filings by the respective parties be made under seal, absent compliance with constitutional and common law principles; and (3) authorizing Newspaper movants' reporters to attend oral argument on the Summary Judgment Motions' return date, in the event such argument is conducted by the Court. *See* Dkt. No. 356, Proposed Order to Show Cause Submitted by Proposed Intervenors; Dkt. No. 380, Order granting Application for Order to Show Cause and establishing filing deadlines.

The Defendants' Motions for Summary Judgment, which is the focal point of the Intervention Motion, is presently pending before the Honorable Norman A. Mordue, United States District Judge. The matter is now fully briefed and oral argument was scheduled but subsequently adjourned; it appears the matter will now be considered on submit.[2] *See* Text Orders, signed by Judge Mordue on May 17, May 23, and June 28, 2005.  On July 20, 2004, Judge Mordue referred the Proposed Intervenors' Order

---

[1] *See* Appendix A, attached to this Report and Recommendation, for a list of submissions this Court considered in making the within recommendations.

[2] The Text Order, dated June 28, 2005, states that oral argument has been cancelled and the Motion will be taken on submit with no appearance.  At the time of this Report and Recommendation, there has been no revision to this Text Order.
     Motions for Summary Judgment is a reference to the Defendants' independent Motion for Summary Judgment collectively.  *See* Dkt. Nos. 323-28; *see also infra* note 26.

*-1-*

to Show Cause, and intervention issues raised therein, to this Court. Dkt. No. 377.

By Agreement, executed on November 5, 2004, the litigants narrowed, to some degree, the documents at issue [hereinafter referred to as "Subject Documents" or "Contested Documents"] in the Intervention Motion. According to the terms of the Stipulated Agreement, the Defendants will "make publicly available the parties' respective summary judgment motion papers . . . subject to the redaction of (1) information allegedly protected by the attorney-client privilege and (2) the "personal identifiers" mandated by Local Rule 8.1." Dkt. No. 396, Nov. 5th Agreement. The Agreement further noted that, with regard to Local Rule 8.1, the Defendants' redactions

> will be limited to the five mandatory categories specified therein (social security numbers, names of minor children, dates of birth, financial account numbers, and home addresses) and will ***not*** include information within the purview of its suggested cautionary categories (personal identifying number, such as a driver's license number; medical records, treatment and diagnosis; employment history; individual financial information; and proprietary or trade secret information).

*Id*. at n.1 (emphasis in original).

## A. The April 15th and June 24th 2005 Orders

On April 15, 2005, after receiving several letter briefs from the Proposed Intervenors demanding immediate resolution of their Motion to Intervene, the latter of which threatened mandamus action, this Court issued an Order holding in abeyance the Motion to Intervene pending Judge Mordue's resolution of the Motions for Summary Judgment. Dkt. No. 404, *Lugosch v. Congel*, 2005 WL 1523412 (N.D.N.Y. Apr. 15, 2005) (Treece, M.J.) ("*Lugosch III*"), *approved by*, *Lugosch v. Congel*, 2005 WL 1523409 (N.D.N.Y. June 24, 2005) (Mordue, D.J.) ("*Lugosch IV*"), *vacated and remanded sub nom*, *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006) ("*Lugosch V*"). Such determination rested upon our reading of the relevant caselaw **in this Circuit**, which up to that point had been somewhat unclear. We first noted that the presumption of public access under both the common law

and the First Amendment only attached to judicial documents.  In reciting the Second Circuit's definition of what constitutes a judicial document, we found that such a determination in this case would be premature in that, at least to our knowledge, the District Judge had not reviewed any of the numerous documents encompassed within the Defendants' Motions for Summary Judgment or Plaintiffs' Opposition thereto.  Dkt. No. 404 at pp. 2-3; *Lugosch III*, 2005 WL 1523412, at *1-2.[3]

On April 22, 2005, the Proposed Intervenors appealed that decision to Judge Mordue pursuant to Federal Rule of Civil Procedure 72 and Local Rule of Practice for the Northern District of New York 72.  Dkt. Nos. 406-07.  Defendants opposed the appeal while Plaintiffs apparently took no stance.  Dkt. Nos. 409-12.  On June 24, 2005, Judge Mordue adopted this Court's finding that it was premature to decide whether the subject documents were judicial documents.  Dkt. No. 417; *Lugosch IV*, 2005 WL 1523409.  Going one step further, Judge Mordue found that even if the documents were deemed judicial documents to which the presumption of access applied, the <u>weight</u> of such presumption could not legitimately be determined until after the resolution of Defendants' Motions for Summary Judgment.  Dkt. No. 417 at pp. 7-8; *Lugosch IV*, 2005 WL 1523409, at *3 (emphasis added).  Concomitantly, just as the Court would be stymied in assessing the strength of the weight of the presumption, so too would

---

[3] Specifically, we stated:
> [i]n considering the definition of a judicial document, the Second Circuit stated: We think that the **mere filing** of a paper or document with the court is **insufficient** to render that paper a judicial document subject to the right of public access.  We think that the item filed **must be relevant to the performance of the judicial function and useful in the judicial process** in order for it to be designated a judicial document.

*United States v. Amodeo*, 44 F.3d 141, at 145-46 (2d Cir. 1995) (emphasis added); *see also SEC v. theStreet.com*, 273 F.3d 222, 231 (2d Cir. 2001) (citing *Amodeo*). Dkt. No. 404 at p. 2; *Lugosch III*, 2005 WL 1523412, at *1.

We explained that the Proposed Intervenors sought access to documents that "have not yet been utilized in an Article III function."  Dkt. No. 404 at p. 2-3; *Lugosch III*, 2005 WL 1523412, at *1 (citing *Amodeo*, 44 F.3d at 145-46, for the above quoted proposition).  Accordingly, we reasoned that "[s]ince Judge Mordue has not issued a decision on the Defendants' Summary Judgment Motion, the documents at issue, while possibly relevant to the performance of a judicial function, have not yet been shown to be useful in the judicial process."  Dkt. No. 404 at pp. 2-3; *Lugosch III*, 2005 WL 1523412, at *1 (citing cases).

the Court be unable to balance the presumption of access against any countervailing factors or compelling interests, such as the Defendants' privacy interests and attorney-client privilege.  Dkt. No. 417 at pp. 8-10; *Lugosch IV*, 2005 WL 1523409, at \*3-4.

## B.  The Second Circuit Mandate

On July 13, 2005, the Proposed Intervenors[4] filed a Notice of Appeal to the Second Circuit appealing both this Court's April 15th Order and Judge Mordue's June 24th Order.  Dkt. Nos. 419 & 421-22.  On January 10, 2006, the Second Circuit issued its Decision and Mandate on the Newspapers' appeals.  Dkt. No. 428 (docketed by the Clerk of the District Court on Jan. 19, 2006); *Lugosch V*, 435 F.3d 110.

Initially, the Second Circuit recited the history of the underlying litigation, while at the same time expressed its antipathy over the amount of time the Motions for Intervention and Summary Judgment had been pending with the District Court.   The Second Circuit then grappled with the issue of whether it had the requisite jurisdiction to entertain the Newspapers' appeal from an Order which was not a final judgment; ultimately, the Second Circuit ruled that jurisdiction existed under the collateral order doctrine.[5]  Dkt. No. 428 at pp. 11-14; *Lugosch V*, 435 F.3d at 117-19.

---

[4] We take this time to note that as early as their appeal of this Court's April 15th Order, the Proposed Intervenors began referring to themselves as "Intervenors."  *See* Dkt. No. 407 at pp. 1-2 (noting that the Newspaper's standing to intervene "cannot be reasonably disputed" and asking the District Judge to find that the April 15th Decision granted to the Newspapers "Intervenor status" and further emphasizing that to find otherwise would render that decision unreviewable).  Contrary to the Newspapers' suppositions, no Court has yet ruled on the merits of their Motion to Intervene, though we have been extending courtesies to the Newspapers, *i.e.*, notice and opportunity to be heard in various phone conferences, as if they were indeed parties.  Though the Second Circuit's caption may have referred to the Newspapers as "Intervenor" and "Intervenor-Appellant", such designation was erroneous as no where and at no time has that status been designated, either explicitly or implicitly by operation of law, to the Newspapers by either this Court or the District Court, nor did the Second Circuit reach such issue in their Mandate-Decision.  The Newspapers' standing to intervene is addressed **for the first time** in this Report and Recommendation and Order.  *See infra* Part II.A.

[5] The collateral order doctrine is a "narrow exception to the general rule that interlocutory orders are not appealable as a matter of right."  Dkt. No. 428 at p. 11; *Lugosch V*, 435 F.3d at 117 (quoting *Schwartz v. City of New York*, 57 F.3d 236, 237 (2d Cir. 1995)); *cf. Will v. Hallock*, __ U.S. __, 126 S.Ct. 952, 957 (2006) (vacating the Second Circuit's opinion due to a lack of appellate jurisdiction and noting that the collateral order doctrine is better described not as an exception to the

Two rights of public access are at issue in this case.  The first is the common law right of public access and the second is the public and press' qualified First Amendment right.  The Second Circuit first addressed the common law right of public access to judicial documents, which "is firmly rooted in our nation's history[;]" the Second Circuit then noted that such presumption of access is based upon the need for the public to monitor the federal courts in the performance of Article III functions.  Dkt. No. 428 at p. 14; *Lugosch V*, 435 F.3d at 119 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*") ("Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior.  Without monitoring, moreover, the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings.") (other citations omitted).  Before the common law right attaches, however, "a court must first conclude that the documents at issue are indeed 'judicial documents.'"  Dkt. No. 428 at pp. 14-15; *Lugosch V*, 435 F.3d at 119.  Then, once it is determined that the documents at issue are judicial documents, the weight of the presumption of access must be determined.  Dkt. No. 428 at p. 15; *Lugosch V*, 435 F.3d at 119.  The weight of the presumption is governed by the "role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  Dkt. No. 428 at p. 15; *Lugosch V*, 435 F.3d at 119 (quoting *Amodeo II*, 71 F.3d at 1049).  Finally, and only after determining the weight of the presumption of access, a court must "balance competing considerations against it."  Dkt. No. 428 at p. 15; *Lugosch V*, 435 F.3d at 120 (quoting *Amodeo II*, 71 F.3d at 1050).

---

final decision rule but rather "a practical construction of it") (internal quotation marks and citations omitted).  The Second Circuit explained, "[t]o fit within the collateral order exception, the interlocutory order must: [i] conclusively determine the disputed question, [ii] resolve an important issue completely separate from the merits of the action, and [iii] be effectively unreviewable on appeal from a final judgment."  Dkt. No. 428 at p. 11; *Lugosch V*, 435 F.3d at 117 (quoting *United States v. Graham*, 257 F.3d 143, 147 (2d Cir. 2001)).  Appellate jurisdiction was found to exist in the case primarily due to the fact that the District Court's determination to delay decision on the Intervention Motion, in effect, was a decision on the merits as to the public's right of immediate access and that each passing day constituted a separate injury.  Dkt. No. 428 at pp. 11-12; *Lugosch V*, 435 F.3d at 118.

Turning to the qualified First Amendment right, the Second Circuit noted that "it is well established that the public and the press have a 'qualified First Amendment right to attend judicial proceedings and to access certain judicial documents.'"  Dkt. No. 428 at p. 15; *Lugosch V*, 435 F.3d at 120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)).  Two approaches have been articulated as to whether the First Amendment right applies.  Dkt. No. 428 at p. 15; *Lugosch V*, 435 F.3d at 120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d at 92).  The first approach is the "experience and logic" approach wherein courts are to consider whether the documents "have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question."  Dkt. No. 428 at pp. 15-16; *Lugosch V*, 435 F.3d at 120 (internal quotation marks and citations omitted).  The second approach, known as the "necessary corollary approach," "considers the extent to which the judicial documents are derived from or [are] a necessary corollary of the capacity to attend the relevant proceedings."  Dkt. No. 428 at p. 16; *Lugosch V*, 435 F.3d at 120 (internal quotation marks and citations omitted).  Once a court concludes that the qualified First Amendment right of access applies to judicial documents, the subject documents may be sealed "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  Dkt. No. 428 at p. 16; *Lugosch V*, 435 F.3d at 120 (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).

Acknowledging that the District Court correctly stated the above legal frameworks, the Second Circuit nevertheless found that the decision to hold the Motion to Intervene in abeyance was in error.  The Second Circuit made clear, to the extent such clarity had been lacking in this Circuit, that "documents submitted to a court for its consideration in a summary judgment motion are – as a matter

of law – judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment." Dkt. No. 428 at pp. 17 & 20-21; *Lugosch V*, 435 F.3d at 120-21. In reviewing prior Second Circuit precedent, the Second Circuit reasoned that, as stated in *Joy v. North*, "summary judgment is an adjudication, and '[a]n adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny.'" Dkt. No. 428 at p. 17; *Lugosch V*, 435 F.3d at 121 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)). Thus, absent the most compelling reasons, "documents used by parties moving for, or opposing, summary judgment should not remain under seal[.]" Dkt. No. 428 at p. 17; *Lugosch V*, 435 F.3d at 121 (quoting *Joy v. North*, 692 F.2d at 893). Pointedly, presuming the parties complied with Rule 56 of the Federal Rules of Civil Procedure in submitting admissible evidence in support of their respective positions, the fact that a court may ultimately deny the relief sought does not in any way diminish the fact that the documents submitted to the court, regardless of who submitted them, were indeed judicial documents. Dkt. No. 428 at p. 19; *Lugosch V*, 435 F.3d at 121-22 (citing *Republic of the Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 660 (3d Cir. 1991) and noting that the logic applied by the Third Circuit "applies equally to the plaintiffs' responsive submissions on summary judgment, as they may similarly be assumed to have supported their papers with admissible evidence and non-frivolous arguments"). In making this clear statement of the law, the Second Circuit appears to now be in accord with other sister circuit courts who have similarly held that whether documents are deemed to be judicial documents to which a presumption of access applies is not dependent upon how the court ultimately rules on the motion. Dkt. No. 428 at pp. 19-20; *Lugosch V*, 435 F.3d at 122-23 (citing cases).

As to the weight of the common law presumption of access, the Second Circuit provided some

guidance on how such analysis should proceed.  First, the Second Circuit reiterated that with regard to the documents at issue in this case, such being summary judgment documents, "the presumption is of the highest[.]"  Dkt. No. 428 at p. 21; *Lugosch V*, 435 F.3d at 123.  As with the judicial document determination, the weight of the presumption is in no way affected by the extent such document is relied upon in ultimately reaching a determination of the summary judgment motion.[6]  Dkt. No. 428 at p. 21; *Lugosch V*, 435 F.3d at 123 (quoting *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig*, 101 F.R.D. 34, 43 (C.D. Cal. 1984) ("If the rationale behind access is to allow the public an opportunity to assess the correctness of the judge's decision . . . documents that the judge *should* have considered or relied upon, but did not, are just as deserving of disclosure as those that actually entered into the judge's decision.") (emphasis in original)).

Turning to the First Amendment right alleged by the Newspapers, the Second Circuit, joining the Fourth Circuit, stated clearly that the documents filed in connection with a summary judgment motion are subject to a presumption of access and, accordingly, a higher constitutional burden in requiring disclosure exists.  Dkt. No. 428 at pp. 22-23; *Lugosch V*, 435 F.3d at 124.

After unequivocally establishing that the documents filed in connection with a summary judgment motion are subject to both the common law right of access and the First Amendment, the Second Circuit explained that "the documents may be kept under seal if countervailing factors in the common law framework or higher values in the First Amendment framework so demand."  Dkt. No. 428 at pp. 23-24; *Lugosch V*, 435 F.3d at 124.  And, since the more "stringent" First Amendment framework is applicable, continued sealing of the subject documents may only be justified with "specific, on-the-record findings that sealing is necessary to preserve higher values and only if the

_____

[6] The Second Circuit further emphasized, in response to the Defendants' argument, that the Newspapers' motive in obtaining access is irrelevant.  Dkt. No. 428 at p. 21; *Lugosch V*, 435 F.3d at 123 (quoting *Amodeo II*, 71 F.3d at 1050).

sealing order is narrowly tailored to achieve that aim."  Dkt. No. 428 at p. 24; *Lugosch V*, 435 F.3d at 124.  Noting that the attorney-client privilege may well constitute a compelling reason for continued sealing, the Circuit Court specifically rejected the Newspapers' contention that under *Joy v. North*, such privilege is waived by virtue of filing the summary judgment papers.  Dkt. No. 428 at p. 24; *Lugosch V*, 435 F.3d at 125.  The Second Circuit clarified that such waiver may occur when *a party attempts to rely on its own privileged documents to win summary judgment*, however, in the case at bar, it is the Plaintiffs who "have put [D]efendants' allegedly privileged documents in the record, not the [D]efendants themselves."  Dkt. No. 428 at p. 24; *Lugosch V*, 435 F.3d at 125.  Having an incomplete record to review, the Second Circuit remanded the case to the District Court to address the "fact-specific inquiry as to whether (1) the contested documents are subject to attorney-client privilege, and (2) defendants waived the privilege by placing in issue the contents of the privileged information."[7]  Dkt. No. 428 at p. 25; *Lugosch V*, 435 F.3d at 125 (citations omitted).

Lastly, the Second Circuit addressed the Defendants' contention that the Newspapers are

---

[7] We must at this point address several points made by the litigants in their respective Memoranda of Law.  We reject any attempt made by the litigants to confuse the clear Mandate set forth by the Second Circuit.  It is this Court's understanding that we are to first decide whether the Contested Documents are even subject to the attorney-client privilege and **then** we are to determine whether such privilege has been waived.  It makes little sense in this Court's estimation to surpass step one and only decide step two.  Obviously, if a particular document is not privileged, then we need not even address the issue of whether a waiver ensued since it is clearly moot.  For the same reason, we find it futile to reverse the steps, as has been suggested.  Furthermore, while the Second Circuit made clear that we should make a specific inquiry as to whether an "at issue" waiver has occurred, this Court should not be precluded in assessing whether any other waiver has taken place which would also defeat the asserted privilege.  Finally, the Court needs to clear up a misunderstanding regarding statements made at the January 30th Conference.  At that conference, the Court provided clarification to the parties regarding its January 20th Order.  The Court specifically told the litigants that it would not be considering the admissibility of each document *per se*.  If the Defendants sought a ruling on the admissibility of each document, such would need to be presented to the District Judge, not this Court.  However, the Court nevertheless asked the parties to brief what effect, if any, admissibility may have on the public access issue currently before the Court.  While the Court clarified that it would not engage in a document by document review for admissibility purposes, it was never even suggested to the Court that a document by document review would not take place as to whether a particular document was protected by a privilege or whether such has been waived.  *See* Dkt. No. 441, Newspapers' Lt.-Brief, at p. 3 n.4.  The Second Circuit's demand of a "fact-specific inquiry" in our view requires just that – a document by document review.  As stated above, some documents may not even be privileged, while in other instances the privilege may be waived, and in some instances, there may be no waiver.  The Court cannot make the necessary on-the-record fact-specific inquiries without engaging in a document by document review.

improperly trying to modify the Confidentiality Order to which production of the Subject Documents was made during discovery. The Circuit Court first noted that the "mere existence of a confidentiality order says nothing about whether complete reliance on the order to avoid disclosure was reasonable." Dkt. No. 428 at pp. 25-26; *Lugosch V*, 435 F.3d at 126 (citing *Sec. and Exch. Comm'n (S.E.C.) v. TheStreet.com*, 273 F.3d 222, 231 (2d Cir. 2001)). The reasonableness of the Defendants' purported reliance of eternal secrecy in the disclosed documents, in the Second Circuit's estimation, may be doubtful as the Confidentiality Order at issue specifically contemplates a process by which relief from the provisions therewith may be sought at any time. Dkt. No. 428 at p. 26; *Lugosch V*, 435 F.3d at 126 (quoting the Confidentiality Order, "This Confidentiality Order shall not prevent anyone from applying to the Court for relief therefrom[,]" and noting that in light of such provision, "it is difficult to see how the defendants can reasonably argue that they produced documents in reliance on the fact that the documents would **always be kept secret**." (emphasis added)). Nevertheless, the Second Circuit granted Defendants the opportunity on remand to call to the District Court's attention "any particular circumstances surrounding the production of a contested document."[8] Dkt. No. 428 at p. 26; *Lugosch V*, 435 F.3d at 126.

In conclusion, after reiterating the important holdings made clear by their decision, the Second Circuit emphasized that the District Court "must make its findings quickly." Dkt. No. 428 at p. 27; *Lugosch V*, 435 F.3d at 126-27 (quoting *Grove Fresh Distrib., Inc. v. Everfresh Juice Co.*, 24 F.3d 893,

---

[8] This Court, and possibly the litigants, are somewhat perplexed as to what door has been opened by this sentence. We don't find the Newspapers' argument regarding the placement of this sentence above the conclusion as somehow diminishing the weight or importance of this statement. While it is clear that the Second Circuit brushed aside Defendants argument of reasonable reliance, they don't appear to have dismissed the notion outright. They simply found Defendants' argument of reasonable reliance to be implausible based upon the stated terms of the Confidentiality Order. While it was "difficult" for the Second Circuit to accept the reasonableness of Defendants' reliance, they nevertheless granted Defendants the opportunity on remand to call to the District Court's attention "any particular circumstances surrounding the production of a contested document." Dkt. No. 428 at p. 26; *Lugosch V*, 435 F.3d at 126. We don't think the Second Circuit entirely foreclosed Defendants' reasonable reliance argument, though serious doubts were indeed placed on the record.

897 (7th Cir. 1994) ("The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression.") (other citations omitted)). Accordingly, in the interest of avoiding further delays, the Second Circuit ruled that the mandate should be complied with forthwith. Dkt. No. 428 at p. 28; *Lugosch V*, 435 F.3d at 127.[9]

### C. The Expedited Briefing Schedule

In accordance with the dictates set forth therein, this Court took immediate action in setting up a telephone conference with all Parties and Proposed Intervenors. Dkt. No. 427, Text Order dated Jan. 17, 2006. Such conference was held on January 20, 2006, one day after the Mandate was docketed by the Clerk of this Court. *See* Minute Entry, dated Jan. 20, 2006; *see also* Dkt. No. 428. Several reasons supported the need for a conference. First, the Motion to Intervene was first briefed by all litigants prior to entering the November 5, 2004 accord. *See* Dkt. Nos 356-67 & 393-94, Proposed Intervenors' Motion, Mem. of Law, Exs., and Reply; Dkt. Nos. 386-87, Pls.' Response; Dkt. Nos. 389-90, Defs.' Response; Dkt. No. 396, Lt-Agreement, dated Nov. 5, 2004. That November 5, 2004 Agreement gave the Proposed Intervenors access to virtually 99.9% of the Motions for Summary Judgment and the Oppositions thereto, constituting thousands of pages of documents, affidavits, and redacted memoranda of law. After the litigants came to an agreement and many of the Subject Documents were turned over to the Newspapers, the Defendants submitted an updated privilege log, detailing only those documents withheld on the basis of attorney-client privilege and/or work product doctrine. Dkt. No. 397. At the January 20th telephone conference, this Court discussed the inadequacies of the updated privilege log.

---

[9] Pursuant to Federal Rule of Appellate Procedure 41, "[u]nless the court directs that a formal mandate is issued, the mandate consists of a certified copy of the judgment, a copy of the court's opinion, if any, and any direction about costs." FED. R. APP. P. 41(a).

We emphasized that a proponent of a privilege log must "make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." FED. R. CIV. P. 26(b)(5); *see also Bowne of New York City, Inc. v. AmBase, Corp.*, 150 F.R.D. 465 (S.D.N.Y. 1993). Having found the privilege log to be inadequate, the Court granted Defendants a period of time to submit a more detailed privilege log which contained: 1) a description of the documents; 2) identification of the parties to the communication; 3) the relationship among the parties in the log and the litigating parties; and 4) what privilege is being asserted as well as whose privilege is at issue. Dkt. No. 430, Order, dated Jan. 20, 2006.

Since clearly the issue of attorney-client privilege would be a major focus of this Court's inquiry in light of the Second Circuit's explicit instructions, this Court found it necessary for Defendants to submit affidavits from individuals who possessed particularized knowledge of the asserted privilege. Such had not been done with the initial briefing. Both the privilege log and affidavits were necessary in order for this Court to assess whether the attorney-client privilege applies, as set forth in the Second Circuit's Mandate, and for the litigants to know the reasons behind the urging for continued sealing. *See* Dkt. No. 428; *see also infra* Part II.D.

Finally, in reviewing the initial briefs, submitted prior to the November 5th Agreement, we found the discussion of the attorney-client privilege to be somewhat lacking.[10] In light of the Second Circuit's

_____

[10] While Defendants have always adamantly opposed the Motion to Intervene, Plaintiffs had not yet taken a definitive stance on the Intervention Motion *per se*, aside from generally joining the Proposed Intervenors' criticism of the Defendants' "abuse" or "broad application" of the Protective/Confidentiality order. Dkt. Nos. 386-87. Plaintiffs held steadfast to their objection as supported by letters exchanged by Plaintiffs and Defendants questioning, as early as October 15, 2003, the propriety of Defendants' designation of "confidential" on each and every document disclosed. *See, e.g.,* Dkt. No. 387, Jeff S. Shelly, Esq., Decl. in Support of Mot. for Limited Intervention, Exs. 3-5. In response, Defendants sought a detailed explanation of which documents were being questioned and why, to which Plaintiffs again emphasized that all the designations on all documents were improper. *Id.* While the exchange of such correspondence was but the first step in objecting to and supporting the confidential designations, as set forth by the Confidentiality Order, we note that neither

decision, we determined at the conference that the litigants needed to re-brief the issues before us to

ensure a proper and detailed record could be made.  Specifically, we directed the parties to brief the

following issues:

> 1. Whether the contested documents filed by Plaintiffs in Opposition to Defendants'
> Motion for Summary Judgment are subject to the attorney-client privilege and/or work
> product doctrine, and, to the extent it is in issue, privacy considerations under Local
> Rule 8.1;
> 2. Whether there has been a waiver of any privilege and what waiver applies;
> 3. Has this Court previously ruled on the applicability of any privilege of the documents
> at issue or ruled that such privilege was waived, or that it is the law of the case; and
> 4. Admissibility of Plaintiffs' submissions[.]

Dkt. No. 430 at p. 3

Though it was revealed at that telephone conference that the Defendants had filed with the

Second Circuit an Emergency Motion to Stay the Mandate and expressed an intent, if they had not done

so already, to file a Petition for an *En Banc* Hearing, this Court, on January 20, 2006, nevertheless

found it prudent to establish expedited briefing deadlines for each litigant; such deadlines were

modified by Order dated January 30, 2006.  Dkt. Nos. 430 & 440.  Initially, this Court set the following

deadlines: 1) Defendants shall provide a more detailed privilege log to the Court, all Parties, and the

Proposed Intervenors **no later than January 25, 2006**; 2) Defendants shall submit under seal for *in*

*camera* review affidavits from individuals with particular knowledge in asserting the privilege **no later**

**than February 1, 2006**; 3) Plaintiffs, Defendants, and Proposed Intervenors shall simultaneously file

Memoranda of Law **no later than February 3, 2006**; Plaintiffs' and Defendants' respective

Memoranda shall be temporarily filed under seal due to the potentially sensitive nature of the

---

party, including Plaintiffs, engaged the next essential step of requesting Court intervention to resolve the dispute.  Dkt. No. 55, Confidentiality Order, dated Mar. 4, 2001 at ¶ 8.  Since, under the unusual circumstances of this case, it was Plaintiffs who submitted the documents in Opposition to the Defendants' Motion for Summary Judgment, and such documents are at the cortex of the Motion to Intervene, it was important to understand the Plaintiffs' justification for submitting potentially privileged information.

information and upon receipt of the Memoranda, the Court will undertake a review to determine the viability of continued sealing; and 4) Reply Memoranda of Law, subject to the same filing standards, shall be filed **no later than February 10, 2006**. *See* Dkt. No. 430.

Although Proposed Intervenors adequately expressed their objections at the telephone conference, they nevertheless filed a letter brief objecting for the record any temporary seal of the Memoranda of Law and affidavits. Dkt. No. 429. Proposed Intervenors also stated their objection as to Defendants' intention to file a Motion to Strike. *Id.* In our Order setting the briefing schedule, we denied the objection to the sealing of the Memoranda of Law and affidavits at that juncture noting that as soon as the documents were received by this Court, we would review the validity of the continued sealing. Dkt. No. 430 at pp. 3-4, n.2. In response to the stated objections regarding a possible filing of a motion to strike, we noted "that the Proposed Intervenors, who as of this moment are not parties to this litigation, are clearly not in a position to object to whether a party to this litigation will file a motion or take any other action hereto. Therefore, such objection is denied." *Id.* at p. 3, n.2. Proposed Intervenors later took umbrage with this ruling. Dkt. No. 437 at n.3; *see also supra* note 4.

On January 26, 2006, Defendants requested an extension of time to submit their privilege log. Dkt. No. 433. Though the Plaintiffs and Proposed Intervenors did not *per se* oppose the extension request, both litigants took the opportunity to further chastise the Defendants' purported failure to accurately ensure that the documents they deemed confidential warranted such status. Dkt. Nos. 434 & 435. Finding the extension request did not interfere with the above briefing schedule, and no real opposition being established, this Court granted the request. Dkt. No. 433. The privilege log was then filed on January 27, 2006, with service on Plaintiffs and Proposed Intervenors. Dkt. Nos. 438-39.

As set forth in the briefing schedules, due to the potentially sensitive nature of some of the

*-14-*

submissions and, most importantly, because disclosure of such information would necessarily moot the issues before the Court, we directed that Plaintiffs' and Defendants' Memoranda of Law be filed under seal and that the affidavits would be submitted under seal for *in camera* review only.  By letter dated January 24, 2006, Plaintiffs renewed their request made at the January 20th conference for access to Defendants' affidavits and sought reconsideration of this Court's January 20th Order which directed that such submissions be made *in camera*.  Dkt. No. 432.  Plaintiffs reasoned that they already possessed the documents at issue and wanted an opportunity to attack the Defendants' factual basis for asserting a privilege.  *Id.*  That request was denied at that juncture.  *Id.*  Then, on January 27, 2006, Proposed Intervenors requested reconsideration/clarification of the Court's January 20th Order, where they too requested that the Court reconsider its decision to keep the Affidavits and Memoranda of Law under seal.  Dkt. No. 437.  In light of the submissions, this Court held another telephone conference on January 30, 2006, with all litigants to discuss what, if anything, was unclear in our January 20th Order since in that Order the Court specifically stated that the purpose for the sealing was due to the "sensitive nature of the content of the documents, and because any disclosure would necessarily moot the current dispute before the Court[,]" and further stated therein that "[u]pon receiving the Plaintiffs' and Defendants' respective Memoranda of Law, the Court will determine whether the filings shall remain under seal[.]"  Dkt. No. 430 at pp. 3-4.  After the conference, the Court issued an Order "clarifying" our January 20th Order.  Dkt. No. 440.  In that Order, we reiterated the need for certain submissions to be filed under seal and that the Court would undertake <u>immediate</u> review to assess whether such documents should remain under seal or whether "some redacted version could be made available for public viewing."  *Id.* at p. 2.  The litigants were also assured that they would be provided an opportunity to be heard prior to this Court rendering a ruling on unsealing and/or redaction.  *Id.*  Upon consent of

all litigants, the deadline for submission of the Memoranda of Law was extended to February 7, 2006.[11]
*Id.* at p. 1.

In accordance with this Court's January 20th and January 30th Orders, the respective submissions were timely filed/submitted to the Court. Dkt. Nos. 441-43. On February 9, 2006, this Court held a Hearing on the record with all litigants to discuss redactions of the submissions for public viewing. Text Order, dated Feb. 8, 2006; Minute Entry, dated Feb. 9, 2006. Thereafter, this Court issued an Order directing the refiling of the Memoranda of Law and Affidavits with certain redactions to preserve any privileged information to be available on the public docket. Dkt. No. 444. At the Hearing, and in accordance with *In re New York Times Co.*, 828 F.2d 110, this Court made "specific, on the record findings . . . demonstrating that [sealing] is essential to preserve higher values and is narrowly tailored to serve that interest." 828 F.2d 110, 116 (internal quotation marks and citations omitted) (cited in Dkt. No. 444 at p. 2). Accordingly, all redactions were specifically found to be necessary to preserve the higher value of preserving the attorney-client privilege, and this Court cannot emphasize enough that disclosure therein would necessarily moot the issue currently before the Court. In addition to setting deadlines for filing on the public docket and hard copies to be mailed to the litigants, we also reset the Reply deadline for February 15, 2006. *Id.*

The Plaintiffs initially filed their Reply Memorandum of Law and Exhibits under seal due to the inclusion of possibly privileged material. Based on the Court's suggestion, the litigants entered into

---

[11] Though they consented to the extensions, the Newspapers have consistently maintained, as they emphasize in their Memorandum of Law, that this Court has not obeyed the Second Circuit's Mandate of acting expeditiously on the issues set forth by the Second Circuit, that the briefing schedule itself is a violation of their common law and First Amendment rights of access to the sealed documents, and that such violations are compounded by each passing day the documents remain under seal. *See, e.g.,* Dkt. No. 441 at n.5 ("*The Post-Standard* has serious reservations as to whether the briefing schedule established by the Court's January 20 and January 30 Orders (Docket Nos. 430 and 440) complies with the need for expeditious review of the public's access rights required by the Second Circuit Decision and Mandate (issued on January 10, 2006, and docketed in the District Court on January 19, 2006) in order to avoid the irreparable injury caused by the loss of First Amendment freedoms for even minimal periods of time.")

a stipulation, which was signed by the Court, setting forth the redactions that would be made in order to place the Plaintiffs' submission on the Docket and available for public viewing. The redactions were again necessary to preserve any alleged privilege. The continuing objections of both Plaintiffs and Newspapers were noted in the Stipulation. Dkt. No. 460.

   As previously directed, the Parties filed their respective replies and the matter was fully briefed and ripe for our review. Dkt. Nos. 445-56 & 460-462. Then, as the Court was undertaking its review of the matter, and without first obtaining Court permission, the Plaintiffs submitted to this Court, via hand delivery on February 21, 2006, the Power Point Presentation prepared by Defendants for presentation at the June 28, 2005 Oral Argument, which was subsequently cancelled. *See supra* note 2; *see also infra* notes 14, 36 and Part II.D at p. 55. According to the Plaintiffs, the Defendants had submitted the Presentation to Judge Mordue after they were informed that the Oral Argument was adjourned. The Presentation is not currently a part of the Court's docket and this Court does not possess first-hand knowledge as to whether Judge Mordue actually received the Presentation. The Court then received a letter on behalf of Defendants, dated February 22, 2006, essentially objecting to the Plaintiffs' late submission and questioning its relevance. On February 23, 2006, the Court held another Hearing on the record with all litigants to discuss whether the Court would accept the Plaintiffs' late submission and whether the submission should be shared with the Newspapers. After hearing all arguments, the Court issued an Order whereby we noted the untimeliness of the submission and further questioned the relevance of the submission in light of the Second Circuit's Mandate as well as the fact that the Presentation itself is not currently a part of the record. Dkt. No. 463. Therefore, the Court did not accept the submission nor make it a part of the record. Nevertheless, we did preserve the submission in a sealed envelope. Due to some attorney-client privileged information contained in the

Presentation, we directed that the Presentation remain under seal and not be served on the Newspapers.[12]  On February 24, 2006, the Newspapers informed the Court that subsequent to the Hearing but prior to the issuance of the February 23rd Order, the Newspapers received both Plaintiffs' and Defendants' letters.[13]  Dkt. No. 465.  At that point, the Court again reviewed the letters and determined that in light of the service of the letters and the fact that no privileged information was disclosed therein, the portion of our February 23rd Order directing sealing of the letters was stricken, but all other provisions of that letter remained in effect.  Dkt. No. 466, Text Order, dated Feb. 24, 2006.  Thereafter, upon stipulation by the litigants which was endorsed by the Court, a redacted version of the Power Point Presentation was shared with the Newspapers.  Dkt. No. 469.[14]

## II.  DISCUSSION

### A.  Nature of the Instant Application to Intervene

Initially, the Court is compelled to address the procedural mechanism by which the Proposed Intervenors seek to join this civil action.  Federal Rule of Civil Procedure 24 governs when parties seek to intervene, whether the intervention sought is as of right or with permission from the court.  According to Rule 24, a party <u>shall</u> be permitted to intervene as of right,

> (1) when a statute of the United States confers an unconditional right to intervene; or
> (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that

---

[12] The Newspapers' continuing objection to even provisional sealing was noted.

[13] Though the Plaintiffs' and Defendants' letters indicated a copy had been sent to the Newspapers, it was represented at the Hearing that no such letters had been received.

[14] The submission of the Stipulation by the parties was truly fortuitous.  This Court, in retrospect, contemplated revisiting its February 23, 2006 Order, with the expectation that within this Report and Recommendation we would analyze, consistent with the Second Circuit Mandate, the sealing or possible unsealing of the Power Point Presentation.  By filing this Stipulation, which has been "so ordered," the Court's analysis and ultimate conclusion have been rendered moot in that the Stipulation is consistent with the contemplative result we were prepared to recommend.

interest, unless the applicant's interest is adequately represented by existing parties.
FED. R. CIV. P. 24(a).

Permissive intervention, however, is governed by Rule 24(b), which states that anyone <u>may</u> be permitted to intervene,

> (1) when a statute of the United States confers a conditional right to intervene; or
> (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

FED. R. CIV. P. 24(b).

Regardless of whether intervention is sought as of right or on permission, the Rule requires pursuit of a "timely application."  Determination of the timeliness of an intervention application, whether by right or permission, is within the sound discretion of the trial court viewed from all circumstances.  *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994).  The Second Circuit has suggested the following four factors in considering whether a motion to intervene is timely: "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness."  *Id*.; *see also Brooks v. Sussex County State Bank*, 167 F.R.D. 347, 350 (N.D.N.Y. 1996) (quoting factors set forth in *Pitney Bowes*).

Though the Newspapers failed to specify whether they were seeking intervention as of right or by permission, the Second Circuit has suggested that Rule 24(b) is the proper procedural route for intervention by a non-party into a private civil action for the purpose of challenging a confidentiality order in an effort to gain public access to the court record.  *See Palmieri v. State*, 779 F.2d 861, 864 (2d Cir. 1985); *Martindell v. Int'l Tel. and Tel. Corp*, 594 F.2d 291, 293 (2d Cir. 1979); *United States v.*

*Town of Moreau*, 979 F. Supp. 129, 132 (N.D.N.Y. 1997) (Kahn, D.J.); *see also Diversified Group, Inc. v. Daugerdas*, 217 F.R.D. 152, 157 (S.D.N.Y. 2003) (stating that Rule 24(b) is the proper procedure for a third party to seek modification of a protective order in a private suit) (citing cases).

We find that, essentially, through their Intervention Motion, the Newspapers seek modification of the March 2001 Confidentiality Order since, by their Motion, they seek access to documents that were filed under seal pursuant to the Confidentiality Order.  Dkt. No. 55, Confidentiality Order at ¶ 12 (specifically covering motions and other filings with the Court as subject to the terms of the Order); *see also infra* App. B.[15]  This Court is fully acquainted with both the terms and applicability of the Protective Order at issue since we have written multiple decisions and entertained countless discussions on this somewhat infamous order.  The Protective Order to which we refer was signed by the Honorable Ralph W. Smith, retired United States Magistrate Judge, on March 14, 2001, and has been utilized, with equal force, by all parties throughout the various and lengthy stages of this litigation.  Dkt. No. 55.

When a party has reasonably relied on a protective order granted under Federal Rule of Civil Procedure 26(c), a court should not modify such order "absent a showing of improvidence in the grant[ing] of [the] order or some extraordinary circumstance or compelling need."  *S.E.C. v. TheStreet.com*, 273 F.3d 222, 229 (2d Cir. 2001) (quoting *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir. 1979) (other citations omitted).  Unlike in *Martindell*, we deal here with documents submitted in opposition to Motions for Summary Judgment, not simply exchanged discovery materials.  And, as noted by the Second Circuit, any reasonable reliance of the perpetual secrecy of the documents exchanged is doubtful in light of the specific terms of this Confidentiality Order.  Accordingly, the strong presumption against modification enunciated in *Martindell* and *SEC* does not

---

[15] *See* Appendix B, attached to this Report and Recommendation, for a reproduction of the terms of the Confidentiality Order.

have as much weight here. *SEC v. TheStreet.com*, 273 F.3d at 229-30 (quoting F<small>ED</small>. R. C<small>IV</small>. P. 26(c) ("Without an ability to restrict public dissemination of certain discovery materials that are never introduced at trial, litigants would be subject to needless 'annoyance, embarrassment, oppression, or undue burden or expense.'"); *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d at 295-96 ("[T]he vital function of a protective order issued under Rule 26(c) . . . is to "secure the just, speedy, and inexpensive determination" of civil disputes . . . by encouraging full disclosure of all evidence that might conceivably be relevant."); *see also* F<small>ED</small>. R. C<small>IV</small>. P. 26(c).

As noted by the Second Circuit, during the pendency of this litigation, Defendants have been "involved in lobbying the New York State Senate and the governor's office to obtain various tax credits and other sources of public funding to construct a highly publicized mega-mall in Syracuse, New York called "DestiNY USA." Dkt. No. 428 at p. 4; *Lugosch V*, 435 F.3d at 113. Indeed, in support of their Motion to Intervene, the Newspapers submit various affidavits with attached articles chronicling the extensive coverage of the DestiNY USA undertaking. *See generally* Dkt. Nos. 358, 360, 363, 367, & 368. Thus, thought not a critical element of the underlying litigation, the Newspapers have an interest in reporting on matters affecting the DestiNY USA undertaking. Though the Newspapers have known about the Confidentiality Order for some time, the Motion to Intervene was timely filed as it relates to the public's right of access to the documents filed in connection with Defendants' Motions for Summary Judgment. Furthermore, while the Plaintiffs and Defendants have both endured significant briefing on the Intervention issue, there exists no undue delay of the litigation at this point since the Summary Judgment Motions are fully briefed and ready for the District Judge's review. The potential prejudice to the Newspapers, however, in seeking to intervene on behalf of the public, is considerable. Again, while the reasonable reliance on the Confidentiality Order has been called into question by the

Second Circuit, this Court need not address reliance here as it relates to the Newspapers' standing to intervene since the common law and First Amendment right to judicial documents, which the Second Circuit found clearly applicable here, are without doubt proper bases to modify the Protective Order at issue.  "The Second Circuit Court of Appeals and its district courts consistently have held that news agencies have standing to challenge protective orders in cases of public interest." *Savitt v. Vacco*, 1996 WL 663888, at *7 (N.D.N.Y. Nov. 8, 1996) (citing, *inter alia*, *In re Dow Jones & Co., Inc.*, 842 F.2d 603, 608 (2d Cir.), *cert. denied*, 488 U.S. 946 (1988)).  We find therefore, that the Newspapers may properly intervene in this action.  We now analyze whether they are entitled to the specific relief sought through their intervention.

### B.  Admissibility of Summary Judgment Documents

We first address the Defendants' contention that the Subject Documents are not judicial documents.  The Defendants reason that, in finding the documents submitted in a summary judgment motion were judicial documents, the Second Circuit <u>assumed</u> that the documents submitted were admissible as governed by Federal Rule of Civil Procedure 56.  Rule 56(e) states that a motion for summary judgment may be supported by affidavits which "shall set forth such facts as would be admissible in evidence" and all papers referred to in such affidavits shall be attached thereto.  Defendants deduce that since the documents submitted by the Plaintiffs were not "admissible" documents, such documents are simply not judicial documents.

We think the Defendants' analysis presumes too much.  It is true that in assessing what constitutes a judicial document, the Second Circuit, citing to a Third Circuit case, stated that the Plaintiffs' responsive submissions on summary judgment "may similarly be assumed to have supported their papers with admissible evidence and non-frivolous arguments."  Dkt. No. 428 at p. 19; *Lugosch*

*V*, 435 F.3d at 122.  In making this statement, the Second Circuit was addressing Defendants', and previously this Court's, view that whether a document constituted a judicial document depended on the outcome of a summary judgment motion.  The Second Circuit rejected this notion as did they reject the idea that what constituted a judicial document was somehow connected to which party filed the document.  In making these assertions, the Second Circuit joined other sister circuits who have held that summary judgment is an adjudication of substantive rights and that the presumption of access attaches to documents filed in connection with a summary judgment motion. Dkt. No. 428 at pp. 19-20; *Lugosch V*, 435 F.3d at 122-23.  Thus, "by virtue of having been submitted to the court as supporting material in connection with a motion for summary judgment[,]" regardless of which party filed the submission, the documents at issue were deemed to be judicial documents under both the common law and the First Amendment.  *Id.*  Whether the District Judge ultimately finds the submitted papers to be inadmissible or improperly submitted is a decision subject to the public's right to monitor.  As the Second Circuit noted, it was incorrect to assume that different types of documents receive different weights of presumption based upon the extent to which the judge relied on them in deciding the motion.  "If the rationale behind access is to allow the public an opportunity to assess the correctness of the judge's decision . . . documents that the judge *should* have considered or relied upon, but did not, are just as deserving of disclosure as those that actually entered into the judge's decision." *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 101 F.R.D. 34, 43 (C.D. Cal. 1984) (emphasis in original) (internal citations omitted) (quoted in *Lugosch V*, 435 F.3d at 123).  "Moreover, '[o]nce those submissions come to the attention of the district judge, they can fairly be assumed to play a role in the court's deliberations.'" *Lugosch V*, 435 F.3d at 123 (quoting *Fed. Trade Comm'n v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 409 (1st Cir. 1987)).  Such reasoning is *apropos*

in this case where Plaintiffs contest that the documents are subject to any privilege at all.

Clearly then, the admissibility or inadmissibility of Plaintiffs' submission is not dispositive of whether the documents are judicial documents. The Second Circuit Mandate could not be clearer on this point. Further, in assessing the weight of the presumption of access to such judicial documents, again, the fact that the documents may ultimately be deemed inadmissible does not in any manner overcome the strong presumption. This Court is not persuaded that potential admissibility constitutes a compelling interest or countervailing factors. In this regard, we agree with both the Newspapers and Plaintiffs that Defendants had other procedural vehicles to challenge the admissibility of the Plaintiffs' submission, such as a motion to strike. The Defendants could not have reasonably relied on the Confidentiality Order in failing to take timely action on Plaintiffs' purportedly improper submission since, while the Confidentiality Order does by its terms cover documents submitted in a motion, the Confidentiality Order does not give any party the authority to disobey the Federal Rules of Civil Procedure. Defendants counter that they contest the admissibility of the documents in their Reply papers. While such may be the case, the Court notes that it is not clear whether they sought the documents to be stricken from consideration altogether. We therefore recommend a finding that the issue of admissibility in no way affects the public's right of access.

### C. Analysis Under Second Circuit Mandate

We now commence our analysis as directed by the Second Circuit's Mandate. Based upon the privilege log and the arguments presented by Defendants to preserve the confidentiality of these Contested Documents and the Plaintiffs' and Newspapers' opposition, we are confronted with only two asserted privileges -- attorney-client privilege and work product doctrine.

1.  Attorney-Client Privilege

The attorney-client privilege is a longstanding, common law privilege recognized in New York and by the federal courts under FED. R. EVID. 501. It is one of those "bedrock principle[s] of our justice system [which has been sustained] for hundred[s] of years," dating back to the 1600s. *See* AM. LAW INST. - ABA - ATTORNEY-CLIENT PRIVILEGE (May 15, 2005) at p. 87; *United States v. Blizerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (citing 8 J. WIGMORE, EVIDENCE, at § 2290, at pp. 542-44 (McNaughton rev. 1961) (the privilege being the oldest known - "[the] most ancient of confidential communication privileges")). This rule has been immortalized as a legal doctrine for eons to encourage full engagement between a party and her attorney so that full and frank communication exists to impart all the information an attorney may need in order to give sage and cogent advice on the matter. *Swidler Berlin v. United States*, 524 U.S. 399, 403 (1998); *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir. 1989) ("[The] communications between attorney and client endures as the oldest rule of privilege known to the common law."). Stated another way, its essential purpose is to encourage clients to be fully forthcoming with their attorney and to receive, in return, advice which will protect the client's legal rights. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ.*, 1996 WL 14448, at *4 (S.D.N.Y. Jan. 16, 1996) (citing, *inter alia*, *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.), *cert. denied,* 414 U.S. 867 (1973)). The free-flow of information and the twin tributary of advice are the hallmarks of the privilege. For all of this to occur, there must be a zone of safety for each to participate without apprehension that such sensitive information and advice would be shared with others without their consent. *In re Grand Jury Subpoena Duces Tecum Dated November 16, 1974*, 406 F. Supp. 381, 386 (S.D.N.Y. 1975) ("The sine qua non of the attorney-client-privilege is . . . a confidence reposed . . . .").

When determining if there is in fact an attorney-client privilege present to cloak both the client's

communication and the corresponding legal advice, a court needs to ascertain that this safety net attaches to only those communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived. *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997) (citing *In Re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036 (2d Cir.1984)); *Madanes v. Madanes*, 199 F.R.D. 135, 143 (S.D.N.Y. 2001) (citing, *inter alia*, *In re Richard Roe, Inc.*, 68 F.3d 38, 39-40 (2d Cir.1995) & quoting *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir.1961)); *see also* 8 WIGMORE, EVIDENCE § 2292.  This privilege, as previously stated, further attaches to the advice rendered by the attorney.  *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943-44 (2d Cir. 1992).   The burden of proving each element of the privilege rests on the party claiming the protection.  *In re Horowitz*, 482 F. 2d at 82.

Contrary to modern yet ill-informed perceptions, the attorney-client privilege is often "[n]arrowly defined, riddled with exceptions, and subject to continuing criticism." *United States v. Schwimmer*, 892 F.2d at 243.  Grand as the privilege stands in our legal lexicon, it is nonetheless narrowly defined by both scholars and the courts. *Univ. of Pa. v. E.E.O.C.*, 493 U.S. 182, 189 (1990).[16] The attorney-client privilege is not given broad, unfettered latitude to every communication with a lawyer, but is to be narrowly construed to meet this narrowest of missions. *Fisher v. United States*, 425

---

[16] There is the general maxim that the public, particularly within the judicial forum, is entitled to be exposed to "everyman's evidence." 8 WIGMORE, EVIDENCE § 2317 (McNaughton rev. ed. 1961).  The quest is for the truth of the matter to flow forward before the court, and  "[t]he suppression of truth is a grievous necessity at best . . . [only justified] when the opposed private interest is supreme."  *In re Megan-Racine Assocs., Inc.*, 189 B.R. 562, 570 (Bankr. N.D.N.Y. 1995) (citing *McMann v. Sec. and Exch. Comm'n*, 87 F.2d 377, 378 (2d Cir. 1937)).  But since the attorney-client privilege "stands in derogation of the public's right to everyman's evidence, . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of the principle."  *In re Grand Jury Proceedings v. John Doe*, 219 F.3d 175, 182 (2d Cir. 2000) (citing *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214).

U.S. 391, 403 (1976) ("However, since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose."); *see also In re Horowitz*, 482 F.2d at 81 (privilege ought to be "strictly confined within the narrowest possible limits consistent with the logic of its principle") (quoting 8 WIGMORE § 2292 at 70); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214.

There isn't any dispute that a corporation's "in-house counsel" is afforded the same protection as an outside counsel with respect to this privilege, *Upjohn Co. v. United States*, 449 U.S. 383, and it is axiomatic that the same is true for partnerships' internal attorneys. *In re Bieter Co.*, 16 F.3d 929, 935 (8th Cir. 1994) (reasoning that the rules regarding the attorney-client privilege of corporations are no less instructive when applied to a partnership or some other client entity not an individual); *Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 414 n.34 (S.D.N.Y. 2004) (citing, *inter alia*, *United States v. Campbell*, 73 F.3d 44 (5th Cir. 1996) and holding that "there is no logical reason to distinguish partnerships from corporations or other legal entities in determining the client a lawyer represents" and that "the rules regarding the attorney-client privilege of corporations are no less instructive when applied to a partnership")). Consistently, the privilege also protects communications between in-house counsel and the corporation's outside attorneys as well. *United States Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156, 160 (E.D.N.Y. 1994) (citing *Upjohn Co. v. United States*, 449 U.S. at 395).

Factual investigations by an attorney or its agents, which include gathering statements from employees, clearly fall within the attorney-client rubric. *Upjohn Co. v. United States*, 449 U.S. at 390-91; *United States v. Davis*, 131 F.R.D. 391, 398 (S.D.N.Y. 1990) (citing *Upjohn Co.* for the proposition that the attorney-client privilege encompasses factual investigations). The Supreme Court observed

-27-

that attorneys dealing with a complex legal problem such as this are

> thus faced with a 'Hobson's choice'. If he interviews employees not having 'the very highest authority', their communications to him will not be privileged. If, on the other hand, he interviews *only* those employees with the 'very highest authority,' he may find it extremely difficult, if not impossible, to determine what happened.

*Upjohn Co*., 449 U.S. at 391-392 (citations omitted).

That being so, statements made by employees, of any station or level within a corporation or a sophisticated business structure, to an attorney or the attorney's agent which were done in confidence and outside the purview of others are protected. *Bruce v. County of Rensselaer*, 2003 WL 355460, at *2 (N.D.N.Y. Feb. 11, 2003) (citing *UpJohn Co.*, 449 U.S. at 393-396 & *United States v. Int'l Bhd. of Teamsters*, 119 F.3d at 214); *United States v. Davis*, 131 F.R.D. at 398. And, if the attorney-client privilege extends to employees' statements, surely it extends to the attorneys' notes, memoranda, and files pertaining to those statements. *Upjohn Co.*, 449 U.S. at 388-90 (questionnaires submitted to corporate employees not disclosed); *Carter v. Cornell Univ.*, 173 F.R.D. 92, 94-95 (S.D.N.Y. 1997) (interview notes not disclosed). But it should be absolutely clear that there is a line of demarcation between attorney driven versus management conducted investigations: the attorney-client privilege will not be a safe harbor for internal investigations conducted by management itself. *In re Grand Jury Subpoena*, 599 F.2d 504, 510 (2d Cir. 1979).

But, making statements to an in-house attorney, in and of itself, does not render the communication or the advice privileged. The curious character of an in-house counsel is that they generally have multiple roles and frequently give to their client business, management or other advice in addition to legal advice. *Colton v. United States*, 306 F.2d 633, 638 (2d Cir.), *cert. denied* 371 U.S. 951 (1963); *MSF Holding, Ltd. v. Fiduciary Trust Co. Intern.*, 2005 WL 3338510, at * 1 (S.D.N.Y. Dec. 27, 2005). And these dual functions are very likely to become mixed, in some degree obfuscating

the true nature of the function performed.  *Bank Russells Lambert v. Credit Lyonnais (Suisse)*, 220 F.

Supp. 2d 283, 286 (S.D.N.Y. 2002).  Therefore, the request for legal advice must be distinctly clear and

void of nuances of business consultation or instruction, if it is to be privileged.  *United States v.*

*Millman,* 822 F.2d 305, 310 (2d Cir. 1987) (the party has to show that attorney-client communications

were not related to his role as business advisor); *In re Grand Jury Subpoena Duces Tecum Dated Sept.*

*15, 1983*, 731 F.2d at 1037 ("[T]he privilege is triggered only by a client's request for legal, as

contrasted with business advice."); *United States Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F.

Supp. at 160 (stating that "if the communication is made to the attorney in her capacity as a business

adviser . . . it ought not be privileged"); *Rattner v. Netburn*, 1989 WL 223059, at *6 (S.D.N.Y. June

20, 1989) (ruling that the communication must be characterized as **predominately** legal in order for

the privilege to apply) (emphasis added).  To ensure that the attorney-client privilege remains affixed

to the communication and/or advice, the corporation has the burden of establishing that the

communication was for the purpose of procuring legal advice.  *In re Grand Jury Subpoena*, 599 F.2d

at 510.  Because of the duality of the advice, a court must assume the very complicated task of

inquiring into the subject matter of the communication in order to determine its true characteristic.

*Elliot Assocs., L.P. v. Republic of Peru*, 176 F.R.D. 93, 97 (S.D.N.Y. 1997) (citing *Colton v. United*

*States*, 306 F.2d at 636) (opining that the inquiry should be of a "sufficient abstract level so as to not

reveal the substance of the advice").  When the ultimate decision is based upon both legal and business

considerations, the business and management aspect of the discussion will not be as fortunate in

receiving protection by the privilege.  *TVT Records v. Island Def Jam Music Group*, 214 F.R.D. 143,

144 (S.D.N.Y. 2003) (citing *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d

at 1037 (protects legal advice not business));[17] *Fine v. Facet Aerospace Prod. Co.*, 133 F.R.D. 439, 444

(S.D.N.Y. 1990); *Hardy v. New York News, Inc*., 114 F.R.D. 633, 643-44 (S.D.N.Y. 1987); *United*

*States v. Schenectady Sav. Bank*, 525 F. Supp. 647, 650 (N.D.N.Y. Oct. 28, 1981) (citing *Colton v.*

*United States*, 306 F.2d at 638, for the proposition that tax advice is not protected).  To this extent, a

court may have to parse not only the words but their intent in order to glean the authentic purpose of

the communication.

     2.  Work Product Doctrine

     Whenever the attorney-client privilege is raised in on-going litigation, concomitantly the work

product doctrine is virtually omnipresent.  They are inseparable twin issues, and when one is advanced,

surely the other will follow.  The work product privilege is more broad than the attorney-client

privilege.  *In re Grand Jury Proceedings*, 219 F.3d 175, 190 (2d Cir. 2000).  This privilege exists to

protect attorneys' mental impressions, opinions, and/or legal theories concerning litigation.  *Horn &*

*Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir. 1989).  Indeed, the work product privilege is

designed to protect an adversarial system of justice and has been analyzed in that context by the

Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947).  This doctrine establishes a "zone

of privacy" in which a lawyer can prepare and develop theories and strategies with an eye towards

---

[17] Defendants stake as well settled law "that a communication between counsel and client addressing both legal and non-legal matters is covered by an attorney-client privilege if 'a dominant purpose of the communication was to obtain legal advice.'"  Dkt. No. 453, Defs.' Reply Mem. of Law, dated Feb. 15, 2006, at p. 1 (quoting *United States Postal Serv. v. Phelps Dodge Refining Corp*., 852 F. Supp. at 163); *see also* Defs.' Reply Mem. of Law at p. 3 (citations omitted).  The current view, as stated above, of whether all communication within a mixed legal and nonlegal communication is protected is inapposite to both Defendants' assertion and *Phelps Dodge's* dictum.  *TVT Records v. Island Def Jam Music Group* reiterates the Second Circuit's settled principles on this issue:

     The Second Circuit has made clear that only those communications related to 'legal, as contrasted with business, advice' are protected.  *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1037; *see In re John Doe Corp.*, 675 F.2d 482, 488 (2d Cir.1982).

214 F.R.D. at 144 (quotation in original); *see also Altronic Intern., GMBH v. SAI Semispecialists of* Am., 232 F.R.D. 160, 163 (E.D.N.Y. 2005).

litigation free from unnecessary intrusion by his or her adversaries.  *United States v. Adlman*, 68 F.3d

1495, 1500-01 (2d Cir. 1995) (*"Adlman I"*) (citing *United States v. Nobles,* 422 U.S. at 238 & *Hickman*

*v. Taylor*, 329 U.S. 495); *see also In re Minebea Co., Ltd.*, 143 F.R.D. 494, 499 (S.D.N.Y. 1992).  Of

course the burden, albeit not a heavy one, of establishing that the work product doctrine applies rests

with that party's attorney who is claiming the protection.  The work product doctrine, as well as the

attorney-client privilege, "does not extend to every document generated by the attorney; it does not

shield from disclosure everything a lawyer does."  *Rattner v. Netburn*, 1989 WL 223059, at *6.  The

doctrine is generally invoked as soon as the attorney, in responding to a request for production of

documents, serves upon the requesting party a privilege log asserting this and any other relevant

privilege or provides notification that it will not be disclosed for this reason.  FED. R. CIV. P. 26(b)(5)

& 34(b).  Failure to timely provide the privilege log or objection constitutes a waiver of any of the

asserted privileges.  Even if a party follows these steps, the security of the work product doctrine is not

assured.  There must be the omnipresent concern that revealing the attorney's mental processes is real

and not just speculative.  *Gould Inc. v. Mitsui Mining & Smelting Co., Ltd.*, 825 F.2d 676, 680 (2d Cir.

1987).

     FED. R. CIV. P. 26(b)(3) provides a relevant rule on the discovery of work product material.  It

reads in part:

> [A] party may obtain discovery of documents and tangible things otherwise
> discoverable under subdivision (b)(1) of this rule and prepared in anticipation of
> litigation or for trial by or for another party or by or for that other party's representative
> (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)
> only upon a showing that the party seeking discovery has substantial need of the
> materials in the preparation of the party's case and that the party is unable without
> undue hardship to obtain the substantial equivalent of the materials by other means.  In
> ordering discovery of such materials when the required showing has been made, the
> court shall protect against the disclosure of the mental impressions, conclusions,
> opinions, or legal theories of an attorney or other representative of a party concerning

the litigation.

It is important to note that the work product doctrine classifies documents into two categories: "non-opinion" work product and "opinion" work product. The distinction between these two categories turns on the effort employed in obtaining disclosure pursuant to Rule 26(b)(3). For "non-opinion" work product, the party seeking this information must show a substantial need for the document and undue hardship to acquire the document or its substantial equivalent by other means. On the other hand, "opinion" work product requires a higher protection to the extent that the requesting party has to demonstrate extraordinary justification before the court will permit its release. *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 521 (S.D.N.Y. 2001) (citing *In re Sealed Case*, 676 F.2d 793, 809-10 (D.C. Cir. 1982)); *see also Upjohn Co. v. United States*, 449 U.S. at 401. At a minimum, such "opinion" work product should remain protected until and unless a highly persuasive showing is made. *In re Grand Jury Proceedings*, 219 F.3d at 191; *United States v. Adlman*, 134 F.3d 1194, 1204 (2d Cir. 1998) (*"Adlman II"*). In a similar vein, in most instances, the work product doctrine does not extend to facts. Generally, non-privileged facts should be freely discoverable. *Compare In re Savitt/Adler Litig.*, 176 F.R.D. 44, 48 (N.D.N.Y. 1997) *with In re Grand Jury Subpoena dated Oct. 22, 2001*, 282 F.3d 156, 161 (2d Cir. 2002).

"[W]here a party faces the choice of whether to engage in a particular course of conduct virtually certain to result in litigation and prepares documents analyzing whether to engage in the conduct based on its assessment of the likely result of the anticipated litigation, [it should be] conclude[d] that the preparatory documents should receive protection under Rule 26(b)(3)." *Adlman II,* 134 F.3d at 1196. The crux being that a document which has been prepared because of the prospect of litigation will not lose its protection under the work product doctrine, even though it may assist in

*-32-*

business decisions. *Adlman I*, 68 F.3d at 1502; *Strougo v. BEA Assocs.*, 199 F.R.D. at 521. But this protection will not be extended, under any circumstances, to records that are prepared in the ordinary course of business. *Adlman I*, 68 F.3d at 1502. Even though the work product doctrine protects the impressions, opinions, theories, and strategies of an attorney, Rule 26(b)(3) makes clear that the document at issue, either obtained or prepared by or for a party, or by or for his representative, may be cloaked by this doctrine as well. *Id.* This maxim makes sound sense considering how complex litigation can be and the undeniable need for others to assist in developing all that is necessary to prosecute or defend a lawsuit. Obviously, impressions and strategies are not always created in a vacuum, but, rather are generated in cogent discourse with others, including the clients and agents. Further, the exchange of such documents and ideas with those whose expertise and knowledge of certain facts can help the attorney in the assessment of any aspect of the litigation does not invoke a waiver of the doctrine. *United States v. Nobles*, 422 U.S. at 239; *Adlman I*, 68 F.3d at 1502.[18]

In terms of the presumptive access to judicial documents that are an integral part of a motion for summary judgment, it is this Court's opinion that the attorney-client privilege and the work product doctrine are of the highest values within our judicial system.

### 3. Waiver of Attorney-client Privilege and Work Product Doctrine

There are circumstances, and permutations thereof, that cause waivers upon waivers to these less than sacrosanct rules. Cynthia B. Feagan, Comment, *Issues of Waiver In Multiple-Party Litigation: The Attorney-Client Privilege and the Work Product Doctrine*, 61 UMKC L. REV. 757 (1993); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, (4th ed. 2001). Considering that the attorney-client privilege protects communications and the work product doctrine

---

[18] We note however that the Plaintiffs do not advance the argument that there is a substantial hardship which would permit disclosure pursuant to the guidelines set forth in Rule 26(b)(3).

protects tangible items which may contain strategies, impressions, and attorney's opinions, both the privilege and the doctrine may be waived in various ways including sharing such documents with a third party. *In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. 13, 22-28 (W.D.N.Y. 1997) (survey of the various types of implicit and explicit waivers); *see also* Feagan, Comment, *Issues of Waiver in Multiple-Party Litigation*, 61 UMKC L. REV. at 775-77. We need not now address all of the potential waivers and exceptions to the attorney-client privilege and the work product doctrine, but it is necessary in the context of this case to first draw upon those waivers which invariably cause lawyers the greatest angst, and may be problematic in this case. *See In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. 13.

### *a. Third Party Waiver*

The waiver to which we speak is whether the client's communication(s) or the legal advice given was shared, in some form or fashion, with a third party. A waiver such as this may be done explicitly or implicitly, or rather, intentionally or inadvertently. 6 JAMES M. MOORE ET AL, MOORE'S FEDERAL PRACTICE § 26.49[5] (3d ed. 2005); In re *Pfohl Bros. Landfull Litig*, 175 F.R.D. at 24-26. Obviously, when communications between a party and her attorney occur in the presence of a third party, the privilege **may** be waived. *United States v. Am. Tel. and Tel. Co.*, 642 F.2d 1285, 1298-99 (D.C. Cir. 1980). Yet, a disclosure to a third party does not waive the privilege unless such disclosure is inconsistent with the "maintenance of secrecy" and if the disclosure "substantially increases the possibility of an opposing party obtaining the information." *GAF Corp. v. Eastman Kodak Co.*, 85 F.R.D. 46, 51-52 (S.D.N.Y. 1979). For example, an exemption from the waiver accrues if such communications are shared with an agent of the attorney, which may include investigators and accountants retained to assist the attorney in rendering legal advice and instruction. *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) (accountant); *United States v. McPartlin*, 595 F.2d 1321,

*-34-*

1336-37 (7th Cir. 1979) (investigator); *United States v. Kovel*, 296 F.2d 918, 921-24 (2d Cir. 1961) (disclosures to an accountant does not waive attorney-client privilege).

      As noted above, the work product doctrine is not absolute either.  Such protection, like any other privilege, can be waived and the determination of such a waiver depends on the circumstances.  *United States v. Nobles*, 422 U.S. at 239-40.  In fact, in most respects, the discussion of a third party waiver is virtually the same for both the attorney-client privilege and the work product doctrine.  A voluntary disclosure of work product, for some or any inexplicable benefit, to a third party, especially if the party is an adversary, may waive the immunity.  *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 234-37 (2d Cir. 2000); *see also In re Grand Jury Proceedings*, 219 F.3d at 191; *Strougo v. BEA Associates,* 199 F.R.D. at 521-22.  Once a party allows an adversary to share in an otherwise privileged document, the need for the privilege disappears, and may disappear forever, even as to different and subsequent litigators.  *In re Steinhardt Partners*, 9 F.3d at 235 (citing *United States v. Nobles,* 422 U.S. at 239).  As an illustration, when a party makes a strategic decision, no matter how broad and sweeping or limited, to disclose privilege information, a court can find an implied waiver.  *In re Grand Jury Proceedings.* 219 F.3d at 190-92.  Moreover, a party cannot partially disclose a privileged document nor selectively waive the privilege and then expect it to remain a shield.  *Id*. at 191.  However, there is no *per se* rule that all voluntary disclosures constitute a waiver of the work product doctrine because there is no way the court can anticipate all of the situations when and how such disclosure is required.  *In re Steinhardt Partners*, 9 F.3d at 236 (*i.e.*, privilege not waived if shared with someone of common interest).  There are times when a waiver can be broad and other times when it has to be narrowly construed.  Each case must be judged on its own circumstances and merits.  *See Strougo v. BEA Associates*, 199 F.R.D. at 521-22.

Plaintiffs strongly intimate that the Defendants voluntarily disclosed confidential attorney-client privilege and work product doctrine documents and failed to maintain the confidence of these documents when they revealed these documents to them pursuant to the Confidentiality Order. *See* Dkt. No. 55, Confidentiality Order, dated Mar. 14, 2001. Any reliance upon the Confidentiality Order by the Defendants as to documents claimed to be protected by the attorney-client privilege and the work product doctrine is, in Plaintiffs' view, inalterably incorrect and misplaced. Dkt. No. 455, Pls.' Reply Mem. of Law, dated Feb. 15, 2006, at pp. 2-4, & 5. By charging that Defendants have attempted to misinform this Court as to the breadth of the Confidentiality Order, it is the Plaintiffs who are truly misleading, or gravely mistaken. Plaintiffs disingenuously state that the Confidentiality Order protects "confidential or proprietary business information or trade secrets" and that is the "only material that Plaintiffs 'recognized' and 'agreed on the need to protect' when they entered into the Confidentiality Order . . . 'Privilege' material is not protected by this Confidentiality Order." *Id*. at pp. 2-3. These parties knew that during the discovery process they would be sharing millions of pages of documents, of all kinds and character, which would invariably include privileged documents, in order to avoid the tortuous and time consuming task of reviewing beforehand all of the documents for the purpose of complying with discovery requests. Hence, a more literal, accurate, and workable reading of the Confidentiality Order, as a whole, intelligently entered into by both parties, makes transparent that "inadvertent disclosure of any privileged or work product information in connection with the litigation shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine or any other applicable privilege." Dkt. No. 55, Confidentiality Order at ¶ 19. Plaintiffs' argument is inconsistent with previous entanglements this Court had to address during the toilsome course of this litigation with regard to the exchange of confidentiality information. Thus, there was no waiver of the

privilege by virtue of disclosing privilege documents under the Confidentiality Order.[19]

### b. Business Structure and Waiver Issue

The general rules governing waivers are more complicated when the issue arises in the corporate or complicated legal entity context:

> As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers. Similarly, it cannot directly waive the privilege when disclosure is in its best interest. Each of these actions must necessarily be undertaken by individuals empowered to act on behalf of the corporation.

*In re Grand Jury Proceedings v. John Doe*, 219 F.3d at 183 (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)).

The authority to waive the corporate privilege rests with the corporation's management and is "normally exercised by its officers and directors." *Id.* at 184. The same principles hold true for a partnership. *United States v. Int'l Bhd. of Teamster*, 119 F.3d at 214-215 ("[A]ttorney client privilege presents 'special problems' when asserted by corporations and other entities, since such entities must act through agents[.]"); *United States v. Campbell*, 73 F.3d 44, 47 (5th Cir. 1996) (citing *Hopper v. Frank*, 16 F.3d 92, 96 (5th Cir. 1994) (stating that "there is no logical reason to distinguish partnerships from corporations or other legal entities in determining the client a lawyer represents")); *Meoli v. Am. Med. Serv. of San Diego*, 287 B.R. 808, 816-817 (S.D. Cal. 2003) (citing, *inter alia*, *In re Bieter Co.*, 16 F.3d 929, 935 (8th Cir.1994)). In the context of a partnership, a general partner who has full agency authority has the providence to waive the attorney-client privilege. Although this legal proposition is

---

[19] Plaintiffs bring to our attention that they have repeatedly challenged Defendants blanket use of the Confidentiality Order to cloak every conceivable document sending a tangentially related to this action. Dkt. No. 442, Pls.' Mem. of Law, dated Feb. 7, 2006 at pp. 3-5. As the parties jostle over the broad expanse of the Confidentiality Order, Plaintiffs abbreviated the debate by claiming that all of the documents, as opposed to identifying specific documents, were being challenged as subject to the Confidentiality Order. This all or nothing approach failed to comply with the Confidentiality Order, which clearly states that "[i]f any party objects to the designation of any document or information as "Confidential," it may request removal of the "Confidential" designation by sending a written request to the other party identifying the document and stating the grounds for removal of the "Confidential" designation." Confidentiality Order at ¶ 8. Therefore, Defendants were proper in not addressing the request for removal until such time Plaintiffs met the condition precedent of identifying the specific document, no matter how onerous the task may have been. *See supra* notes 10 & 15.

bereft of any case law pronouncing it as a bright line rule,[20] and maybe because the principle is so painfully obvious, this Court was initially persuaded by those cases that have ruled that a trustee of a partnership in bankruptcy, who steps into the shoes of a general partner, has the authority to waive the privilege.  The pure logic of this reasoning is this: A partnership is much like a corporation inasmuch as it is an inanimate entity that can act only through its agents. When solvent, a partnership is managed by its general partners, which have the power to direct the partnership's affairs and control its property, unless otherwise limited by the partnership agreement.  In the event the partnership finds itself in bankruptcy, "the trustee steps into the shoes of the general partner and removes all power of the general partner to direct affairs and control property."  Weighing these broad powers, the trustee can waive the attorney-client privilege.  *Meoli v. Am. Med. Serv. of San Diego*, 287 B.R. at 817; *see also United States. v. Campbell*, 73 F.3d at 47; *In re Bieter Co.*, 16 F.3d at 935; *Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 414 n.34 (S.D.N.Y. 2004) (noting how other courts have extended *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985), to hold that in a partnership context a trustee for a bankrupt partnership has the authority to waive the partnership's privilege); *In re Sunrise Sec. Litg.*, 130 F.R.D. 560, 570-71 (E.D. Pa. 1989) (finding that each member of a joint venture, which is nothing more than another partnership form, can waive the privilege as to the joint venture).  The

---

[20] This Court reviewed scores of legal precedents, both federal and state law, throughout the nation, including legal treatises, and could not find one case on point that states emphatically that a general partner has the authority to waive the attorney-client privilege on behalf of the partnership, though the concept is consistent with the general agency principles of partnerships.  Although this legal proposition was mentioned repeatedly during conferences, not one party to this Motion provided any legal precedent either in support of or opposition to such principle of law, especially considering that there is cataclysmic schism between the parties as to value of the privileged documents to this litigation and whether Plaintiffs can waive the privilege.  It has been a mantra of the Defendants that Plaintiffs did not have authority to waive the partnership privilege.  For example, Defendants pronounced that "[l]ike any other partnership asset, the privilege belongs to the partnership as a whole and is not for any individual partner - plaintiff or defendant - to waive."  Dkt. No. 453, Defs.' Reply Mem. of Law at p. 2 n.2.  Yet, Defendants did not provide any legal reinforcement of their suppositions or declarations.  This Court is not of the mindset that a privilege is somehow synonymously an asset of the partnership, though that is not to say the privilege does not belong to the partnership as a whole.

inescapable conclusion then that we can reasonably extrapolate from the above discussion would be that if a trustee, who assumes the powers of a single general partner can waive the privilege, the source itself - a general partner - has the same conclusive powers. But there is conspicuous impotence with this logic as it may relate to certain partnerships that claim the privilege. We may not be able to make such a logical determination if the general partners of the partnership have delegated, by virtue of an agreement, management control over the partnership to one or more partners.

It is hornbook law that the business of a partnership is managed by the general partners who are empowered to act for and bind the partnership within the scope of the partnership. JUDSON A. CRANE AND ALAN R. BROMBERG, LAW OF PARTNERSHIP, Ch. 5, § 48 (1968); N.Y. PARTNERSHIP LAW § 20 ("Every partner is an agent of the partnership for the purpose of its business[.]").[21] **In the absence of an agreement between the partners**, each general partner is entitled to take part in the management of the business and have equal stature and voice in participating in that management. 68 C.J.S. *Partnership* § 90 (2005) (emphasis added); 59A AM. JUR. 2D *Partnership* § 274. Thus, a general partner can perform any managerial action he desires. *See supra* note 21. Yet, the general partners can enter into a valid agreement delegating to one or more of the partners exclusive control over the management of the entire partnership business or particular functions of the business. 68 C.J.S *Partnership* at § 90.

In our case, the general partners of all of the Pyramid Mall Partnerships have vested exclusive control of the particular partnership's management within an executive committee. We previously noted that

in essence, each partnership is a developer of a specific yet separate real estate venture

---

[21] New York Partnership Law further states that "[t]hat property rights of a partner [is] . . . his right to participate in the management [of the partnership]." N.Y. PARTNERSHIP LAW § 50.

within a common and unified paradigm we now refer to as the Pyramid Malls.  Each of the Malls are replicas of this paradigm and they essentially employ the same operating procedures. . . . This business/partnership model has two essential elements.  **There is an executive committee which, by all accounts, is the daily decision maker for the respective partnership**.  Although the respective committees are comprised of various personalities, the common denominator on each of these partnerships' executive committee is Robert J. Congel . . . .

*Lugosch v. Congel*, 219 F.R.D. 220, 228-229 (N.D.N.Y.  2003)(*"Lugosch II"*) (emphasis added).

In order to understand the background that is reflected above, this Court required the parties, at that time, to provide sample templates of the partnership agreements, appreciating that the same agreement format was used for and by all of the partnerships, and the Defendants provided a matrix that identified each mall, each partnership, each partner, and members of the executive committee.[22]  *See Lugosch II*, 219 F.R.D. at 229 (citing Dkt. No. 294, Ex. A).  The model partnership agreements reveal that "[t]he executive committee, with the authority granted to it under the agreement, shall have the exclusive right to manage the business of the Partnership and is hereby authorized to take any action of any kind and to do anything and everything in accordance with the provisions of this agreement."[23]  Dkt. No. 294, Ex. A.  Within the framework of the executive committee, there must be an "affirmative vote of at least fifty-one percent of the members (voting <u>per capita</u>) of the Executive Committee shall be required in

---

[22] It is extremely fortuitous that this Court kept copies of those partnership agreements and the matrix in Chambers just on the chance the Court would need to resort to them again.  Here, those agreements and matrix are instrumental in the discussion before us.

[23] The agreements further state, "except as expressly provided hereunder, the authority of any Partner to manage the business of the Partnership shall be exercised only by the Executive Committee, and except as expressly so provided, no Partner other than the Executive Committee shall have any control over Partnership." *See e.g.*, Poughkeepsie Galleria Company Partnership Agreement, § 5.1 at p. 24 & Bershire Mall Group Partnership Agreement § 5.1 at p. 23.  As further evidence of this concentration of authority, the agreements state that " the Executive Committee shall at all times act in good faith and exercise due diligence in all activities relating to the conduct of the business of the Partnership as a whole." *Id.* at § 5.6 at p. 30.  We further note that these provisions are set forth in the Pyramid Crossgate Mall Company Partnership and Bershire Mall Group Partnership Agreement, since these agreements follow the template noted above, which are a part of the voluminous Motion for Summary Judgement record that have already been shared with the Intervenor.  *See* Dkt. No. 397, Jeffrey S. Shelly, Esq., Decl., dated Sept. 10, 2004, Pls.' Ex. 7 (list of Plaintiffs' exhibits to their Opposition to the Motions for Summary Judgment), item 35 (Crossgates Partnership Agreement); Dkt. No. 389, Michael Bovalino Decl., dated Sept. 13, 2004, Ex. A (list of Defendants' Exhibits to their Motions for Summary Judgment), item 18 (Bershire Mall Partnership Agreement).

all matters acted on by the Executive Committee."[24]  *Id.*

As duly noted above, the authority to waive the corporate privilege rests with the corporation's management and is "normally exercised by its officers and directors."  *In re Grand Jury Proceedings v. John Doe*, 219 F.3d at 183 (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. at 348); *United States v. Int'l Bhd. of Teamster*, 119 F.3d at 214-15.  In our case, authority to manage the affairs of the Pyramid Mall Partnerships rests with the respective executive committee, who make management decisions by majority vote.  Generally speaking, at least two of the Defendants, Congel and Tuozzolo, serve, or have served, on a number of Pyramid Mall Partnerships' executive committees, and possibly, one Plaintiff, Robert Ungerer, serves on Crossgates Mall Partnership's executive committee.[25]   Dkt. No. 294, Ex. A.  Since the executive committee has exclusive management prerogatives and acts by majority rule, Defendants' statement that no general partner - either Defendant or Plaintiff - can waive the attorney-client privilege on their own has substantial credence.  *See supra* note 20 (citing Dkt. No. 453 at p. 2 n.2).  Following the instruction of *Weintraub*, we note that only the executive committees of the Pyramid Mall Partnerships would have the proper authority to explicitly waive the attorney-client privilege, if such privilege exists, and only by majority decision.  Conversely then, we therefore recommend a ruling that Plaintiffs who are individual general partners do not hold the function that can waive their partnership's claim of attorney-client privilege, and by filing these privilege documents in opposition to the Motion for Summary Judgment should not be considered a waiver of either the attorney-client privilege or the work product doctrine.

---

[24] *See e.g.*, Bershire Mall Group Partnership Agreement § 7.2; *see also supra* note 23.

[25] At one time, Lugosch was a member of at least three executive committees but either those Mall Partnerships are no longer a unit of the Pyramid Mall family or he is no longer a partner of that specific Mall of which he served as a member of its executive committee.

 *c.  At Issue Waiver*

Plaintiffs and Intervenors exclaim there is another implied waiver that is the centerpiece of their position that the attorney-client privilege and work product doctrine should be forfeited.  This waiver is commonly called "at issue" waiver, which is based upon the Fairness Doctrine.  Had Defendants submitted these privileged documents with their Motions for Summary Judgment, we could with ease have concluded that presumptively the privileges were waived.  *See Joy v. North*, 692 F.2d 880, 894 (2d Cir. 1982) ("[T]he submission of material to a court in order to obtain a summary judgment utterly precludes the assertion of the attorney-client privilege or work product immunity.").  But this case is not that perfect scenario and we cannot lose sight of who actually included Defendants' claimed attorney-client privileged documents into this record. We are devilishly confronted with Plaintiffs, not Defendants, who have placed these privileged documents before the District Court in support of their Opposition to the various Motions for Summary Judgment,[26] and therefore we cannot readily cosign, as the Intervenor would like, that a waiver has accrued.

It is well settled law that in "certain circumstances a party's assertion of factual claims can, out of consideration of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted." *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003) (citing, *inter alia*, *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)).  The application of "at issue" waiver is primarily due to the fact that the party asserting the privilege has placed "a contention at issue." *Id.* (citing, *inter alia*, *Worthington v. Endee*, 177 F.R.D. 113, 116-117 (N.D.N.Y.

---

[26] As previously mentioned, motions for Summary Judgment is a reference to the Defendants' independent Motion for Summary Judgment collectively.  *See* Dkt. Nos. 323-28; *supra* note 2.

1998) and 6 JAMES WM. MOORE ET. AL, MOORE'S FEDERAL PRACTICE § 26.70[6][c] (3d ed. 1997)).[27]

Forfeiture of the privilege turns on the consideration of fairness, or, more correctly cast, unfairness to the adversary. This unfairness to the adversary is "*having to defend* against a privilege holder's claim without access to pertinent privilege material that might refute the claim." *John Doe Co. v. United States*, 350 F.3d at 304 (emphasis in original). Thus, in the circumstances where a party contends facts to an "adjudicating authority" (a court, jury or decision maker) then relies upon the privilege "to deprive its adversary of access to [the] material that might disprove, [impeach], [effectively contest], [rebut] or undermine the party's contention" would be unfair. *Id.* at 302 & 303; *In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987) (assertion during a judicial proceeding).[28] Or, where the privilege holder intends to visit prejudice upon his opponent or disclose only select portions of the privileged communication for "self serving purposes" in order to promote a claim in the litigation that in fairness may require examination of this protected communication, then the privilege may be forfeited. *United States v. Blizerian*, 926 F.2d at 1292 & 1293 ("[ For example, the court] cannot sanction the use of the privilege to prevent effective cross examination on matters reasonably related

---

[27] It is now an established principle of law that if the advice of counsel is placed in issue by either a claim, defense, or testimony it is deemed waived. *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994); *United States v. Bilzerian*, 926 F.2d 1285. Moreover, it is not the filing of the lawsuit that matters but the relevance of the contention that controls. *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408 (D. Del. 1992).

[28] Often the scope of *In re von Bulow,* which is a seminal case on this issue, is overstated in terms of the breadth of "at issue" forfeiture. The case actually stands for a limited version of a waiver or forfeiture of the attorney-client privilege. von Bulow granted permission to his attorney to make certain disclosures in a book about his infamous criminal case. Many revelations and privileged discussions were publicly disclosed in this best selling book. It would appear then that these revelations would have forever waived the attorney-client privilege in a subsequent civil lawsuit. However, the Second Circuit did not find these *extrajudicial disclosures* of the attorney-client communication to be a *carte blanche* waiver of the protection. Rather, the Second Circuit held that these extrajudicial disclosure, which were not used in a judicial proceeding and did not prejudice his adversary, did not constitute a waiver of the privilege as to the **undisclosed** portion of the attorney-client communications. *In re von Bulow*, 929 F.2d at 102. The extrajudicial disclosures of privileged information "results only in [a] waiver of the communication revealed, but not of related communications." *In re Grand Jury Proceedings*, 219 F.3d at 189 (citing *In re von Bulow*, 929 F.2d at 102-03). The *von Bulow* Court went on to say that had this been a "subject matter waiver" the results would have been much different and the reach of the waiver may have touched on all privileged conversations. *In re von Bulow*, 929 F.2d at 102-03.

to those introduced in direct examination."). The Fairness Doctrine will not allow the privilege to stand when the proponents seek to use it for a purpose that is inconsistent with the privilege. What the court is attempting to avoid is the wielding of the attorney-client privilege and the work product doctrine as both a shield and a sword. *In re Grand Jury Proceedings*, 219 F.3d at 182; *United States v. Blizerian*, 926 F.2d at 1292 (citing *In re von Bulow*, 828 F.2d at 103). It is the unfairness that is the crucible for the forfeiture. *John Doe Co. v. United States*, 350 F.3d at 306 (citing *In re von Bulow*, 828 F.2d at 102).

Resolving whether an "at issue" forfeiture has occurred may appear initially easy, but we know, from experience, that it can be a vexing exercise for a court. Nonetheless, the test that the courts within the Second Circuit have resorted to in order to facilitate this nettling analysis is:

> 1) assertion of the privilege was a result of some affirmative act, such as filing suit, (2) through the affirmative act, the asserting party puts the protected information at issue by making it relevant to the case, and (3) the application of the privilege would have denied the opposing party access to information vital to the defense.

*Bank Brussels Lambert v. Credit Lyonnais (Suisse),* 1995 WL 598971, at *3 (S.D.N.Y. Oct. 11, 1995) (citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975).[29]

Because of the fragility of broad generalizations and sometimes *per se* rules, in the context of determining fairness, it is more prudent to decide the at issue waiver on a case by case basis, which "depends primarily on the specific context in which the privilege is asserted " or on its own particular facts. *John Doe Co. v. United States*, 350 F.3d at 302 & 305 (citing *In re Grand Jury Proceedings*, 219 F.3d at 183. The forfeiture should be narrowly construed and tailored to remedy the unfairness or prejudice. *In re Grand Jury Proceedings*, 219 F.3d at 188. It is further axiomatic, when a number of

---

[29] There are other criteria which a court may consider in ascertaining whether an "at issue" forfeiture is applicable: (1) the very subject of privileged communication [is] critically relevant to the issue litigated, (2) there is a good faith basis for believing such essential privileged information exists, and (3) there is no other source of direct proof. *Bank Brussels Lambert v. Credit Lyonnais (Suisse)*, 1995 WL 598971, at *5.

documents are claimed to be privileged, that there is no wholesale waiver but rather a specific inquiry

as to each document.

Newspaper Intervenors doggedly persist in arguing, relying upon *Joy v. North*, and it now

appears that Plaintiffs have adopted the same tactic, that submission of Defendants' attorney-client

privilege documents by **either** party waives the claim to such privilege.  Dkt. No. 452, Michael J.

Grygiel, Esq., Reply Lt.-Brief, dated Feb. 15, 2006, at p. 5 & n.6.  We reiterate the Second Circuit's

admonishment to the Intervenors:

> The Newspaper misread *Joy v. North* by insisting that that case precludes invocation of
> the privilege no matter which party puts the documents at issue, based on our statement
> there that "documents moving for, or opposing, summary judgment should not remain
> under seal absent the most compelling reasons." *Joy v. North*, 692 F.2d at 893.  Yet this
> statement says nothing about the question at hand, because attorney-client privilege
> might well be such a compelling reason.  *See The Diversified Group, Inc.*, 217 F.R.D.
> at 160-161 n.7.

*Lugosch V*, 435 F.3d at 125.

It must be the Defendants themselves, who claim the privilege, who take an affirmative step to interject

the privileged material into the litigation.  *In re Grand Jury Proceedings*, 219 F.3d at 187; *Chase*

*Manhattan Bank N.A. v. Drysdale Securities Corp*., 587 F. Supp. 57 (S.D.N.Y. 1984) (holding that an

implied waiver of the privilege occurs **only through** an affirmative act on the part of the one who holds

it) (emphasis added); *Oxyn Telecommunications, Inc. v. Onse Telecom*, 2003 WL 660848, at *6

(S.D.N.Y. Feb. 27, 2003) (standing for the proposition that "a party cannot, through its own allegations

of fraud or bad faith waive its adversary's privilege").[30]  With this and other precedents in mind, the

Second Circuit accordingly mandated that this Court determine "whether (1) the contested documents

---

[30] Further, *Onxyn v. Onse*, in support of this proposition, cites *Chase Manhattan v. Drysdale Securities*, 587 F.
Supp. at 59, in stating that "[i]t cannot be possible for [a defendant] to justify breaching [the plaintiff's] privilege by reason
of its own pleading of an affirmative defense. That would give an adversary who is a skillful pleader the ability to render
the privilege a nullity."  2003 WL 660848, at *6; *see also Tribune Co. v. Purcigliotti*, 1997 WL 10924, at *5 (S.D.N.Y. Jan.
10, 1997).

are subject to the attorney-client privilege, and (2) defendants waived the privilege by placing in issue the **contents of the privilege information**." *Lugosch V*, 435 F.3d at 125 (emphasis added).

Plaintiffs suggest that the Defendants' Motions for Summary Judgment are rife with at issue factual claims and the contents of the claimed privileged documents, and we need not look any further than the Defendants' Memoranda of Law. Dkt. No. 455 at pp. 2-8. In order to oppose Defendants' Motions, Plaintiffs asserverate that every document, including the privileged documents, were asserted in their Appendix so that they could address issues put at issue by Defendants. *Id*. at p. 4 n.2. For Plaintiffs, many if not all of the contested documents were not disclosed to them until this litigation and after the execution of a Confidentiality Order. Dkt. No 442, Pls.' Mem. of Law, dated Feb. 7, 2006, at pp. 6-8. Some of those alleged "factual claims" Plaintiffs maintain that Defendants' placed at issue by virtue of their Memoranda of Law to the Motions for Summary Judgment and Reply Memorandum of Law are:

- Plaintiffs were active participants in the very business practices about which they now complain.
- A collaborative business culture, in which the partners shared responsibility and rewards, were the hallmark of the Pyramid organization.
- All of the Plaintiffs participated in daily morning meetings at which the partners reviewed each center's operations and financial conditions and charged each center's future course. Whether it was in these meetings or in the other venues of formal and informal decision-making, the watchword was collaboration.
- Plaintiffs, since they first became involved in the Pyramid organization, have known about, participated in, and benefitted from the very same business practices that they now, decades later, allege to be misleading and deceptive.
- Plaintiffs admit that, as partners, they participated in daily partner meetings and conference calls at which these business practices were discussed.
- [Plaintiff actively advocated] for the investment in the early 1990s in Bonwit Teller, Inc.

Dkt. No. 455, Ex. 1, (Defs.' Jt. Preliminary Statement in Conjunction with their Independent Mots. for Summ. J.).

********** 

- Plaintiffs knowingly and actively participated in the business practice that they now claim were concealed from them.

*-46-*

● Defendants encouraged a culture of informal yet fully informed decision-making among the partners concerning the partnership business.
● The undisputed facts reveal a culture of disclosure and transparency.
● Defendants used and operated a Concentration Account which was fully disclosed to Plaintiffs.
● Plaintiffs were not mislead or deceived by any facet of Defendants' relationship with Chase Bank.
● Plaintiffs had a long standing knowledge of the practice of intercompany loans and that it was a part of the Pyramid Culture.
● The undisputed disclosure of fees and expenses by PMG to Plaintiffs and other partners defeat any contention that the challenged practices were some how misleading or designed to deceive.
● Plaintiffs were intimately involved in Pyramid's decision to purchase Bonwit Teller, were fully aware of the downside of the purchase, and were explicitly informed, in writing, every year, among other things.
● The Plaintiffs' two decades of knowing acquiescence precludes any claim of breach of contract.

Dkt. No 442, Pls.' Mem. of Law, dated Feb. 7, 2006, at pp. 6-8; Ex. 7, Def. Congel's Mem. of Law in Support of Summ. J; Ex. 10, Def. Malifitano and Brevenik's Mem. of Law in Support of Summ. J.

The Court is not prepared to adopt, without critical analysis, Plaintiffs' laundry list of Defendants' statements as putting a matter at issue.  Without a specific review of the Subject Documents, and then putting the statement in relevant context with the content of the Subject Documents, any blanket endorsement of this list would be premature and not based upon the Second Circuit's mandate that a specific inquiry as to whether or not the content of the document has been placed at issue.  Moreover, this Court does not review these statements as being a subject matter waiver as discussed in *In re von Bulow*.  828 F.2d at 102-03.

### D.  Specific Review of Subject Documents

There are certain factors that we must taken into account before embarking upon this arduous and exhaustive task of specific factual inquiry into each Subject Document to determine if (1) it is protected by the attorney-client privilege or work product doctrine and (2) whether there may have been a waiver of either of these privileges, which would include Defendants' placing the content of the

Subject Documents at issue in this litigation.  It has been represented by the Defendants that all of these Subject Documents have been shared with the Plaintiffs pursuant to the Confidentiality Order or other Court directives.  To the extent that these documents had not been shared with Partner Plaintiffs, they should be pursuant to the *Garner* Rule.  *Lugosch II*, 219 F.R D. at 242-43 (citing *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970)).  To reiterate and to make  absolutely clear, the extension of the *Garner* Disclosure Rule is applicable when there is a fiduciary relationship, and it is only between those who are within that fiduciary relationship.  It does not extend to third parties such as Intervenors however.  As we weigh and identify the nature of the Subject Documents, there are also a considerable number of documents for us to navigate which the Defendants wish to remain confidential as well, and they are pages of depositions wherein witnesses discuss, sometimes at extraordinary length, the claimed attorney-client privileged or work product documents.  In this regard, the corresponding deposition testimony to the Subject Document will also need to be analyzed under the same document by document basis, with the Court ascertaining whether the testimony is inextricably connected to the privileged document.

In conjunction with deposition testimony, as a blanket argument, Plaintiffs claim that the Defendants did not preserve the testimony as confidential.  Although Defendants do not directly address it, presumably they believe that they had.  Since only certain aspects of the testimony deal with the documents claimed to be privileged and which have been redacted from the transcript, and based upon the Plaintiffs' statements at a deposition on this very issue, this Court concludes that Defendants preserved the privilege.[31]  Lastly, Plaintiffs at every turn raise the argument that many of these

---

[31] The following is an exchange between the attorneys at Malifitano's deposition:
**Bray** [attorney to one of the Defendants]: Can I interject that we reserve on this subject matter all issues of privilege . . .
**Endler** [attorney for Plaintiffs]: Sure.  As a matter of fact, we can stipulate that we have all reserved a lot

documents do not include "legal advice."  For the sake of brevity, despite the reiteration, we wish to issue an all inclusive bulletin now so as to avoid repetition.  Apparently Plaintiffs have forgotten, repeatedly, that the privilege also attaches to communications with an attorney in order to receive that legal advice, and not just legal advice.  So in that respect, when the Court recommends that the attorney-client privilege has attached, it includes both client communication and/or attorney information and advice.

The following findings and recommendations are summarized in Appendix C and are hereby incorporated into this Report and Recommendation.

1.  Bonwit Teller and the Shearman and Sterling Opinion Letter

Bonwit Teller and the Shearman and Sterling Opinion Letter have been the perennial subject of ongoing debates among the partners and before this Court as long as we can remember.  When this Court first addressed this issue, we directed that the Shearman and Sterling Opinion Letter be shared with the Plaintiffs pursuant to the *Garner* Rule.[32]  Dkt. No. 147, Mem. Decision and Order, dated Jan. 9, 2002, at pp. 22-36, and Dkt. No. 148, Corrective Order, dated Jan. 22, 2002 (correcting a minor error in Dkt. No. 147 and clarifying the granting of disclosure of the Shearman and Sterling Opinion Letter to partners only).  Shortly thereafter, we were confronted again with the issue of whether a series of Bonwit Teller documents were protected by the attorney-client privilege.  On that occasion, we did

_____

of things in this case and no one has given up on anything.
Subject Document #26, at p. 94.

This colloquy is consistent with the provisions of the Confidentiality Order.  Dkt. No. 55, Confidentiality Order at ¶ 6; *see also* App. B.

[32] *Garner v. Wolfinbarge*r, 430 F.2d 1093 (5th Cir. 1970) (cited for the legal proposition that where a fiduciary relationship exists, such as a partnership, there is an exception to the attorney-client privilege, which in essence requires the fiduciary to share the contents of the attorney-client privileged communication with his principals).  And just because there has been some directed disclosure premised upon the *Garner* Rule, contrary to Plaintiffs' contentions then, the attorney-client privilege has not been waived, at least not yet, as to third parties.

indeed find that the series of documents were cloaked by the privilege: "As to the Bonwit Teller issue, the Court finds the Defendants established that the [documents] are privileged and not waived by any legal reason." *Lugosch II*, 219 F.R.D. at 245.  Now, once again, the Bonwit Teller documents, the Shearman and Sterling Opinion Letter, and related deposition testimony, although with a different slant challenging their protection, are before the Court.  The *gravitas* of all of the Bonwit Teller documents rests upon the Shearman and Sterling Opinion Letter.

Defendants have held steadfast that these documents are subject to the attorney-client privilege and should remain as such, relying, *inter alia*, upon the Court's previous rulings.  Plaintiffs otherwise contend that Defendants have put the content of the Shearman and Sterling Opinion Letter and other related Bonwit Teller documents at issue in their Motions for Summary Judgment, by their own words: (1) Plaintiffs were the most enthusiastic advocates of the Bonwit Teller acquisition; (2) Plaintiffs were "intimately involved" in the decision to purchase Bonwit Teller; (3) Plaintiffs were "fully aware of the downside risk" and "were explicitly informed as to the extent of Bonwit Teller related debt for which their partnerships were responsible;[33] and (4) Plaintiffs were explicitly informed, in writing, every year beginning in 1990, as to the exact amount of the Bonwit Teller debt for which Plaintiffs' partnerships were responsible.  Dkt. No. 442, Pls.' Mem of Law at pp. 7, 14-16, Ex. 7, Def. Congel Mem. of Law at pp. 14-15 & 47; *see also* Dkt. No. 455, Pls.' Reply Mem. of Law.  As to the alleged "factual claims" made in Defendant Congel's Memorandum of Law in support of his Motion for Summary Judgment that Plaintiffs received regular reporting since 1990 including the amount of their respective liabilities

---

[33] Bonwit Teller Limited Partnership was comprised of Bontel Corporation as the general partner and Retail Distribution Enterprises (RDE) as the limited partner.  RDE was comprised of three general partners - Pyramid Company of Buffalo, Pyramid Crossgatess Company, and Pyramid Company of Onondaga.  Plaintiffs Lugosch, Ungerer, and Steingraber are or were partners in one of these three partnerships.  Defendants contend that the Pyramid Malls' roles as partners included financing its participation in the acquisition and operation of Bonwit Teller through loans from Woodchuck Hill Associates, a Defendant in this case.  Dkt. No. 442, Ex. 7, at p. 14 n.8; *see also* Ex. 7, at p. 47.

for the loans of the Retail Distribution Enterprise (RDE), Plaintiffs point out that Defendants did not share with them the January 1, 1999 Shearman and Sterling Opinion Letter until the commencement of this litigation and only pursuant to the Confidentiality Order.  *See* Dkt. No 442, Pls.' Mem. of Law & Ex. 7 at p. 47.  Such failure to share this Opinion Letter, in their assessment, is contrary to Defendants' notion of regular reporting and, the Subject Document further discusses, in their view, the scope of Partners' liability.  First, Plaintiffs assert that the Shearman and Sterling Opinion Letter challenges the extent of the Plaintiffs' respective liability, and second, contradicts that Defendants have handled this matter with transparency.  Lastly, Plaintiffs argue that Defendants, by their Reply Memorandum of Law in Support of Defendants' Motions for Summary Judgment, put the matter squarely at issue in this case.

The struggle for this Court on the matter of the Shearman and Sterling Opinion Letter and Bonwit Teller is the juxtaposition of contention and content.  In their mandate, the Second Circuit directed that we look at the "content" of the Subject Documents.  However, there are other cases within the Second Circuit that speak of placing a "contention at issue" which would also invoke the Fairness Doctrine.  Obviously, Plaintiffs have drawn attention to a number of contentions which are set forth above, but are those contentions the type of contentions referred to by the Second Circuit and other courts within the Circuit, or even rise to the level of invoking the Fairness Doctrine?  Contentions, on their face, are generally nebulous unless put in direct context with a privileged document or statement.  Some contentions are obviously subject matter claims, some are substantial factual claims, and others are not so clear.  The safer course in this dichotomy would be to rely upon the content of a document rather than bare contentions that can be vague, ambiguous, and primarily rhetorical.  Therefore, we must consider whether these contentions are merely factual yet rhetorical responses to the Plaintiffs'

claims of fraud and deception or, have Defendants put at issue, in the first instance, the content of the Subject Documents.

Most of the contentions listed above, alone, would not put the matter at issue. We note that it was not until Defendants' Reply Memorandum of Law for the Motions for Summary Judgment that the contents of the Shearman and Sterling Opinion Letter were presented in one of their pleadings, which the Defendants still wish to keep confidential. Subject Document # 3. Prior to the Reply Memorandum, the contents of the Opinion Letter were not raised in Defendants' Answer nor can it be found within the four corners of Defendants' Motions for Summary Judgment. Dkt. No. 442, Ex. 7 & 12. It has not escaped us that it was Plaintiffs who put Defendants' privileged documents into the sealed record with their Opposition to the Motions for Summary Judgment, and it was Plaintiffs who first discussed the content of the Opinion Letter in support of their position in the lawsuit, albeit under their erroneous belief that either the contention or contents were now in issue in this case. Presumably, the erroneous belief is premised upon a misreading of a portion of Defendants' Memorandum of Law:

> Plaintiff's injuries arising out of Bonwit Teller consist of the liabilities borne by Pyramid Company of Buffalo and Pyramid Crossgatess Company as partners in RDE, which financed the lion's share of the acquisition and operational costs of Bonwit Teller through loans from Woodchuck Hill Associates. Plaintiffs received regular reporting on the financial position of Crossgatess and Buffalo as partners in RDE, including the amount of their respective liabiliities for the loans to RDE and the **annual operating losses suffered by Bonwit**. The IRS Form K-1s sent to plaintiffs beginning in 1991 demonstrate that plaintiffs were able to avail themselves of the tax benefits of these "passive" losses flowing from the participation of Crossgatess and Buffalo in RDE beginning in the 1991 tax year and that these losses could be used to offset passive income from other real estate investment activities.

Dkt. No. 442, Ex. 7, at p. 47, Defs.' Mem. of Law in Support of Motion for Summ. J. (emphasis added).

Plaintiffs reacted to the reference of "operating losses" and extrapolated that somehow they are now liable for Bonwit Teller's operating losses, something that they claim they were not previously aware of. Dkt. No. 370, Pls.' Mem. of Law in Opp. to Motion for Summ. J. They then argue, and

concomitantly made the Opinion Letter a part of their document Appendix to their Opposition to the Motions for Summary Judgment, that the 1999 Shearman and Sterling Opinion Letter refutes that purported fact and thus the content of this Opinion Letter is now at issue. But as we read further, Defendants explain that Plaintiff received "passive losses," which a limited partner of a limited partnership, much like Bonwit Teller, are entitled to receive and report for income tax purposes.[34] Receiving "passive income" does not mean that a limited partner has unquestionably assumed the full liability that may be caused by an operating loss. This recitation of the facts of the litigation in the Defendants' Memorandum of Law did not put at issue the content of the Opinion Letter. However, once Plaintiffs referred to the Opinion Letter in their Memorandum of Law, giving their spin on the situation and the Subject Document's relevance, which essentially is an affirmative use of the documents on their part, Defendants were compelled to respond and contravene those assertions. As we all know replies are supposed to address new arguments and materials raised by an adversary in their opposition to a motion, and generally do not create new ones. Such replies are the natural response commonplace in all litigation that invariably, however, may flush out a defendant's interpretation of the subject document they were not inclined to expose or rely upon in the first instance. We do not view "flushing out" and "affirmatively asserting" to be one and of the same. In essence our challenge here is one of timing.

None of the legal precedents that address the at issue waiver or the Fairness Doctrine dealt with a reply document, as has occurred in this case, and this may be a matter of first impression. As

---

[34] The Internal Revenue Code permits in certain circumstances partners in a partnership to record for tax purposes "passive losses" to offset certain other gains for income tax purposes. *See* 26 U.S.C. § 772. Passing on "passive losses" to investors are commonplace in Sub Chapter S Corporations as well as Limited Partnership. Passing on passive losses does not mean that the Plaintiffs are responsible for any liability associated with the operating losses, but that as a feature of their investment in the partnership and in terms of determining the income tax of a partner, it is the partner's distributive share of the partnership's taxable income or loss. *Id.*

instructed, the at issue wavier and the Fairness Doctrine cannot be subject to a *per se* rule but must be determined on a case by case basis and on the particular facts confronting the court. We are also guided by the crucible of the Fairness Doctrine, which is the unfairness to the adversary, which quite frankly eludes us in this case on this issue, and whether Defendants affirmatively interjected the content of this Opinion Letter into this litigation and thus making it relevant. *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975). It is our review that Plaintiffs are the ones who acted affirmatively in interjecting the contents of the Opinion Letter into this litigation and we are not prepared to reward a party whose somewhat "skillful" pleading caused a reaction to their arguments.[35] Intentions notwithstanding, had Plaintiffs not raised the contents of the Opinion Letter first, we are uncertain, based upon the representations that they have made to the Court, that Defendants would have resorted to or revealed the contents of the Subject Document in this litigation, and that the only purpose for which it was mentioned in the Reply Memorandum of Law was to contradict Plaintiffs' interpretation of the Subject Documents. We say all of this knowing that all along that Defendants have fought long and hard to keep this draft Opinion Letter confidential. Furthermore, it is of no great moment that Defendants were prepared to argue their interpretation of this Subject Document at Oral Argument on the Motions for Summary Judgment. Such subsequent arguments are after the fact and a natural aftermath of the Plaintiffs' affirmative act, not Defendants.[36] *See supra* notes 2, 14, and Part I.C at pp. 17-18.

---

[35] Plaintiffs may decry the pejorative connotation to the word skillful in the context of this pleading. Even if we were to cast motives aside, the adept interjection of the Opinion Letter into the Litigation could have only generated two responses: none at all or the actual response rendered by Defendants. It is fair to presume that Plaintiffs gave consideration to the ramification and effect of disclosing the content of the Opinion Letter, an apparent privileged document, in this fashion.

[36] We recognize that there is no temporal limitation on when a party puts an issue into the case. An affirmative assertion, an at issue waiver, could even occur during trial. But as the case law rightfully guides us, in order to conclude that a party put a matter at issue, it has to be posited upon an affirmative act, and not upon denial of another party's interpretation or employment of the Subject Document.

Moreover, Defendants' contentions that Plaintiffs had actively advocated for the purchase of Bonwit Teller, had knowledge of debt obligations, and benefitted from the Bonwit Teller transaction does not put the contents of the Shearman and Sterling Opinion Letter at issue. The Court is not persuaded by Plaintiffs' argument that Defendants' claim of sharing all documents with Plaintiffs interjected the content of this Subject Document into the litigation.[37]

    We find that Plaintiffs and Intervenors have failed to establish that Defendants affirmatively asserted this privileged communication into the lawsuit thereby putting the protected information at issue, making it relevant to the case, and then applying or asserting the attorney-client privilege in order to deny the Plaintiffs access to information vital to the defense of the factual claim. *Hearn v. Rhay*, 68 F.R.D. at 581. In this regard, it cannot be said that Defendants used this Subject Document as a shield and a sword. As we noted above, the Shearman and Sterling Opinion Letter is the linchpin to a host of Bonwit Teller documents. A decision on the Opinion Letter will inextricably have a domino effect on most of the other related documents and testimony. Lest we forget - client communication and the corresponding advice is considered protected by the attorney-client privilege. Therefore, we recommend that Subject Documents, which includes deposition testimony, designated 15, 16, 18, 19, (principal documents at issue), and corresponding references: 1 (pp. 29, 30, 45, 46, and 75), 2 (pp. 109 and 110), 3 (pp. 12 and 13), 4 (pp. 6), 26 (redacted portions of pp. 54, 55, 56, 57, 66, 67, 68, 94, 95, 96, 98, 99, 100, 102, 103, 104, 105 (lines 1-10), 115, 120, 132, and 133) 28 (redacted pp. 157, 158, 159, 160, 161, 162, 163, 164, 165, 167, 256, 257, and 258), 29 (redacted pp. 64, 65, 66, 67, and 132) remain

---

[37] Moreover, the Court does not totally agree with the Plaintiffs' interpretation on what the Opinion Letter may signify, and, on the other hand, we may be more incline to accept the Defendants' interpretation as more correct. Plaintiffs have somewhat contorted the full context of the opinion letter beyond its original meaning to benefit their claims against the Defendants. In our view, Plaintiffs are thus not prejudiced by the Opinion Letter remaining confidential because it does not support their interpretation of the document.

-55-

confidential and sealed.

However, a different result is in order with regard to the content of Subject Document #5. Defendants placed at issue that "Plaintiffs were intimately involved in Pyramid's decision to purchase Bonwit Teller, were fully aware of the downside of the purchase, and were explicitly informed, in writing, every year, beginning in 1990, as to exact amount of the Bonwit Teller related debt for which partnerships were responsible . . . among other things." Dkt. No. 442, Ex. 7 (summarizing Defendants' quote on p. 14). Intensifying that factual claim is Defendants' further contention that Plaintiffs knowingly and actively participated in the business practice that they now claim were concealed from them. In essence, Plaintiffs should have been aware of any determination of additional investments in Bonwit Teller. These factual claims are more than mere contentions but actual statements of fact, which are indelibly connected to Subject Document #5. When considering those factual claims in context with Subject Document #5, it is obvious that Subject Document #5 cuts to the heart of these factual claims and appears to refute the notion promulgated by Defendants of Plaintiffs' awareness and intimate involvement in each and every decision related to Bonwit Teller. This Subject Document, in fairness, could be used to challenge Defendants' factual claim as stated above. Further, this Subject Document adverts to a factual question as to who decided to incur additional investment that would constitute more debt on behalf of the partners in RDE. Moreover, Subject Document #5, although it is a communication between two persons who are attorneys, does not have the earmarkings of being an attorney-client communication. Both the recipient, Shanley, and sender, Malfitano, have extra, non-legal roles with regards to their clients, and this memorandum smacks of a business memorandum as opposed to being an attorney-client communication. Therefore, we recommend that Subject Document #5 no longer have the veil of the attorney-client privilege and should be designated a public document.

Corresponding deposition testimony should no longer be protected by the privilege as well.  Therefore we recommend that Subject Document #26 (at pp. 105 (lines 20-25), 106, 107, 108, 110, 111, 112, 113, 114, 116, 117, 118, 119 (except lines 8-14 and 18), 121, 122, 123, 124, 125, 126, 127, and 128) be deemed an at issue waiver.

2.  Crossgates Mall Tax and Tenant Issues

Subject Document #6 was prepared by PMG administrator Kyle Schroeder regarding "notes from meeting with Marc Malifitano regarding billing methodologies."  Malifitano avers that he was giving legal advice to Schroeder on billing methodologies but this Subject Document underscores the dilemma of Malifitano's multi-hats in the Pyramid Malls Organization. Dkt. No. 442, Malifitano Decl. at ¶ 25(6).  Even undergoing a critical reading by this Court with an eye towards ascertaining a legal communication, it is truly difficult to discern the true nature of the communication.   We note that the burden of establishing that the Subject Document is attorney-client privileged rests with the one asserting the privilege, and in the instant matter, Defendants have failed to meet that burden.  The content of Subject Document #6 appears to be nothing more than a statement of facts and history, which are not generally protected by either the attorney-client privilege or the work product doctrine.  And to the degree that Malifitano provided advice, it is more colorable business than legal.  Hence, we recommend that Subject Document #6 not receive the protection of any privilege and be revealed to all parties including the public.  Redacted pages 234, 235, and 236 of Malifitano's deposition relate to Subject Document #6, which we recommended above be disclosed, and likewise we recommend the same as to these redacted pages.

As to Subject Document #7, prepared by Richard Hoffman, an outside attorney to Crossgates Mall, we take a contrary view to our recommendation for Subject Document #6.  First, Hoffman does

-57-

not suffer from the entangled and multi-facet roles of Malifitano. Exploring the four corners of this memorandum, we can readily discern that Hoffman is rendering a legal opinion sought by the client via Malifitano as to the Crossgates Tax Issue, and we note that the contents of this document have not been placed at issue by the Defendants in bringing their Motions for Summary Judgment nor at any other time in this prolonged litigation. Thus we recommend that Subject Document #7 remain cloaked by the attorney-client privilege. Redacted pages 237, 238, 239, and 240 of Malifitano's deposition reflect corresponding testimony to Subject Document #7, which we just recommended as confidential, and these pages of deposition testimony should be treated alike. Similarly, pages 37 and 38 of Subject Document #1, Plaintiffs' Memorandum of Law in Opposition to Summary Judgment (Dkt. No. 370), relate to Subject Document #7 and should remain confidential.

Subject Document #8, a memorandum from in-house counsel Austin Hoffman, will suffer the same fate as Subject Document #6. This memorandum is nothing more than a factual recitation of negotiations between a Mall tenant's attorney and Austin Hoffman. Its core element is a verbatim log of what transpired between these two attorneys, particularly as to tenant's discourse on the relevant issues. Notwithstanding Malifitano's affirmation that this is work product doctrine, Subject Document #8 is devoid of any legal discussion, any legal advice, lawyer's impression or strategies. Again, not every document prepared by an attorney is protected. The law is also clear that facts are generally not protected and that the work product doctrine protects lawyer's impressions and strategies; and if there are any lawyer impression or strategy, they are too negligible to warrant any protection or concern. We therefore recommend that Subject Document #8 receive no legal protection and should be included unencumbered in this Summary Judgment record.

3.  Previous Litigation

Outside Counsel, Richard Hoffman, prepared a summary of a witness deposition in a previous case.  Subject Document #9 has all of the indicia of a work product doctrine except for one particular discussion on the first page that engenders an at issue waiver.  In Defendants' Memorandum of Law in support of their Motions for Summary Judgment, Defendants' overall factual claim is that Plaintiffs' partnerships were not overcharged ("PMG's charges [are a] part of a scheme to defraud") and Plaintiffs complaints of overcharging  are unfounded in that all charges were properly set forth in the financial statements.  Dkt. No. 442, Ex. 7, Defs.' Mem. of Law at p. 12.  The Court is not in the position to say that portion of Subject Document #9 reflects an undisclosed overcharge or that there was a scheme to defraud.  Yet, we believe that a parcel of the content of this Subject Document does ruminate upon certain expenses from PMG being passed through to the other partnerships which may be "excessive," and such could constitute a contradiction of the Defendants' claim which is affirmatively placed at issue in their Memorandum of Law.  We submit that the Fairness Doctrine requires that at least this portion of Subject Document #9 should be disclosed. Because a portion of a document is being disclosed it does not implicate a waiver of the entire document. Accordingly, we recommend that page one of Subject Document #9 be made public and pages two and three of the document remain sealed since they represent work product.

Subject Documents ##10 and 11 are summaries and matrix of pending litigation.  They are prepared by attorneys so they, at first glance, appear to have the imprimatur of being work product documents.  But these Documents are nothing more than recitation of the basic facts of pending litigation without any recital of lawyer's impression, strategies, or legal advice, which is in all probability already a matter of public record.  They are sterile of any of these types of opinions and concerns and, in essence, are ministerial acts not deserving of protection from disclosure.  Thus, we

recommend that Documents ##10 and 11 also be made public.  Also, page 56 of Subject Document #2, Plaintiffs' Response to Defendants' Omnibus Statements of Undisputed Facts (Dkt. No. 271), relates to Document #11 and should be made public.

Subject Document #12 is a letter from Malifitano to one of his outside counsel about a pending case.  This Document can been considered protected under the work product doctrine and the attorney-client privilege.  It is much more than a cover letter, as Plaintiffs claim.  Plaintiffs argue, again, that it should be made public because it is devoid of any legal advice.  Here again we have the same problem. What Plaintiffs fail to recognize or recollect is that the attorney-client privilege covers both communications to a lawyer and the subsequent legal advice.  Clearly, Malifitano is bringing a matter to the attention of outside counsel which will eventually lead to counsel providing advice. We can also state that the contents of this letter have not been placed at issue in this case.  Hence, we recommend that Document #12 remain confidential.

4.  Audits and Other Business Related Documents

Subject Document #13 is composed of instructions from Malifitano to a PMG staff member on how to proceed with an audit.  Once again, we cannot gainsay that this is a mixed legal and business advice memorandum.  The bulk of the content, in our view, is business related.  Careful inspection of the memorandum has revealed, however, certain yet limited legal advice. We cannot with any clarity identify for the purpose of this Report and Recommendation what aspect of the document is subject to redaction, since they fall within bullet points that are unnumbered; but we have marked in yellow on Subject Document #13 those areas disposed to be labeled attorney-client privileged.  *See* App. C. Based upon the foregoing, we recommend that the Subject Document #13 be disclosed except for redactions.  Similarly, to the extent page 56 of Subject Document #2, Plaintiffs' Response to

Defendants Omnibus Statement of Undisputed Facts (Dkt. No. 371), relates to non-privileged portions of Subject Document #13, then it should also be made public.

There is no dispute that Subject Document #14 contains advice from Malifitano to Defendant Congel on the Portfolio Disposition. The challenge is whether it is legal advice so that it may be cloaked by the attorney-client privilege or deemed to be something else. The basic overture of this Subject Document is commonsensical and not legal. The advice has the salient feature of being business and management advice and not related to the law. We are unable to find an attorney-client privilege or work product ingredient so we recommend that this Subject Document be revealed to the public.

In the same vein, Subject Document #16 is a memorandum to the partners prepared by Michael Shanley, who is an employee having multiple roles in the Pyramid Mall family. There is nothing mysterious about this Document and for all tense and purposes this is nothing more than a ministerial notice to the partnership about an upcoming meeting, with only one exception. Ministerial documents do not rise to the level of being attorney-client privileged even if prepared by an attorney. The exception that we note is a paragraph reference to the Shearman and Sterling Opinion Letter which we have already provided a recommendation hereinabove. This paragraph should be redacted. In sum, Subject Document #16 should be disclosed to the public, sans redaction.

We are visited with an at issue waiver with Subject Document #17. This Document is an exchange between Malifitano and outside counsel and emerges, at first glance, as an attorney-client privileged document. But we agree with Plaintiffs that this Document may challenge the factual claims set forth in Defendants' Malifitano's Memorandum of Law to his Motion for Summary Judgment. *See* Dkt. No. 442, Ex. 10 at pp. 2 and 9. The factual claims upon which we speak are:

> In 1989 PMG and the mall partnerships updated the 1984 management agreements with new, substantively identical agreements, and those 1989 management agreements remain in effect today. . . . [B]ecause the 1989 management agreements use the same language as the 1984 management agreements, and because the language of the 1984 agreements do not cover the supplemental services, the 1989 management agreements also do not cover those services. Put another way, the same language, forged in the same die and cast as the earlier language, must have the same meaning in 1989 as it did in 1984. Further, the only evidence concerning the intent of the 1989 agreements confirms that the 3% management fee was not intended to cover leasing and the other services the plaintiffs challenge.

*Id*. at Ex. 10, at p. 2

************

> The execution of the 1989 management agreement did not modify or terminate the parallel 1984 supplemental management agreement. The 1984 supplemental management agreements remained in effect because they ran concurrently with the terms of the management agreements unless terminated by notice.

Id. at Ex. 10, at p. 9.

A fair reading of Subject Document #17, which is dated December 19, 1994, strongly intimates that the existence of a supplemental management agreement did not exist until 24 months prior to this memorandum. Plaintiffs argue that the Subject Document runs counter to the factual assertions mentioned in the Memorandum of Law and the Defendants' general claim that they did not overcharge Plaintiffs' Partnerships under the applicable management agreements. The Subject Documents seem to dispute Defendants' factual contention that such agreements were in effect for more than twenty years when this memorandum seems to suggest that they were in effect for no more than two years. There is probably much more to the true meaning of Subject Document #17, which the Defendants have failed to provide. We conclude that Defendants have affirmatively put this claim at issue and, pursuant to the Fairness Doctrine, we recommend that the contents of Subject Document #17 should be disclosed.

Subject Documents #20 is a composite of four different documents that apparently address the topic - the Limited Litigation. These four documents are interrelated but the presentation of the Subject

*-62-*

Documents starts with the Plaintiffs' letter to this Court, dated September 12, 2003, which was submitted under seal. Defendants seek only to maintain confidential certain aspects which are denoted in a yellow highlight. The highlighted areas then refer to the other documents, which now comprise Subject Documents #20. For discussion purposes, rather than start with the September 12, 2003 Letter-Memorandum, we will commence with Attorney Eric Dadd's memorandum about a meeting on the Limited subject matter, which is designated Exibit 4. This memorandum is drafted as a work product document, but like so many others, it is generally an exposé of a meeting with others, outlining the substantive dialogue, and the tenor and tone of the meeting's discussion focusing on the opposing side's statements and posture on the issues. There are, however, sporadically interlaced throughout this summary of the negotiations with Limited's Counsel Dadd's impressions, strategies, and discussion of the law. Such impressions, strategies and the like can be readily excised out of this document and this Court has indicated with yellow highlight those portions of this document which should be redacted.[38] Exhibit 6 to Subject Documents #20 is protected by both the attorney-client privileged and work product doctrine. There are no waivers including an at issue waiver, and it should remain privileged. As a corollary to Exhibit 6, those portions of Malifitano's deposition that discuss this particular document therein shall remain privileged as well: Exhibit 3 at redacted pp. 148, 149, 150, 151, 154, 155, 156, 157, 159, 160, 64, and 222. Lastly, as to the September 12, 2003 Letter-Memorandum, this Court agrees with Defendants that the redacted portion should remain confidential inasmuch as they refer to Exhibits 3, 4 and 6. Further, to the extent Subject Document #1, Plaintiffs' Memorandum of Law in Opposition to Summary Judgment  (Dkt. No. 370), on page 36 refers to confidential matters, then such shall remain sealed.

---

[38] The particulars of this redaction will be revealed in Appendix C.

In some respect Subject Documents #21 are integrally related to Subject Documents #20. In fact, sub document designated Exhibit 6 is in fact the same document designated as Subject Document #20, Exhibit 4. The recommendation as to its treatment is set forth immediately above. The remainder of Subject Documents #21 is purportedly, related deposition testimony. As to Malifitano's deposition on this topic, we find that pages 172, 173, and 203 should not be sealed because Defendants have previously disclosed the subject matter to Intervenors. We have here, in essence, a waiver to a third party. This Court previously noted in another decision in this case that "the newspaper interviews of Marc Malifitano and Robert Congel on the alleged problem with the Pilot Bills [Limited] [were slightly troublesome for the Court]." *Lugosch I*, 218 F.R.D. at 51. During this interview[s] Congel specifically acknowledged the problem, settlement of the problem, and that there was an investigation as to what occurred. During this lengthy interview, Congel was rather general on the facts . . . ." *Id*.; *see also* James M. Odato, *A mall's uncertain destiny*, Albany Times Union, May 2, 2004 at p. A8. Therefore, this Court recommends that Subject Documents #20, Exhibit 3 and #21, Exhibit 10, which are the same pages of Malifitano's deposition, (pp. 172, 173, and 203) should no longer remain sealed. However, Subject Document #21, Ex. 11, at pp. 181 of Defendant Tuozzolo's deposition shall remain confidential. Although it is somewhat a permutation of the Limited discussion, the disclosure to the press did not cover the sub-issue being expostulated upon by Tuozzolo. And much like *In re Von Bulow*, this is not a sweeping subject matter waiver.

Subject Document #22 are two pages of Plaintiff Bersani's deposition. This Court does not agree completely with Defendants on what remains protected and what should be disclosed. As to Plaintiff Bersani's discussion with PMG's outside counsel, commencing at page 167, last word on line 23, and extending to page 168, lines 1-6, this is a privileged conversation and we recommend that this

aspect remain sealed.  However, the balance of page 168 continuing to the top of page 169 are solely Bersani's view of the issue and he has a first amendment right to espouse his point of view, which we believe culminates from a variety of sources.  We thus recommend that these pages be unsealed.

Subject Document  #23 concerns the deposition of Mammolito, an employee of PMG, who spoke with PMG's outside counsel, Mr. Sonneborn, on a tax dispute litigation that involved Crossgates Mall.  Defendants assert that this testimony touches upon both attorney-client privilege and work product.  Plaintiffs contend that since this litigation pertains to Crossgates Mall and not to PMG there is no attorney-client relationship that is pertinent here.  But this lengthy testimony reiterating the communication between Mammolito with both outside counsel (Sonneborn) and in-house counsel (Malifitano) does concern itself with PMG's role in the litigation and on its face it is evident that there is either an attorney-client privilege or work product protection to this communication.  There are no waivers of the protection and the matter was not affirmatively placed at issue by the Defendants.  Hence, we recommend that Subject Document #23 (redacted pp. 48, 49, 50, 95, 96, 97, 98, and 99) remain confidential.

Subject Document #25 are specific pages of Bruce Kenan's, a partner at Crossgatess, deposition.  We disagree with the Plaintiffs in that we view the question posed on page 64 and the top of page 65 is legal advice, and we recommend that it remain confidential.  On the other hand, the redacted questions and responses on pages 151 and 152 are not sufficiently presented as privileged, and, as we know, the burden rests with the one asserting the privilege to substantiate its presence. We then recommend that pages 151 and 152 be unsealed.

More deposition testimony of Malifitano is the overall subject matter of Subject Document #26.  Notwithstanding Plaintiffs' suggestion to the contrary, the lack of credibility of the deponent alone is

not a relevant basis in determining whether a privilege attached or has been waived.  Defendants claim that Malifitano is testifying to privileged communications.  Redacted pages 54, 55, 56, and  57 pertain to another Shearman and Sterling communication which is addressing creating business structures and therefore are attorney-client privileged documents.  In conjunction with this Shearman and Sterling communication, redacted pages 66, 67, and 68 pertain to Subject Document #19, which we found to be a privileged document, and therefore, we recommend that these redacted pages be considered confidential as well.  Redacted pages 86 and 87 refer to discussions between Malifitano and Robert Hunter, who is an in-house attorney, as they discuss business structures and partnership agreements. We recommend that these pages remain sealed.  The Shearman and Sterling Opinion Letter and the Kaplan and Drysdale Opinion letter, which are discussed above, are the subject matters of redacted pages 94, 95, 96, 98, 99, 100, 102, 103, 104, 105 (lines 1-10), 115, and 120 and we already commend that they continue to be deemed confidential.[39]  We add to that list the following pages that should remain confidential: pp. 132 and 133.  Similarly, we have made a recommendation above that redacted pages 105 (lines 20-25), 106, 107, 108, 110, 111, 112, 113, 114, 121, 122, 123, 124, 125, 126, 127, and 128, as well as pages 116, 117, 118 and 119 (except lines 8-14, and 18) not be shielded any further and thus disclosed.  Redacted pages of 138, 139, 143,  144, and 145 are not privileged, or if they were, we have recommended that they be classified as at issue waiver, and therefore we recommend that they be disclosed.  Redacted pages 148, 149, 150, 151, 154, 155, 156, 157, 159, 160, 164, and 222, are recommended as confidential.  Redacted pages 172, 173, and 203 were touched upon above when we referred to Congel's statement to the press being a waiver and therefore we recommend that these pages be shared with the public.  We recommend that redacted pages 242 and 244 be treated as confidential.

---

[39] This Court had previously ruled that the Kaplan and Drysdale Opinion Letter was an attorney-client privileged document and confidential. Dkt. No. 147, Order dated Jan. 9, 2002, *corrected by* Dkt. No. 148, Order, dated Jan. 22, 2002.

The Edison Brother Litigation and corresponding work product impression, strategies, and tactics were covered on redacted pages 244, 245, 246, 247, and 248. Accordingly, we recommend that they maintain their confidentiality.

PMG employee Michele Murphy's deposition is the subject of Subject Document #27. A close inspection of her testimony deals with certain acts or omission that may have occurred during the Melville Litigation and her conversation with in-house counsel, Malifitano. We recommend that pages 66, 68, and 70 qualify as being confidential. The subject matter of Subject Document #28 (portion of Shanley's deposition) relate to Subject Documents ## 15, 16, 18, &/or 19 and should remain under seal consistent with the redactions on pages 157, 158, 159, 160, 161, 162, 163, 164, 165, 167, 256, 257, and 258. Subject Document #29 is the deposition of James Tuozzolo for which we make the following rulings: 1) pages 64, 65, 66, 67, and 132 relate to Subject Documents ## 15, 16, 18, and 19, and should remain under seal; 2) page 135 relates to Subject Document #20 Exhibit 6 and should remain sealed consistent with Defendants' redactions; 3) as previously stated, page 181 relates to Subject Document #21 and should remain sealed; 4) pages 141, 142, 152, and 166 discuss privileged information and no waiver has occurred, thus, consistent with Defendants' redactions, it should remain sealed; and 5) there has been no privilege established on pages 155, 156, 158, 161, and 213, and therefore should be available for public viewing. Finally, Subject Document #30 is portions of Joanna Viggiano's deposition that discusses matters already deemed to be confidential and thus, to reiterate, the redactions on pages 116, 117, 118, 120, 121, 124, 125, 134, 144, 145, 146, 170, 171, 172, 183, 184, 200, and 201 should remain confidential as well.

### III. CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the Newspapers be allowed to intervene in this action; and it is further

**RECOMMENDED**, that the purported inadmissibility of the Plaintiffs' submissions in Opposition to Defendants' Motions for Summary Judgment does not affect the public's right of access; and it is further

**RECOMMENDED**, that the District Court enter a ruling that Defendants did not waive any privilege by sharing documents with Plaintiffs under the Confidentiality Order nor as directed pursuant to the *Garner* Rule; and it is further

**RECOMMENDED**, that the District Court enter a ruling that Plaintiffs, who are individual general partners do not hold positions of authority that would allow them to unilaterally waive their respective partnerships' claim of attorney-client privilege and the mere filing of such privileged documents is not a waiver of any privilege that may exist; and it is further

**RECOMMENDED**, that the District Court enter a ruling, pursuant to the Second Circuit Mandate, that in terms of the presumptive access to judicial documents, the attorney-client privilege and work product doctrine are of the highest values within our judicial system and constitute compelling reasons, under the First Amendment, and countervailing factors, under the common law right of access, that sufficiently outweigh the public's right of access; and it is further

**RECOMMENDED**, that the Newspapers' request for access to the Subject Documents (Dkt. No. 356) be **GRANTED IN PART and DENIED IN PART** as set forth in the Summary of Rulings in Appendix C, hereby incorporated as recommendations regarding each of the Subject Documents as to whether a privilege was found to exist, whether such privilege was waived, and what portions, if any, of the Subject Documents should remain under seal; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order

on the parties and Intervenors.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b), 6(a), & 6(e).

SO ORDERED.

Date:    March 7, 2006
         Albany, New York

_____
RANDOLPH F. TREECE
United States Magistrate Judge

## <u>Appendix A</u>

**1)** Dkt. No. 356, Proposed Order to Show Cause re: Mot. for Limited Intervention; Michael J. Grygiel, Esq., Aff. in Supp. of Mot. for Limited Intervention with Exs. A-F:

> **Ex. A:** Dkt. No. 320, Jt. Stip. and Order Regarding Disp. Mot. Deadlines, dated Apr. 26, 2004.
>
> **Ex. B:** Dkt. No. 321, Lt. to Judge Mordue, dated May 4, 2004, from Michael J. Cunningham, Esq., on behalf of all Defs., requesting permission to file motion papers conventionally due to the length of the submissions.
>
> **Ex. C:** Dkt. No. 322, Lt. to Judge Mordue, dated May 7, 2004, from Cunningham on behalf of all Defs., listing twenty-four (24) items submitted in support of Defs.' Summ. J. Mots. and indicating that fourteen (14) of those listing are filed under seal.
>
> **Ex. D:** Lts. exchanged between Christopher D. Moore, Esq., and Grygiel regarding the Newspapers' objections to the Defs.' extensive sealing of documents and attempts to negotiate a resolution without court intervention.
>
> **Ex. E:** Lt. to Judge Mordue, dated June 10, 2004, from Grygiel notifying the Court of the Newspapers' intention to file a motion and requesting permission to proceed on an expedited basis.
>
> **Ex. F:** Lt. to Judge Mordue, dated June 14, 2004, from Paul F. Ware, Jr., Esq., responding on behalf of all Defs. to Newspapers' requests.

**2)** Dkt. No. 357, Exs. G-L to Grygiel Aff.:

> **Ex. G:** Lt. to Judge Mordue, dated June 15, 2004, from Grygiel replying to Defs.' objections.
>
> **Ex. H:** Lt. to Judge Mordue, dated June 15, 2004, from Michael Endler, Esq., responding on behalf of Pls to Newspapers' requests and opposing Defs.' objections. Attached to Endler's Letter were Exs. 1-3:

**Ex. 1:** Lt. to Defs.' Counsel, dated Oct. 15, 2003, from Endler objecting to Defs.' overuse of the Mar. 14, 2001 Confidentiality Order.

**Ex. 2:** Lt. to Endler, dated Oct. 28, 2003, from Anthony S. Fiotto, Esq., requesting on behalf of all Defs. that Pls. specify particular documents that should not be considered "confidential."

**Ex. 3:** Lt. to Fiotto, dated Oct. 29, 2003, from Endler informing Defs. that Pls. object to all of the Defs.' blanket designations of confidentiality.

Lt. to Judge Mordue, dated June 17, 2004, from Fiotto addressing issues raised by Grygiel's June 15th Letter.

Lt. to Judge Mordue, dated June 18, 2004, from Grygiel responding to Fiotto's June 17th Letter.

**Ex. I:** Dkt. No. 269, Pls.' Third Am. Compl., dated Sept. 16, 2003.

**Ex. J:** Dkt. No. 51, Judge Mordue Order, dated Feb. 1, 2001, allowing Pls.' RICO claims to survive Defs.' Mot. to Dismiss, filed pursuant to Fed. R. Civ. P. 12(b)(6).

**Ex. K:** Dkt. No. 131, Pls.' Amended Civil RICO Statement, dated Nov. 29, 2001.

**Ex. L:** Lt. to Jim Tuozzolo, dated Apr. 2, 1998, from Robert Congel regarding upcoming meeting of all partners in the Pyramid Companies, scheduled for Apr. 9, 1998.

**3)** Dkt. No. 368, Exs. M-Q to Grygiel Aff.:

**Ex. M:** Copy of Partners' Apr. 9, 1998 Meeting Agenda and materials distributed at the meeting.

**Ex. N:** Various news accounts published by The Wall Street Journal, Dow Jones, Reuters, Bloomberg, and The Post Standard regarding Pyramid's plans to sell its entire network of thirty-one (31) shopping mall properties.

**Ex. O:**       Printout of information regarding DestiNY USA from http://www.destinyusa.com.

**Ex. P:**       Printout of media coverage of DestiNY USA project from http://www.destinyusa.com.

**Ex. Q:**       Copies of articles, in computerized formal, covering the DestiNY USA project, published by The New York Times and the Minneapolis Star Tribune.

**4)** Dkt. No. 358, Exs. R-S to Grygiel Aff.:

**Ex. R:**       Records from the On-Line Lobbyist Registration System, maintained by the New York State Temporary State Commission on Lobbying, concerning lobbying activity performed for DestiNY USA during 2003.

**Ex. S:**       Records from the On-Line Lobbyist Registration System, maintained by the New York State Temporary State Commission on Lobbying, concerning lobbying activity performed for DestiNY USA during 2004.

**5)** Dkt. No. 359, Exs. T-Z to Grygiel Aff.:

**Ex. T:**       Copy of the text of Governor Pataki's annual State of the State Address, delivered on Jan. 7, 2004.

**Ex. U:**       Dkt. No. 55, Magistrate Judge Smith Confidentiality Order, dated Mar. 14, 2001.

**Ex. V:**       Lt. to all Defs., dated Oct. 15, 2003, from Endler requesting removal of the "confidential" designation from all documents.

Lt. to Endler, dated Oct. 28, 2003, from Fiotto on behalf of all Defs., requesting Endler specify which documents were inappropriately designated "confidential."

Lt. to Fiotto, dated Oct. 29, 2003, from Endler, responding to Fiotto's Oct. 28th Letter.

**Ex. W:**       Dkt. No. 284, Magistrate Judge Treece Order, dated Oct. 17, 2003,

regarding extent of discovery and privilege issues on PILOT billing statements.

**Ex. X:**    Lt. to Grygiel, dated March 16, 2004, from Fiotto, regarding agreement stricken between the Defs. and Newspapers regarding disclosure of certain documents in order to resolve intervention dispute.

**Ex. Y:**    Lt. to Fiotto, dated Apr. 27, 2004, from Grygiel, objecting to the redaction of certain documents included in the Mar. 16th Agreement.

**Ex. Z:**    Lt. to Moore, dated Apr. 30, 2004, from Grygiel, regarding agreement to provide documents.

**6)** Dkt. No. 363, John F. O'Brien, Professional Journalist employed as a reporter by The Herald Company, publisher of The Syracuse Post-Standard ("The Post-Standard), Aff. in Support of Mot. for Limited Intervention with Exs. AA-CC:

**Ex. AA:**    Copies of news articles, in computerized format, published by The Post Standard covering instant litigation.

**Ex. BB:**    Copy of full-page advertisement, purchased by Pyramid, published in a Sunday edition of The Post-Standard on Dec. 9, 2001, regarding DestiNY USA.

**Ex. CC:**    Copies of news articles, in computerized format, published by The Post Standard covering the DestiNY USA project.

**7)** Dkt. No. 367, John F. O'Brien, Professional Journalist employed as a reporter by The Herald Company, publisher of The Syracuse Post-Standard ("The Post-Standard), Aff. in Support of Mot. for Limited Intervention with Exs. CC (cont.) - EE.

**Ex. CC:**    Copies of news articles, in computerized format, published by The Post Standard covering the DestiNY USA project.

**Ex. DD:**    Copy of article, in computerized format, published in The Post Standard, dated Oct. 22, 2003, covering the PILOT bills and Magistrate Judge Treece's Order, dated Oct. 17, 2003.

**Ex. EE:**    Copy of article, in computerized format, published in The Post

<u>Standard</u>, dated May 2, 2004, covering the PILOT bills.

**Ex. FF:**    Copy of Docket Report of instant action reflecting various documents filed under seal and unavailable for public viewing.

**8)** Dkt. No. 360, James M. Odato, Professional Journalist employed as a reporter in the Capital Bureau of the <u>Albany Times Union</u> (<u>Times Union</u>), Aff. in Support of Mot. for Limited Intervention with Ex.s GG-LL:

**Ex. GG:**    Copies of news articles, in computerized format, published by the <u>Times Union</u> covering legislative matters on the DestiNY USA project.

**Ex. HH:**    Copy of an Associated Press article published in the <u>Times Union</u> on Nov. 19, 2003, regarding legislation affecting DestiNY USA project.

**Ex. II:**    Copy of article, in computerized format, published in the <u>Times Union</u> on Nov. 16, 2003, regarding special legislation affecting DestiNY USA project.

**Ex. JJ:**    Copy of article, in computerized format, published in the <u>Times Union</u>, dated Oct. 24, 2003, covering the PILOT bills and Judge Treece's Order, dated Oct. 17, 2003.

**Ex. KK:**    Copy of article, in computerized format, published in the <u>Times Union</u>, dated Nov. 27, 2003, covering the PILOT bills.

**Ex. LL:**    Copy of article, in computerized format, published in the <u>Times Union</u>, dated May 2, 2004, covering the PILOT bills.

**9)** Dkt. No. 362, Proposed Intervenors' Mem. of Law in Support of Mot. for Limited Intervention.

**10)** Dkt. Nos. 364-65, Proposed Intervenors' Appendix of Cited Cases (complying with N.D.N.Y.L.R. 7.1(a)(1)).

**11)** Dkt. No. 386, Pls.' Mem. of Law in Response to Mot. for Limited Intervention.

**12)** Dkt. No. 387, Jeff S. Shelly, Esq., Decl. in Support of Mot. for Limited Intervention, with Exs. 1-7:

**Ex. 1:**     Dkt. No. 55, Magistrate Judge Smith Confidentiality Order, dated Mar. 14, 2001.

**Ex. 2:**     Lt. to Shelly, dated Apr. 12, 2001, from Lisa Bonanno, Esq., regarding Pls.' discovery requests in the instant litigation.

**Ex. 3:**     Lt. to Defs.' counsel, dated Oct. 15, 2003, from Endler requesting removal of the "confidential" designation from all documents.

**Ex. 4:**     Lt. to Endler, dated Oct. 28, 2003, from Fiotto on behalf of all Defs., requesting Endler specify which documents were inappropriately designated "confidential."

**Ex. 5:**     Lt. to Fiotto, dated Oct. 29, 2003, from Endler, responding to Fiotto's Oct. 28th Letter.

**Ex. 6:**     Copy of newspaper article entitled <u>Secrecy Cloaks Meeting on Mall</u>, published in <u>The Post-Standard</u> on July 23, 2004.

**Ex. 7:**     Pls.' Privilege Log, as required by Judge Treece's Order to Show Cause, dated Aug. 11, 2004, detailing the bases for sealing documents accompanying Pls.' Opp. to Defs.' Mots. for Summ. J.

**13)** Dkt. No. 390, Defs.' Mem. of Law in Opp. to Mot. for Limited Intervention.

**14)** Dkt. No. 389, Michael Bovalino, Chief Executive Officer of Pyramid Management Group, Inc., Decl. in Support of Defs.' Opp. to Mot. for Limited Intervention, with Exs. A-C:

**Ex. A:**     Log of documents contained in the Jt. Appendix to Defs.' Mots. for Summ. J.

**Ex. B:**     Log of documents contained in the Appendix to Pls.' Opp. to Defs.' Mot. for Summ. J.

**Ex. C:**     Log of Summ. J. Pleadings.

**15)** Dkt. No. 393, Newspapers' Reply Mem. of Law in Support of Mot. for Limited Intervention.

**16)** Dkt. No. 394, John F. O'Brien, Professional Journalist employed as a reporter by <u>The Post-Standard</u>, Reply Aff. in Support of Mot. for Limited Intervention with Exs. MM-OO:

*-6-*

| | |
|---|---|
| **Ex. MM:** | Dkt. No. 24, Mem. of Law, dated July 21, 2000), filed in Support of Defs.' Mot. to Dismiss. |
| **Ex. NN:** | Dkt. No. 92, James A. Tuozzolo Decl. with Exs., dated Aug. 22, 2001, filed in Opp. to Pls.' Mot. for a TRO. |
| **Ex. OO:** | Dkt. No. 93, David J. Hensler Decl. with Exs., dated Aug. 22, 2001, filed in Opp. to Pls.' Mot. for a TRO. |

**17)** Dkt. No. 396, Lt. to Judge Treece, dated Nov. 8, 2004, from Grygiel informing the Court of agreement and stipulation regarding Mot. for Limited Intervention, attached Nov. 5, 2004 Executed Agreement.

**18)** Dkt. No. 397, Lt. to Judge Treece, dated Nov. 12, 2004, from Cunningham providing Amended Privilege Log in light of parties' Nov. 5th agreement.

**19)** Dkt. No. 438, Defs.' Privilege Log Pursuant to Court's Jan. 20, 2006 Order.

**20)** Dkt. No. 441, Newspapers' Lt.-Brief Pursuant to the Court's Jan. 20th and 30th, 2006 Orders.

**21)** Dkt. No. 442, Pls.' Mem. of Law in Opp'n to (1) Defs.' Claim of Privilege, and/or Work Product Protection over the Subject Documents, and (2) Defs.' Mot. to Strike the Subject Documents based upon Inadmissibility, filed under seal pursuant to the Court's Jan. 20th and 30th, 2006 Orders.

**22)** Dkt. No. 442, Decl. of Jeffrey Shelly in Support of Pls.' Mem. of Law and in Opp'n to Defs.' Continuing Attempt to Withhold Certain Documents from Proposed Intervenors with Exs. 1-12, filed under seal pursuant to the Court's Jan. 20th and 30th, 2006 Orders:

| | |
|---|---|
| **Ex. 1:** | Dkt. No. 55, Magistrate Judge Smith Confidentiality Order, dated Mar. 14, 2001. |
| **Ex. 2:** | James A. Tuozzolo Decl., dated Aug. 22, 2001, with Ex. 19, Lugosch's Schedule K-1 for Crossgatess Mall for tax year 1992. |
| **Ex. 3:** | Lt. to Defs' counsel, dated Oct. 15, 2003, from Endler requesting removal of the "confidential" designation from all documents. |
| **Ex. 4:** | Lt. to Endler, dated Oct. 28, 2003, from Fiotto on behalf of all Defs., requesting Endler specify which documents were inappropriately designated "confidential." |

| Ex. 5: | Lt. to Fiotto, dated Oct. 29, 2003, from Endler, responding to Fiotto's Oct. 28th Letter. |
|---|---|
| Ex. 6: | Dkt. No. 412, Lt. to Judge Mordue, dated May 12, 2005, from Shelly indicated Pls.' take no position on the Newspapers' Appeal of Judge Treece's April 15th Order and requested guidance as to Pls.' intended use of subject documents at oral argument on the Mots. for Summ. J. |
| Ex. 7: | Robert J. Congel's Mem. of Law in Supp. of Mot. for Summ. J., dated May 7, 2004. |
| Ex. 8: | Dkt. No. 431, Lt. to Judge Treece, dated Jan. 19, 2006, from Paul Ware, requesting conference with the Court to discuss admissibility issues regarding the subject documents as submitted by Pls. |
| Ex. 9: | Defs.' Pet. for Rehr'g and Rehr'g *En Banc*, dated Jan. 24, 2006. |
| Ex. 10: | Marc A. Malfitano's and Robert Brvenik's Mem. of Law in Supp. of Mot. for Summ. J., dated May 7, 2004. |
| Ex. 11: | Brief for Defs.-Counter-Defs.-Appellees, Defs.-Appellees, and Defs.-Countercl.-Appellees, dated Aug. 19, 2005, submitted to the Second Circuit. |
| Ex. 12: | Decl. of Jeff Shelly, dated July 12, 2004, in Supp. of Pls.' Opp'n to Defs. Mots. for Summ. J. |

**23)** Dkt. No. 443, Defs.' Mem. of Law in Supp. of the Continued Sealing of the Documents Identified in Defs.' Log of Privileged Materials, filed under seal pursuant to the Court's Jan. 20th and 30th, 2006 Orders, with Ex. A:

| Ex. A: | Lt. to Shelly, dated Apr. 12, 2001, from Lisa Bonanno, Esq., regarding Plaintiffs' discovery requests in the instant litigation. |
|---|---|

**24)** Decl. of Marc Malfitano, dated Feb. 7, 2006, filed under seal for *in camera* review pursuant to the Court's Jan. 20th and 30th, 2006 Orders.

**25)** Decl. of Michael P. Shanley, dated Feb. 7, 2006, filed under seal for *in camera* review pursuant to the Court's Jan. 20th and 30th, 2006 Orders.

**26)** Decl. of James Tuozzolo, dated Feb. 7, 2006, filed under seal for *in camera* review pursuant to the Court's Jan. 20th and 30th, 2006 Orders.

**27)** Dkt. No. 445, Redacted version of Pls.' Mem. of Law in Opp'n to (1) Defs.' Claim of Privilege, and/or Work Product Protection over the Subject Documents, and (2) Defs.' Mot. to Strike the Subject Documents based upon Inadmissibility, available for public viewing pursuant to the Court's Feb. 9th Order.

**28)** Dkt. No. 446, Decl. of Jeffrey Shelly in Supp. of Pls.' Mem. of Law and in Opp'n to Defs.' Continuing Attempt to Withhold Certain Documents from Proposed Intervenors with Exs. 1-12, full unredacted version made available for public viewing pursuant to Court's Feb. 9th Order.

**29)** Dkt. No. 448, Redacted version of Defs.' Mem. of Law in Supp. of the Continued Sealing of the Documents Identified in Defs.' Log of Privileged Materials, with Ex. A, made available for public viewing pursuant to Court's Feb. 9th Order.

**30)** Dkt. No. 449, Redacted Decl. of Marc Malfitano, dated Feb. 7, 2006, made available for public viewing pursuant to Court's Feb. 9th Order.

**31)** Dkt. No. 450, Redacted Decl. of Michael P. Shanley, dated Feb. 7, 2006, made available for public viewing pursuant to Court's Feb. 9th Order.

**32)** Dkt. No. 451, Redacted Decl. of James Tuozzolo, dated Feb. 7, 2006, made available for public viewing pursuant to Court's Feb. 9th Order.

**33)** Dkt. No. 452, Newspapers' Lt-Brief in Reply in Further Supp. of Public Access.

**34)** Dkt. No. 453, Defs.' Reply Mem. of Law in Supp. of Continued Sealing of the Documents Identified in Defs.' Log of Privileged Materials.

**35)** Dkt. No. 455, Pls.' Reply Mem. of Law in Opp'n to Defs.' Mem. of Law in Supp. of the Continued Sealing of the Documents Identified in Defs.' Log of Privileged Materials, filed under seal pursuant to the Court's Jan. 20th and 30th, 2006 Orders.

**36)** Dkt. No. 456, Decl. of Jeffrey Shelly in Supp. of Pls.' Resp. Mem. of Law in Opp'n to Defs.' Mem. of Law in Supp. of the Continued Sealing of Documents Identified in Defs.' Log of Privileged Materials with Exs. 1-2, filed under seal pursuant to the Court's Jan. 20th and 30th, 2006 Orders:

> **Ex. 1:**    Defs.' Jt. Preliminary Statement in Conjunction with Their Independent Mots. for Summ. J., dated May 7, 2004.

**Ex. 2:**          June 11, 2003 Dep. Tr. of Michael P. Shanley.

**37)** Dkt. No. 460, Stip. and Order, signed by Jeff Shelly, Christopher Moore, Michael Grygiel, and endorsed by the Court on Feb. 17, 2006, setting forth redactions to be made to Pls.' Response Memoranda to be filed on the Docket for public viewing.

**38)** Dkt. No. 461, Redacted version of Reply Mem. of Law in Opp'n to Defs.' Mem. of Law in Supp. of the Continued Sealing of the Documents Identified in Defs.' Log of Privileged Materials and Decl. of Jeffrey Shelly in Support with Exs. 1-2.

**39)** Dkt. No. 469, Stip. and Order, signed by Jeff Shelly, Christopher Moore, Michael Grygiel, and endorsed by the Court on Mar. 1, 2006, setting forth redactions to be made to Defs.' Power Point Presentation to be shared with the Newspapers.

**Appendix B**

**CONFIDENTIALITY ORDER**

WHEREAS, J. Daniel Lugosch, III, Robert L. Ungerer, John A. Bersani, Edward A. Kellogg, John C. Charters and Peter C. Steingraber ("Plaintiffs") and Robert J. Congel, James A. Tuozzolo, Robert Brvenik, and Mark A. Malfitano ("Defendants") are parties to the above-captioned litigation; and

WHEREAS, certain materials and information likely to be disclosed in connection with the litigation contain confidential business information related to private partnerships and other non-public entities, and, accordingly, the parties hereby stipulate and agree, subject to the approval of the Court, to the entry by the Court of the following Confidentiality Order:

NOW, THEREFORE SUBJECT TO THE APPROVAL OF THE COURT, IT IS HEREBY STIPULATED, AGREED AND ORDERED that:

1.   Either party may designate as "Confidential" any documents, testimony or other materials that contain confidential or proprietary business information or trade secrets. "Confidential" material, as used in this Confidentiality Order, shall refer to any so designated document, testimony or other material and all copies thereof, and shall also refer to the information contained in such materials.

2.   "Confidential" material shall be used solely in connection with the above-captioned action and shall not be disclosed to any person except:

   a)   parties and counsel for the parties, including counsel's office attorneys, paralegals and clerical employees, provided that each such party and attorney has signed an undertaking in the form of Exhibit A hereto and provided that each such paralegal or clerical employee has been advised in accordance with paragraph 4 below;

   b)   in-house counsel provided that such counsel has signed an undertaking in the form of Exhibit A hereto;

    c)      the Court in the above-captioned action and court reporters employed in connection with that action;

    d)      a deponent or witness in the above-captioned action, during the course of examination;

    e)      officers or employees of the parties, provided they have signed an undertaking in the form of Exhibit A hereto;

    f)      any outside experts or consultants used or retained by counsel to the extent deemed necessary by counsel to aid in the prosecution, defense or settlement of the above-referenced action, provided that any such expert or consultant has signed an undertaking in the form of Exhibit A hereto.

3.    All "Confidential" material produced in accordance with this Confidentiality Order shall be used by the recipient solely for purposes of the above-captioned legal proceeding, including in prosecuting, defending or settling the proceeding, in testimony and exhibits at the trial and appeal of the proceeding, or in connection with motions, depositions or witness preparation in the proceeding subject to the restrictions of this Confidentiality Order, but such use shall not include, inter alia, use for or in connection with any commercial or business activity, including but not limited to research, development, manufacture, sale, solicitation or marketing of any product or process, or for purposes of publicity, or in any legal proceeding other than the proceeding.

4.    Prior to any office attorney, paralegal, translator or clerical employee obtaining access to any "Confidential" material pursuant to paragraph 2 above, an attorney of record or an attorney who has signed an undertaking in the form of Exhibit A hereto shall advise each such person of his or her duties and responsibilities to abide by the terms and conditions of this Stipulation.

5.    Except as otherwise provided in ¶ 6 hereof, no designation of "Confidential" shall be effective unless there is placed or affixed on such material a "CONFIDENTIAL" designation or reasonable equivalent.  No disclosure of a document without such

designation shall constitute a breach of this Stipulation.  It is further understood that with respect to any documents produced prior to the date of this Confidentiality Order, the producing party shall have the option of reissuing the original production with a "CONFIDENTIAL" designation on the designated documents, in which event the confidential documents originally produced (and all copies thereof) shall be destroyed by the receiving party.

6.      Any portion of deposition testimony given in this case may be designated as "Confidential" by (1) advising counsel present at the deposition of the confidential nature of the testimony and instructing the court reporter to note such designation in the transcript or (2) designating such information as confidential by written notice to the other parties within ten working days after receipt of the transcript by the designating party.  If during the course of a deposition, testimony is designated as confidential, the deposition shall proceed but the testimony shall be subject to the restrictions of this Confidentiality Order.

7.      No party, by entering into this Confidentiality Order, concedes that any document, material or information designated as "confidential" or redacted does in fact contain or reflect confidential business information or proprietary information.

8.      If any party objects to the designation of any document or information as "Confidential," it may request removal of the "Confidential" designation by sending a written request to the other party identifying the document and stating the grounds for removal of the "Confidential" designation.  If the designating party fails to respond to that request in ten business days, the "Confidential" designation shall be removed.  If the designating party objects to the removing the "Confidential" designation, the parties shall try to resolve the issue informally.   If the issue cannot be resolved informally, either party may seek appropriate relief from the Court.   The burden to prove that the documents are confidential or otherwise properly subject to a protective order shall remain on the party having designated the documents as confidential.  Until the Court rules on whether the

materials in question are properly confidential, all documents, information and deposition testimony designated as such shall be treated as though they are confidential and shall be subject to the provisions of this Confidentiality Order.

9.   In the event that a party desires to provide access to or disseminate "Confidential" material to any person not otherwise entitled to access under this Confidentiality Order, the party may request the consent of the designating party.  If that consent is refused, the party may move the Court for an order that such person be given access thereto.  In the event that the motion is granted, such person may have access to "Confidential" material after first signing an undertaking in the form of Exhibit A attached hereto.

10.  Any dispute over the "Confidentiality" designations provided for herein, or other matters governed by this Agreement, shall be subject to resolution by the Court in the above-captioned action during the pendency of that action, provided the parties have first made good-faith efforts to resolve the dispute.

11.  Within thirty days after the conclusion of the above-captioned action (including all appeals), all "Confidential" material and all copies thereof shall be returned to the producing party, or counsel of record shall certify in writing that such material has been destroyed, except that counsel for each party may retain one copy of all pleadings or other materials filed with the Court and one copy of all transcripts.

12.  No "Confidential" material shall be filed in the public record.  All materials designated as "Confidential" that is filed with the Court, and any pleadings, motions, or other papers filed with the Court disclosing any such material, shall be filed in a sealed envelope and kept under seal by the Clerk of the Court.  Where possible, only "Confidential" portions of filings with the Court shall be filed under the seal.  To facilitate compliance with this Agreement, material filed under the designation "Confidential" shall be contained in a sealed envelope bearing such designation on its front face.  In addition, the envelope shall bear the caption of this proceeding, shall contain a concise, non-disclosing inventory of its contents for docketing purposes and shall state thereon that it is filed

under the terms of this Confidentiality Order.

13.	If "Confidential" information supplied in accordance with this Confidentiality Order is disclosed to any person other than in the manner authorized by this Confidentiality Order, the party responsible for the disclosure shall immediately bring such disclosure to the attention of the supplier.

14.	Restrictions and obligations are set forth herein relating to "Confidential" material shall not apply to any information which (a) is already public knowledge or becomes public knowledge through disclosure in open court and (b) the disclosing party agrees, or the Court rules, has become public knowledge other than as a result of disclosure by the receiving party.  Such restrictions and obligations shall not be deemed to prohibit discussion with any person of "Confidential" material if said person already has or obtains legitimate possession thereof, without restrictions which would independently prohibit such discussion.

15.	This Confidentiality Order shall also apply to any confidential information or documents required to be produced by subpoena, court order, or otherwise by law.  The party producing the information shall be advised of the terms of this Confidentiality Order and shall be permitted to designate documents, testimony or other material as "Confidential" in accordance with the procedure set forth in paragraph 1 hereof.  Thereafter, materials designated as "Confidential" shall be treated in the manner provided in this Confidentiality Order.

16.	Any party receiving "Confidential" information agrees to provide at least ten business days notice, if possible, to the disclosing party prior to disclosing "Confidential" information pursuant to any court order, subpoena, summons or request for production of such documents.

17.	This Confidentiality Order shall not prevent anyone from applying to the Court for relief therefrom.  This Confidentiality Order shall further not prevent anyone from applying to the Court for further or additional protective orders, or prevent the parties from

agreeing between themselves in writing to modification of this Confidentiality Order, subject to the approval of the Court.

18.     The Court may impose sanctions to the full extent provided by law for any material violation of the terms of this Confidentiality Order and any order entered pursuant thereto.

19.     Inadvertent disclosure of any privileged or work product information in connection with the litigation shall not be deemed a waiver of the attorney-client privilege, the attorney work product doctrine or any other applicable privilege.  Upon the request from a party which has inadvertently produced any document which it believes to be subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege, the party receiving the information shall immediately return it to the producing party.

20.     The Court shall retain jurisdiction over the matters governed by this Confidentiality Order, including but not limited to issues relating to the compliance of any person or entity with this Confidentiality Order after the conclusion of the above-captioned action.

*******

(Signatures of Counsel and Court Omitted)

EXHIBIT A

AGREEMENT CONCERNING INFORMATION COVERED BY STIPULATION
AND ORDER OF CONFIDENTIALITY

The undersigned hereby acknowledges that he/she has read the Stipulation and Order of Confidentiality ("the Stipulation") entered into between J. Daniel Lugosch, III, Robert L. Ungerer, John A. Bersani, Edward A. Kellogg, John C. Charters, Peter C. Steingraber and Robert J. Congel, James A. Tuozzolo, Robert Brvenik, and Mark A. Malfitano, understands its terms, and agrees to be bound by each of those terms.  Specifically, and without limitation upon such terms, the undersigned agrees not to use or disclose any confidential business information made available to him/her other than in accordance with the Stipulation.  The undersigned agrees to take, or to cause to be taken, all necessary precautions to prevent disclosure of materials provided under the Stipulation, including but not limited to, where appropriate, physically securing, safeguarding and restricting access to the material subject to the Stipulation.  The confidentiality of material provided under the Stipulation shall be maintained in perpetuity.

The undersigned understands that the violation of any of the terms of the Stipulation may subject the undersigned to legal penalties.

*****

(Signature Lines Omitted)

## Appendix C
## SUMMARY OF RECOMMENDATIONS AS TO SUBJECT DOCUMENTS

| Tab No. | Date | Description of Document | Privilege found by Court | Waiver found by Court | | Remain Confidential/Redactions |
|---|---|---|---|---|---|---|
| 1 | 7/12/04 | Dkt. No. 370, Pls.' Mem. of Law in Response to Defs.' Motions for Summ. J. | 1) Yes, in part | 1) No | 1) Yes, in part | 1) Relate to Subj. Docs. ##15, 16, 18, & 19 and should remain under seal consistent with Defs.' redactions on pp. 29, 30, 45, 46, & 75 |
| | | | 2) Yes, in part | 2) No | 2) Yes, in part | 2) Relate to Subj. Doc. #7 and should remain under seal consistent with Defs.' redactions on pp. 37 & 38 |
| | | | 3) Yes, in part | 3) No | 3) Yes, in part | 3) Relate to Subj. Doc. #20, Ex. 4 and should remain under seal consistent with Defs.' redactions on p. 36. |
| 2 | 7/12/04 | Dkt. No. 371, Pls.' Resp. to Defs.' Omnibus Statement of Undisputed Facts | 1) Yes, in part | 1) No | 1) Yes, in part | 1) Relate to Subj. Docs. ##15, 16, 18, & 19 and should remain under seal consistent with Defs.' redactions on pp. 109 & 110 |
| | | | 2) No | 2) N/A | 2) No | 2) Relate to Subj. Docs. ##11 & 13 and p. 56 should be available for public viewing |
| 3 | 8/13/04 | Dkt. No. 384, Defs.' Omnibus Reply Mem. of Law in Supp. of Defs.' Motions for Summ. J. | Yes, in part | No | Yes, in part | Relate to Subj. Docs. ##15, 16, 18, & 19 and remain under seal consistent with Defs.' redactions on pp. 12 & 13 |
| 4 | 8/13/04 | Reply Mem. of Law in Supp. of Marc A. Malfitano's and Robert Brevnik's Mot. for Summ. J. | Yes, in part | No | Yes, in part | Consistent with Defs.' redactions, p. 6 n.9 should remain sealed |

| Tab No. | Date | Description of Document | Privilege found by Court | Waiver found by Court | | Remain Confidential/Redactions |
|---|---|---|---|---|---|---|
| 5 | 6/30/99 | Dkt. No. 373, Pls.' App., Ex. 28, Mem. from Marc Malfitano, Esq., (in-house counsel) to Michael Shanley, Esq.,  regarding Bonwit Teller and Shearman & Sterling Letter | No | N/A | No | Should be available for public viewing in its entirety |
| 6 | 2/8/95 | Dkt. No. 373, Pls.' App., Ex. 30, Mem. from Kyle Schroeder regarding meeting with Malfitano on billing methodology for tenants at Crossgates Mall | No | N/A | No | Should be available for public viewing in its entirety |
| 7 | 3/8/96 | Dkt. No. 373, Pls.' App., Ex. 31, Mem. from Richard S. Hoffman, Esq., (outside counsel) relating to ongoing litigation and conversation with Malfitano | Yes | No | Yes | Should remain under seal |
| 8 | 3/4/99 | Dkt. No. 373, Pls.' App., Ex. 32, Mem. from Austin Hoffman, Esq., regarding lease negotiations with tenant | No | N/A | No | Should be available for public viewing in its entirety |
| 9 | 10/27/93 | Dkt. No. 373, Pls.' App., Ex., 55, Mem. from Richard S. Hoffman regarding deposition on pending litigation and case development | Yes | Yes, in part (at issue) | Yes, in part | P. 1 should be available for public viewing while pp. 2 & 3 should remain sealed |
| 10 | 7/1/94 | Dkt. No. 373, Pls.' App., Ex. 61, Mem. from Eric Cotton, Esq., to Jim Tuozzolo summarizing litigation involving Crossgates Mall | No | N/A | No | Should be available for public viewing in its entirety |
| 11 | 3/22/93 | Dkt. No. 373, Pls.' App., Ex. 62, summary of lease-form related tenant litigation, disputes, and audits | No | N/A | No | Should be available for public viewing in its entirety |

| Tab No. | Date | Description of Document | Privilege found by Court | Waiver found by Court | | Remain Confidential/Redactions |
|---|---|---|---|---|---|---|
| 12 | 12/5/00 | Dkt. No. 373, Pls.' App., Ex. 64, Lt. from Malfitano to Kenneth Smurzynski, Esq., regarding attached newspaper article and pending litigation | Yes | No | Yes | Should remain under seal |
| 13 | 1/17/00 | Dkt. No. 373, Pls.' App., Ex. 65, Mem. from Malfitano to Mike Mammolito regarding upcoming tenant audit, procedures, and information requests | Yes, in part | No, to that portion protected | Yes, in part | P. 1 should be available for public viewing in its entirety.<br><br>The following redactions should be made on pp. 2-3:<br>• Under the designation of #8, the last sentence in the second paragraph, beginning with "To the extent" and ending with "back to him"<br>• Unnumbered third bullet under #8, the second sentence beginning with "This is a" all the way through the last sentence of that bullet ending with "or non-compliance"<br>• Unnumbered fourth bullet under #8, the second sentence beginning with "In general" and ending with "in their files"<br>• Unnumbered fifth bullet under #8, fourth (last) sentence beginning with "We should not" and ending with "utility meters"<br>• Unnumbered sixth bullet under #8, fourth (last) sentence beginning with "The real question" and ending with "chart of accounts"<br>• The entirety of Unnumbered bullets 8, 9, & 10 |

| Tab No. | Date | Description of Document | Privilege found by Court | Waiver found by Court | | Remain Confidential/Redactions |
|---|---|---|---|---|---|---|
| 14 | 2/16/98 | Dkt. No. 373, Pls.' App., Ex. 98, Mem. from Malfitano to Bob Congel regarding potential meeting about portfolio sale | No | N/A | Yes | Should be available for public viewing in its entirety |
| 15 | 6/24/99 | Dkt. No. 373, Pls.' App., Ex. 154, Lt. from Shanley to Chris M. Smith, Esq., regarding Bonwit Teller | Yes | No | Yes | Should remain under seal |
| 16 | 6/24/99 | Dkt. No. 373, Pls.' App., Ex. 156, Draft Mem. (not sent) from Shanley regarding upcoming meeting on Bonwit Teller and retention of outside counsel to provide legal opinions | Yes, in part | No | Yes, in part | The following redactions should be made:<br>• Item #3, second paragraph beginning with "Additionally Shearman & Sterling" through the last sentence of that paragraph ending with "discuss those issues" |
| 17 | 12/19/94 | Dkt. No. 373, Pls.' App., Ex. 157, Mem. from Malfitano to Richard Hoffman regarding revision to, and review of, Management Agreements and Supplemental Services Agreements | Yes | Yes (at issue) | Yes | Should be available for public viewing in its entirety |
| 18 | 7/6/99 | Dkt. No. 373, Pls.' App., Ex. 158, Draft Legal Opinion from Chris Smith to Shanley regarding Bonwit Teller and handwritten notes regarding related communications with outside counsel | Yes | No | Yes | Should remain under seal |
| 19 | 5/3/90 | Dkt. No. 373, Pls.' App., Ex. 164, Communication between Malfitano and Peter Elliott, Esq., regarding Bonwit Teller | Yes | No | Yes | Should remain under seal |
| 20 | 9/12/03 | Dkt. No. 373, Pls.' App., Ex. 205, Lt. from Jeff Shelly, Esq. to Judge Treece regarding tenant dispute with The Limited | Yes, in part | No | Yes, in part | References to Exs. 3, 4, & 6 should be redacted and remain under seal consistent with Defs.' redactions |

| Tab No. | Date | Description of Document | Privilege found by Court | Waiver found by Court | | Remain Confidential/Redactions |
|---|---|---|---|---|---|---|
| | 8/21/03 | Dkt. No. 373, Pls.' App., Ex. 205, Shelly Lt., Ex. 3, excerpts from Malfitano Dep. (*See* Tab 26) | 1) Yes, in part | 1) No | 1) Yes, in part | *See* Tab #26<br><br>1) Consistent with Defs.' redactions at pp. 148, 149, 150, 151, 154, 155, 156, 157, 159, 160, 164, 222, 242, 244, 245, 246, 247, and 248 should remain under seal |
| | | | 2) Yes, in part | 2) Yes (3d party) | 2) Yes, in part | 2) PP. 172, 173, & 203 should be available for public viewing |
| | | | 3) No, in part | 3) N/A | 3) Yes, in part | 3) PP. 234, 235, & 236 relate to Subj. Doc. #6 and should be available for public viewing |
| | | | 4) Yes, in part | 4) No | 4) Yes, in part | 4) PP. 237, 238, 239, & 240 relate to Subj. Doc. #7 and should remain under seal |
| | 11/13/00 | Dkt. No. 373, Pls.' App., Ex. 205, Shelly Lt., Ex. 4, Lt. from Eric Dadd, Esq., discussing settlement negotiations with The Limited | Yes, in part | No | Yes, in part | The following portions shall be redacted and remain under seal:<br>•     P. 1, second bullet, last sentence beginning with "He also stated" and ending with "views on the issues"<br>•     P. 2, third bullet, three lines from the bottom of the page, the clause in-between the commas and separated by "extemporaneous" and "colloquy"<br>•     P. 3, eighth line from the top, last sentence in that paragraph beginning with "I have not" and ending with "legal talent"<br>•     P. 3, under the "N.B." designation, clause in the first sentence beginning with "I want to" and ending with the clause embarrass us"<br>•     P. 3, under the "N.B." designation, fifth |

| Tab No. | Date | Description of Document | Privilege found by Court | Waiver found by Court | | Remain Confidential/Redactions |
|---------|------|-------------------------|--------------------------|-----------------------|---|--------------------------------|
| | | | | | | line from the bottom of the page, the clause in-between the commas and separated by "admitted" and "that Limited's" |
| | | | | | | • P. 3, under the "N.B." designation, second and last line from the bottom of the page, clause beginning with "Gregory" including the first word of the last line on the page |
| | | | | | | • P. 4, second line from the top of the page, sentence beginning with "The fact" through the end of that paragraph ending with "years from discovery)" |
| | | | | | | • P. 4, first bullet under the heading "Trash", clause beginning with "apparently" and ending on the same line with "performed" |
| | | | | | | • P. 4, first bullet under the heading "Trash", second sentence in paragraph beginning with "The upshot" and ending with "proper charge" |
| | | | | | | • P. 5, entire first bullet beginning with heading "HVAC" and ending with "etc., etc." |
| | | | | | | • P. 5, second bullet, clause beginning with "and that Pyramid" and ending with "the intent" |
| | 10/17/00 | Dkt. No. 373, Pls.' App., Ex. 205, Shelly Lt., Ex. 6, Mem. from Malfitano, with mark-ups, regarding response to The Limited | Yes | No | Yes | Should remain under seal |

| Tab No. | Date | Description of Document | Privilege found by Court | Waiver found by Court | Remain Confidential/Redactions | |
|---|---|---|---|---|---|---|
| 21 | 11/13/00 | Dkt. No. 373, Pls.' App., Ex. 206, Jeff Shelly Decl., dated Nov. 7, 2003, Ex. 6, Lt. from Eric Dadd regarding settlement negotiations with The Limited | Yes, in part | No | Yes, in part | *See* Tab #20 above, Dkt. No. 373, Pls.' App., Ex. 205, Shelly Lt., Ex. 4 |
| | 8/21/03 | Dkt. No. 373, Pls.' App., Ex. 206, Shelly Decl., Ex. 10, excerpts of Malfitano Dep. (*See* Tab 26) | Yes | Yes (3d party) | Yes, in part | *See* Tab #26, pp. 172, 173, & 203 should be available for public viewing |
| | 8/14/03 | Dkt. No. 373, Pls.' App., Ex. 206, Shelly Decl., Ex. 11, excerpts of Tuozzolo Dep. (*See* Tab 29) | Yes | No | Yes, in part | *See* Tab #29, p. 181 should be remain under seal consistent with Defs.' redactions |
| 22 | 9/5/03 | Dkt. No. 373, Pls.' App., Ex. 209, Dep of John Bersani | 1) Yes, in part | 1) No | 1) Yes, in part | 1) P. 167, line 23, commencing with last word on the line through p. 168, entirety of lines 1-6 should remain sealed |
| | | | 2) No, in part | 2) N/A | 2) No, in part | 2) P. 168, line 7 through the remainder of p. 169 should be made available for public viewing |
| 23 | 8/28/03 | Dkt. No. 373, Pls.' App., Ex. 216, Dep. of Crossgates (by Mammolito) | Yes | No | Yes, in part | Should remain under seal consistent with Defs.' redactions at pp. 48, 49, 50, 95, 96, 97, 98, & 99 |
| 24 | 11/19/01 | Dkt. No. 373, Pls.' App., Ex. 222, Dep. of Robert Hunter | Defendants withdrew their claim of privilege. | | | |
| 25 | 3/25/03 | Dkt. No. 373, Pls.' App., Ex. 224, Dep. of Bruce Kenan | 1) Yes, in part | 1) No | 1) Yes, in part | 1) P. 64, line 25 through p. 65, lines 1-3, consistent with Defs.' redactions, shall remain sealed |
| | | | 2) No | 2) N/A | 2) No | 2) PP. 151-52 should be available for public viewing in its entirety |
| 26 | 8/21/03 | Dkt. No. 373, Pls.' App., Ex. 226, Dep. of Malfitano | 1) Yes, in part | 1) No | 1) Yes, in part | 1) Relate to Subj. Doc. ##15, 16, 18, & 19 and should remain sealed consistent with Defs.' |

| Tab No. | Date | Description of Document | Privilege found by Court | Waiver found by Court | | Remain Confidential/Redactions |
|---|---|---|---|---|---|---|
| | | | | | | redactions on pp. 54, 55, 56, 57, 66, 67, 68, 94, 95, 96, 98, 99, 100, 102, 103, 104, 105 (lines 1-10), 115, 120, 132, & 133 |
| | | | 2) No | 2) If privileged, then Yes (at issue) | 2) No, in part | 2) Relate to Subj. Doc. #5 and should be available for public viewing– pp. 105 (lines 20-25), 106, 107, 108, 110, 111, 112, 113, 114, 116, 117, 118, 119 (except lines 8-14 & 18), 121, 122, 123, 124, 125, 126, 127, & 128 |
| | | | 3) No | 3) N/A | 3) No, in part | 3) Relate to Subj. Doc. #6 and should be available for public viewing – pp. 234, 235, & 236 |
| | | | 4) Yes, in part | 4) No | 4) Yes, in part | 4) Relate to Subj. Doc. #7 and should remain sealed consistent with Defs.' redactions on pp. 237, 238, 239, & 240 |
| | | | 5) Yes, in part | 5) No | 5) Yes, in part | 5) Relate to Subj. Doc. #20, Ex. 6 and should remain sealed consistent with Defs.' redactions on pp. 148, 149, 150, 151, 154, 155, 156, 157, 159, 160, 164, & 222 |
| | | | 6) Yes | 6) Yes (3d party) | 6) No, in part | 6) Reproduced in Subj. Doc. ##20 & 21 and should be available for public viewing – pp 172, 173, & 203 |
| | | | 7) No | 7) If privileged then, Yes (at issue) | 7) No, in part | 7) The following should be available for public viewing – pp. 138, 139, 143, 144, & 145 |
| | | | 8) Yes | 8) No | 8) Yes, | 8) Consistent with Defs.' redactions, pp. 86-87 |

| Tab No. | Date | Description of Document | Privilege found by Court | Waiver found by Court | Remain Confidential/Redactions | |
|---|---|---|---|---|---|---|
| | | | | | in part | should remain sealed |
| | | | 9) Yes | 9) No | 9) Yes, in part | 9) Consistent with Defs.' redactions, pp. 242, 244, 245, 246, 247, & 248 should remain sealed |
| 27 | 11/15/01 | Dkt. No. 373, Pls.' App., Ex. 228, Dep. of Michele Murphy | Yes | No | Yes, in part | Consistent with Defs.' redactions, pp. 66, 68, & 70 should remain sealed |
| 28 | 6/11/03 | Dkt. No. 373, Pls.' App., Ex. 232, Dep. of Shanley | Yes, in part | No | Yes, in part | Relate to Subj. Doc. ##15, 16, 18, & 19 and should remain sealed consistent with Defs.' redactions on pp. 157, 158, 159, 160, 161, 162, 163, 164, 165, 167, 256, 257, & 258 |
| 29 | 8/14/03 | Dkt. No. 373, Pls.' App., Ex. 235, Dep. of Tuozzolo | 1) Yes, in part | 1) No | 1) Yes, in part | 1) Relate to Subj. Doc. ##15, 16, 18, & 19 and should remain sealed consistent with Defs.' redactions on pp. 64, 65, 66, 67, & 132 |
| | | | 2) Yes, in part | 2) No | 2) Yes, in part | 2) Relate to Subj. Doc. #20, Ex. 6 and should remain sealed consistent with Defs.' redactions on p. 135 |
| | | | 3) Yes, in part | 3) No | 3) Yes, in part | 3) Relate to Subj. Doc. #21 and should remain sealed consistent with Defs.' redactions on p. 181 |
| | | | 4) Yes, in part | 4) No | 4) Yes, in part | 4) Consistent with Defs.' redactions on pp. 141, 142, 152, & 166 should remain sealed |
| | | | 5) No, in part | 5) N/A | 5) No, in part | 5) PP. 155, 156, 158, 161, & 213 should be made available for public viewing |
| 30 | 1/29/03 | Dkt. No. 373, Pls.' App., Ex. 238, Dep. of Joanna Viggiano | Yes | No | Yes, in part | Consistent with Defs. redactions, pp. 116, 117, 118, 120, 121, 124, 125, 134, 144, 145, 146, 170, 171, 172, 183, 184, 200, & 201 should remain sealed |