UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

**J. DANIEL LUGOSCH, III; ROBERT L. UNGERER; JOHN
A. BERSANI; EDWARD A. KELLOGG; JOHN C.
CHARTERS; PETER C. STEINGRABER; RICHARD K.
ASKIN; and WILLIAM TAPELLA,**

**Plaintiffs,**

**-v.-**                                                         **5:00-CV-0784**

**ROBERT J. CONGEL, individually and as General Partner of
Woodchuck Hill Associates, Riesling Associates, Madeira
Associates, and Moselle Associates; PYRAMID COMPANY OF
ONONDAGA; EKLECCO L.L.C.; WOODCHUCK HILL
ASSOCIATES, RIESLING ASSOCIATES, MADEIRA
ASSOCIATES, AND MOSELLE ASSOCIATES; JAMES A.
TUOZZOLO; ROBERT BRVENIK; MARC A. MALFITANO;
and SCOTT R. CONGEL,**

**Defendants.**

◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

APPEARANCES:                                    OF COUNSEL

BOIES, SCHILLER & FLEXNER, LLP                  Michael Endler, Esq.
100 State Street                                Jeffrey S. Shelly, Esq.
Albany, New York 12207
and
GREEN, SEIFTER LAW FIRM                         Daniel J. French, Esq.
900 One Lincoln Center
Syracuse, New York
and
OFFICE OF DONALD T. KINSELLA                    Donald T. Kinsella, Esq.
90 State Street, Suite 1440
Albany, New York, 12207
Attorneys for Plaintiffs

GOODWIN, PROCTER LAW FIRM                       Anthony S. Fiotto, Esq.
Exchange Place                                  Christopher D. Moore, Esq.
53 State Street                                 Kai W. Lyman, Esq.
Boston, MA 02109-2881                           Paul Ware, Jr., Esq.
and
ISEMAN, CUNNINGHAM LAW FIRM                     Michael J. Cunningham, Esq.
9 Thurlow Terrace
Albany, NY 12203
and

MACKENZIE, HUGHES LAW FIRM                Nancy L. Pontius, Esq.
101 South Salina Street                   Stephen T. Helmer, Esq.
PO Box 4967
Syracuse, NY 13221-4967
Attorneys for Defendants Robert J. Congel, Woodchuck Hill Associates, Riesling Associates, Madeira Associates, and Moselle Associates

WINSTON, STRAWN LAW FIRM                  Gordon A. Coffee, Esq.
1700 K Street N.W.                         Krista M. Enns, Esq.
Washington, DC 20006                      David Sharp, Esq.

GOODWIN, PROCTER LAW FIRM                 Anthony S. Fiotto, Esq.
Exchange Place                            Christopher D. Moore, Esq.
53 State Street                           Kai W. Lyman, Esq.
Boston, MA 02109-2881                     Paul F. Ware, Jr., Esq.

ISEMAN, CUNNINGHAM LAW FIRM               Michael J. Cunningham, Esq.
9 Thurlow Terrace
Albany, NY 12203
and
DADD, NELSON LAW FIRM                     Eric T. Dadd, Esq.
11 Exchange Street
P.O. Box 238
Attica, NY 14011
Attorneys for Defendants Pyramid Company of Onondaga and EklecCo L.L.C.

GOODWIN, PROCTER LAW FIRM                 Anthony S. Fiotto, Esq.
Exchange Place                            Christopher D. Moore, Esq.
53 State Street                           Kai W. Lyman, Esq.
Boston, MA 02109-2881                     Paul F. Ware, Jr., Esq.
and
KING, SPAULDING LAW FIRM                  John M. Bray, Esq.
1700 Pennsylvania Avenue, NW              Michael J. Ciatti, Esq.
Washington, DC 20006-4706
and
MACKENZIE, HUGHES LAW FIRM                Nancy L. Pontius, Esq.
101 South Salina Street                   Stephen T. Helmer, Esq.
PO Box 4967
Syracuse, NY 13221-4967
and
ISEMAN, CUNNINGHAM LAW FIRM               Michael J. Cunningham, Esq.
9 Thurlow Terrace
Albany, NY 12203
Attorneys for Defendants Robert Brvenik, James A. Tuozzolo and Marc A. Malfitano

COSTELLO, COONEY LAW FIRM                 Edward G. Melvin, Esq.
205 South Salina Street                   Robert J. Smith, Esq.
4th Floor
Syracuse, NY 13202
and

-2-

KIRKLAND, ELLIS LAW FIRM                         James P. Gillespie, Esq.
655 Fifteenth Street, NW                         Rebecca R. Anzidei, Esq.
Suite 1200
Washington, DC 20005
and
GOODWIN, PROCTER LAW FIRM                        Anthony S. Fiotto, Esq.
Exchange Place                                   Christopher D. Moore, Esq.
53 State Street                                  Kai W. Lyman, Esq.
Boston, MA 02109-2881                            Paul F. Ware, Jr., Esq.
and
ISEMAN, CUNNINGHAM LAW FIRM                      Michael J. Cunningham, Esq.
9 Thurlow Terrace
Albany, NY 12203
Attorneys for Defendant Scott R. Congel

McNamee, Lochner Law Firm                        Michael J. Grygiel, Esq.
677 Broadway
Albany, NY 12207-2503
Attorney for Proposed Intervenor Capital Newspapers Division of the Hearst Corporation, publisher of the
Albany Times Union and The Herald Company

**Norman A. Mordue, Chief Judge:**

## MEMORANDUM-DECISION AND ORDER

## INTRODUCTION

This Memorandum-Decision and Order addresses eight motions in this action under

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*. ("RICO") and

New York common law.  There are six motions for summary judgment by defendants as follows:

motion by Robert J. Congel (Dkt. No. 323); motion by James A. Tuozzolo (Dkt. No. 324); motion

by Robert Brvenik and Marc A. Malfitano (Dkt. No. 325); motion by Scott R. Congel (Dkt. No.

326); motion by  Madeira Associates, Moselle Associates, Riesling Associates, and Woodchuck

Hill Associates (Dkt. No. 327); and motion by EklecCo LLC and Pyramid Company of Onondaga

(Dkt. No. 328).  The Court also addresses herein an appeal/motion for reconsideration by Moselle

Associates, Madeira Associates, Riesling Associates, Woodchuck Hill Associates, James A.

Tuozzolo and Robert J. Congel (Dkt. No. 268), and a motion to amend the joint stipulation and

order regarding dispositive motion deadlines by Robert Brvenik, Robert J. Congel, Scott R.

Congel, EklecCo LLC, Madeira Associates, Marc A. Malfitano, Moselle Associates, Pyramid

Company of Onondaga, Riesling Associates and James A. Tuozzolo (Dkt. No. 382).

### THIRD AMENDED COMPLAINT

#### Factual Allegations

The factual allegations in the Third Amended Complaint are as follows. [1]

**Partnerships**

Defendant Robert J. Congel ("R.J. Congel") and his various family entities conduct

business under the business name "The Pyramid Companies" ("Pyramid").  Pyramid develops and

operates shopping centers and has built up a portfolio of more than 20 regional shopping malls

and community shopping centers (collectively the "Portfolio").

Plaintiffs are minority general partners ("Partners") in ten general partnerships

("Partnerships"); each Partnership developed and owns a regional shopping mall or community

shopping center ("Partnership Property").  The majority interest in each Partnership is held by

R.J. Congel individually and as general partner in one of the following four partnerships, all of

which are controlled by R.J. Congel: Woodchuck Hill Associates ("WHA"), Riesling Associates,

Madeira Associates and Moselle Associates (collectively, "Family Partnerships").

Each Partnership is governed by a Partnership Agreement, all of which are substantially

similar.  Each Partnership Agreement establishes a three-partner Executive Committee to manage

the particular Partnership, but permits the partners to overrule or modify any action of the

Executive Committee by a vote of at least 51% of the total Partnership percentages.  According to

---

[1]

The Court emphasizes that the section headed "Third Amended Complaint" sets forth plaintiffs'
allegations and does not represent factual findings by the Court.

the Third Amended Complaint, the Executive Committees have been completely inactive and the Partnerships have been managed exclusively by R.J. Congel.

Among other provisions, the Partnership Agreements require monthly distributions to all Partners of monthly income in excess of expenses, prohibit commingling of Partnership funds, and require that full and accurate financial reporting and accounting be available to every Partner. Plaintiffs claim that R.J. Congel, acting in concert with the other defendants, has intentionally, repeatedly and illegally violated the Partnership agreements. The Third Amended Complaint states:

> The foundation of this action is the illegal and fraudulent scheme of Defendant Robert J. Congel to exploit and drain an otherwise profitable group of shopping malls, and to use the income generated by those malls as his own private checking account. As a result of that corrupt scheme, Defendants have defrauded Plaintiffs, and the other minority partners in those shopping malls, out of millions of dollars in profits, assets and financial opportunity. (Third Amended Compl. ¶ 1.)

**Pyramid Management Group ("PMG")**

Each Partnership's Partnership Agreement provides that the Partnership may hire a managing agent to lease and manage the Partnership Property. Each Partnership has entered into a Management Agreement with Pyramid Management Group ("PMG") whereby PMG manages the Partnership Properties. PMG is owned by the four Family Partnerships. The Partnership Agreements require consent by 70% of all percentage interests of partners for a Partnership to enter into a contract with an "affiliated" company such as PMG, but consent has never been obtained. Nor has PMG complied with many provisions of the Management Agreements, such as reporting the financial condition of the Partnership Properties on a monthly basis, maintaining separate bank accounts for each Partnership Property, refraining from commingling each Partnership's funds with funds of other Partnerships or non-Partnership entities, and using

Partnership funds for Partnership purposes only.

The Third Amended Complaint claims that PMG has regularly, intentionally, and continuously failed to provide financial reports to plaintiffs; intentionally provided – via mail and/or wire – false and misleading financial information to the Partners; intentionally, systematically and continuously commingled – via mail and/or wire – Partnership monies with funds of unrelated business entities controlled by R.J. Congel; and actively engaged in and permitted the conversion of Partnership funds for non-Partnership uses.  Plaintiffs further claim that PMG has intentionally, systematically and repeatedly overcharged the Partnerships for management and leasing of Partnership Properties, and has concealed its wrongdoing by withholding financial reports from Partnerships and intentionally providing misleading financial information.

**Fraudulent Scheme**

The Third Amended Complaint avers that defendants perpetrated a fraudulent scheme upon plaintiffs and other minority partners by providing false and misleading information.  Defendants provided only superficial financial reporting, which gave the appearance that the affairs of the Partnerships were reasonably well handled by defendants and that the Partnership Properties were reasonably well managed by PMG.  In the 1990's, R.J. Congel incurred cost overruns in the construction of Carousel Mall ("Carousel"), owned by defendant Pyramid Company of Onondaga ("PCO"), which has no relationship to the Partnerships.  These problems were compounded by debt relating to Palisades Center Mall ("Palisades"), owned by defendant EklecCo, which also has no relationship with the Partnerships.  Other financial strains arose from a series of strip center projects developed by R.J. Congel and his son, defendant Scott Congel, through S&R Group, Inc. ("S&R").

Plaintiffs allege that R.J. Congel and the Family Partnerships used their majority interests in Pyramid Crossgates Company ("Crossgates") (owner of Crossgates Mall, in which plaintiffs Robert L. Ungerer and J. Daniel Lugosch, III are minority partners) and Pyramid Company of Buffalo ("Buffalo") (owner of Walden Galleria, in which plaintiffs Ungerer and Peter C. Steingraber are minority partners) to compel Crossgates and Buffalo to participate in forming a limited partnership, Bonwit Teller L.P. ("Bonwit") to fund the acquisition of the Bonwit Teller department store chain. The general partner in Bonwit is Bontel Corporation, which is owned and controlled by R.J. Congel and his family. The limited partner of Bonwit is Retail Distribution Enterprises ("RDE"), a general partnership comprising Crossgates, Buffalo and PCO. Monies were provided to RDE as a loan to Crossgates, Buffalo and PCO by defendant WHA, one of the Family Partnerships. The monies involved included the acquisition costs of Bonwit Teller and its operating losses. Plaintiffs claim that R.J. Congel shifted these losses onto Crossgates and Buffalo through misleading financial reporting.

Plaintiffs aver that defendants used PMG to drain the Partnerships in order to fund R.J. Congel's non-Partnership projects, including Carousel, Palisades, Bonwit Teller and S&R. As a result, minority general partner distributions all but ceased. Partnership Property payables fell into arrears, including in some instances real estate tax and mortgage payments. Defendants allegedly misappropriated funds, including monies paid by tenants to be held by the Partnerships in trust for the payment of real estate taxes, common area maintenance costs and promotion and marketing expenses. The unaudited year-end financial statements (referred to hereinafter as "financial statements"; also referred to in the record as "year-end statements," "compiled statements," or "tax statements") received by plaintiffs in mid-1997 referred to large sums of money due to the Partnerships from "related entities"; plaintiffs allege that these reflected

-7-

unauthorized loans to non-Partnership projects.  The financial statements also reflected significant sums due to the Partnerships from a "concentration account," which plaintiffs characterize as a fund in which various Partnerships' monies were improperly commingled with non-Partnership monies.  Plaintiffs state that, although the financial statements showed Partnership Property cash flows sufficient to pay operating expenses and make distributions of profits to the Partners, they were more than offset by the unauthorized loans and amounts due from the concentration account.

In late 1997 and early 1998, R.J. Congel and Pyramid announced that they would attempt to sell the entire Portfolio of Pyramid properties.  Chase Manhattan Bank ("Chase"), the investment banker for the marketing and anticipated sale, approved a $200 million loan to finance land acquisitions and to cover building expenses directly related to expansion efforts to increase the value of the existing Portfolio.  According to plaintiffs, R.J. Congel quickly dissipated the proceeds on unauthorized projects such as Palisades and S&R.  The costs of this loan, however, were shown as debts on the financial statements of the Partnerships.  At a meeting in the summer of 1998, R.J. Congel stated that he was a "net lender" to Pyramid, leading plaintiffs to believe that he would use the purported "amounts due to related parties" to inflate the amount due to him and the Family Partnerships from the proceeds of the sale of the Portfolio, at the expense of plaintiffs and other minority partners.

**Concentration Account**

Each Partnership maintains an operating account into which Partnership Property rental income and other receipts are deposited.  The Partnership Agreements and Management Agreements require each Partnership's bills and expenses to be paid from its operating account.  However, on a daily basis PMG has "swept" the receipts from each Partnership's account – via mail and/or wire – and deposited them in one bank account, called a concentration account,

maintained by PMG, where they are commingled with funds of other Partnerships and other business entities controlled by R.J. Congel.  PMG pays all of the Partnerships' disbursements from this account, including management fees and reimbursed expenses to PMG itself.  PMG's cash summary reports, which were mailed and/or wired to the Partnerships monthly, reported the real estate tax escrow cash balances as zero or nominal, indicating that tax escrow monies were improperly diverted.  Money from this account has been loaned to PMG and other Congel projects such as Palisades, Carousel, Bonwit Teller, and S&R, although there is no legitimate explanation for such loans.  Funds from this account have also been used for debt service on loans to the Palisades project and on the Chase loan.

Plaintiff Lugosch states that his requests for information and explanations have been largely unsuccessful, although he did receive a "package" of financial information concerning certain Partnership Properties.  Lugosch claims that the information provided in the package was false and misleading and included entries reflecting unauthorized transactions, such as a $19 million "payable" due to Bonwit.  He also states that PMG defaulted in payments on Berkshire Mall Group's $60 million mortgage loan with Prudential Insurance Co.

**Self-dealing and Fee Overcharging**

Plaintiffs further claim that R.J. Congel and other defendants have used PMG in a "systematic, repeated and intentional pattern of overcharging" the Partnerships for services provided in connection with PMG's management of Partnership Properties.  PMG has paid itself millions of dollars in excess management fees beyond the 3% of gross project revenues authorized in the Management Agreements with each Partnership.  The Management Agreements also provide for reimbursement by the Partnerships to PMG for the cost of on-site management personnel; plaintiffs claim that PMG has overcharged the Partnerships for these services and has

included improper costs.  R.J. Congel also allegedly used PMG to pass through to the Partnerships his personal travel, entertainment and living expenses, which are "wholly unrelated to the conduct of the Partnerships' business."

**Other Fraudulent Acts in Furtherance of the Scheme**

Plaintiffs also claim that defendants have repeatedly failed to report to them and other minority partners on Partnership affairs as required by each Partnership Agreement.  On the occasions when defendants did provide financial reports, they were falsified and misleading.  R.J. Congel and/or Pyramid have submitted falsified or misleading reports to banks such as Chase in order to obtain loans.

According to plaintiffs, PMG has improperly discharged its duties, including its duties to lease space in the Partnership Properties, to pay project vendors and to pay mortgage lenders. When, in the course of disputes with tenants, tenant billing overcharges became evident, PMG settled the cases at great expense and detriment to the Partnerships, sometimes releasing tenants from their leases.

Plaintiffs claim that R.J Congel conspired with Scott Congel to misappropriate Partnership business opportunities, including the acquisition of land adjacent to Partnership Properties and the development thereon of abutting strip center projects to the detriment of the Partnerships.  R.J. Congel personally caused various Partnerships to enter into contracts or transactions with S&R or an affiliate without the requisite 70% approval required for transactions with affiliated entities.

According to plaintiffs, due to the commingling of monies and siphoning of funds, R.J. Congel has made unilateral demands for capital calls in both Berkshire Mall Group ("Berkshire"), in which plaintiffs Lugosch and John A. Bersani and defendant WHA are partners, and Independence Mall Group ("Independence"), in which plaintiffs Lugosch, Bersani, John C.

-10-

Charters, Richard K. Askin, and William Tapella, and defendant Riesling Associates are partners. During the summer of 2001, R.J. Congel took the position that cash flow was not available to service the capital calls.  The disputes have resulted in the ouster of these plaintiffs from the Partnerships, allegedly in violation of the Partnership Agreements.  Similarly, plaintiff Peter C. Steingraber has been improperly ousted from Buffalo.

Plaintiffs state that defendants continue to commingle funds in the concentration account in order to divert funds from one Partnership to another Partnership or to a non-Partnership entity; continue to make claims for repayment of improper intercompany borrowings including the repayment of RDE for the Bonwit Teller loan, some of which has been repaid by Crossgates; and continue to overcharge the Partnerships for management fees.

### Causes of Action

The Third Amended Complaint sets forth ten causes of action.

## Count I - RICO

Plaintiffs claim that R.J Congel and the Family Partnerships violated 18 U.S.C. § 1962(a)-(d), and that the remaining defendants violated 18 U.S.C. § 1962(c), (d).  Plaintiffs base these claims on allegations that defendants engaged in racketeering activity consisting of multiple acts of mail and wire fraud in furtherance of a scheme to defraud plaintiffs and others.  Plaintiffs claim that through PMG, a RICO enterprise, defendants repeatedly, systematically and intentionally overcharged the Partnerships for the management and leasing of the Partnership Properties, commingled Partnership monies with funds of unrelated business entities controlled by R.J. Congel, converted Partnership funds for non-Partnership uses, misappropriated Partnership opportunities, and concealed and perpetuated the scheme by failing to provide financial information and providing false and misleading financial information to the Partners.

-11-

**Count II - Fraud**

Plaintiffs assert a common-law fraud cause of action based on defendants' alleged conduct in providing false and misleading financial information to plaintiffs concerning, *inter alia*, PMG's management of the Partnership Properties, payment of real estate taxes on the Properties, and the transfer of Partnerships' assets to non-Partnership entities.

**Count III - Conversion**

Plaintiffs claim that the Partnerships legally own the funds misappropriated by defendants and that defendants have converted these funds to their own use.

**Count IV - Conspiracy**

Based on the above allegations and the allegation of a common agreement or understanding, plaintiffs claim that defendants conspired and engaged in a common scheme to defraud plaintiffs and to convert for their use funds which rightfully belong to plaintiffs.

**Count V - Aiding and abetting**

Plaintiffs aver that defendants knowingly and willfully aided and abetted the scheme to defraud plaintiffs and to convert for their use funds which rightfully belong to plaintiffs, and that the scheme enabled R.J. Congel to use the income of plaintiffs' Partnerships for his own purposes, resulting in the loss to plaintiffs of millions of dollars in profits, assets and financial opportunities.

**Count VI - Breach of Contract**

Plaintiffs claim that defendants R.J. Congel, the Family Partnerships, Tuozzolo, and Malfitano breached the Partnership Agreements.

**Count VII - Breach of Fiduciary Duty**

Plaintiffs claim that defendants R.J. Congel, the Family Partnerships, Tuozzolo, and

Malfitano breached their fiduciary duty to plaintiffs.

**Count VIII - Breach of Contract**

Plaintiffs claim that defendants R.J. Congel, Tuozzolo, WHA, and Riesling breached the Partnership Agreements for Berkshire, Independence and Buffalo by improperly purchasing the interests of plaintiffs Lugosch and Bersani in Berkshire; the interests of plaintiffs Lugosch, Bersani, Charters, Askin and Tapella in Independence; and the interest of plaintiff Steingraber in Buffalo. These plaintiffs further claim that they are not in default of their Partnership obligations and that these defendants made improper and illegal demands for repayment of their capital accounts. Plaintiffs seek a declaration resolving these matters in their favor.

**Count IX - Breach of Fiduciary Duty**

Plaintiffs assert that defendants R.J. Congel, Tuozzolo, WHA, and Riesling breached their fiduciary duties in connection with the Berkshire, Independence and Buffalo partnerships by improperly purchasing the interests of plaintiffs Lugosch and Bersani in Berkshire; the interests of plaintiffs Lugosch, Bersani, Charters, Askin and Tapella in Independence; and the interest of plaintiff Steingraber in Buffalo; and by making improper and illegal demands for repayment of their capital accounts.

**Count X - Constructive Trust**

Plaintiffs aver that by the actions alleged above, the Family Partnerships, PCO and EklecCo knowingly and willfully received and retained assets and monies properly belonging to plaintiffs.

**Relief demanded**

Plaintiffs seek money damages, including treble damages under RICO. They seek a declaration that the purchase of certain plaintiffs' Partnership interests is null and void, as is their

-13-

obligation to repay capital accounts.  They seek termination of the Management Agreement

between the Partnerships and PMG.  And they seek imposition of a constructive trust in favor of

plaintiffs against the Family Partnerships, PCO and EklecCo.

## THE MOTIONS FOR SUMMARY JUDGMENT

There are six motions for summary judgment by defendants as follows: motion by R.J.

Congel (Dkt. No. 323); motion by James A. Tuozzolo (Dkt. No. 324); motion by Robert Brvenik

and Marc A. Malfitano (Dkt. No. 325); motion by Scott R. Congel (Dkt. No. 326); motion by

Madeira Associates, Moselle Associates, Riesling Associates, and Woodchuck Hill Associates

(Dkt. No. 327); and motion by EklecCo LLC, and Pyramid Company of Onondaga (Dkt. No.

328).

A party moving for summary judgment bears the initial burden of demonstrating that there

is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the

evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in

nonmovant's favor, determines that the movant has satisfied this burden, the burden then shifts to

the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact

requiring a trial.  *See Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989).  If

the nonmovant fails to carry this burden, summary judgment is appropriate.  *See Celotex,* 477

U.S. at 323.

## DISCUSSION – RICO CAUSE OF ACTION

### RICO Cause of Action - Generally

Section 1964(c) of Title 18 of the United States Code creates a private right of action for

anyone injured in his business or property as a result of a violation of section 1962 of Title 18. [2]

To establish a violation of section 1962, a plaintiff must show that, through the commission of

two or more acts constituting a pattern of racketeering activity, the defendant directly or indirectly

invested in, or maintained an interest in, or participated in an enterprise, the activities of which

affected interstate or foreign commerce, or that he conspired to do so. [3]

In the first count of the Third Amended Complaint, plaintiffs claim that defendants

engaged in a pattern of racketeering activity consisting of multiple acts of mail and wire fraud.

Under RICO, a pattern of racketeering activity consists of at least two acts of racketeering activity

---

[2]

18 U.S.C. § 1964(c) provides in part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]

[3]

18 U.S.C. § 1962 provides:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. ***

> (b) It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

(often referred to as the "predicate acts") within a ten year period.  *See* 18 U.S.C. § 1961(1), (5).

Racketeering activity is defined in 18 U.S.C. § 1961(1)(B) as "any act which is indictable under"

specified provisions of Title 18, which include section 1341 (mail fraud) [4] and section 1343 (wire

fraud). [5]   The elements of a claim of mail or wire fraud are (1) the existence of a scheme to

defraud involving money or property; and (2) the use of the mails or wires in furtherance of the

scheme.  *See United States v. Trapilo*, 130 F.3d 547, 551 (2d Cir. 1997); *United States v. Altman*,

48 F.3d 96, 101 (2d Cir. 1995).  The scheme to defraud element is broadly interpreted to include

"'everything designed to defraud by representations as to the past or present, or suggestions and

promises as to the future.'"  *Altman*, 48 F.3d at101 (quoting *Durland v. United States*, 161 U.S.

306, 313 (1896)).

---

[4]

18 U.S.C. § 1341, "Frauds and swindles," provides in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or
> for obtaining money or property by means of false or fraudulent pretenses,
> representations, or promises, ... for the purpose of executing such scheme or artifice
> or attempting so to do, places in any post office or authorized depository for mail
> matter, any matter or thing whatever to be sent or delivered by the Postal Service, or
> deposits or causes to be deposited any matter or thing whatever to be sent or
> delivered by any private or commercial interstate carrier, or takes or receives
> therefrom, any such matter or thing, or knowingly causes to be delivered by mail or
> such carrier according to the direction thereon, or at the place at which it is directed
> to be delivered by the person to whom it is addressed, any such matter or thing, shall
> be fined under this title or imprisoned not more than 20 years, or both.

[5]

18 U.S.C. § 1343, provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or
> for obtaining money or property by means of false or fraudulent pretenses,
> representations, or promises, transmits or causes to be transmitted by means of wire,
> radio, or television communication in interstate or foreign commerce, any writings,
> signs, signals, pictures, or sounds for the purpose of executing such scheme or
> artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

Plaintiffs allege that PMG constitutes the RICO "enterprise" within the meaning of section 1962. *See* 18 U.S.C. § 1961(4) ("'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.").  They allege that PMG carries out legitimate aspects of managing the Partnership Properties but that it also engages in acts directed toward promoting defendants' illegal scheme to defraud plaintiffs by commingling the assets and subverting the interests of the various Partnerships and defrauding plaintiffs and other minority partners out of millions of dollars in profits, assets and financial opportunities.

With respect to the scheme, the Third Amended Complaint alleges:

167. Defendants' fraudulent misconduct at the heart of this action includes mailings and/or wirings of: (1) monthly statements of the receipts, expenses and charges of the Partnership Properties; (2) daily deposits of the receipts collected for the Partnership Properties; (3) almost daily transfers of Partnerships' funds; (4) monthly budget updates for the Partnership Properties; (5) weekly leasing status reports; (6) weekly tenant coordination status reports; (7) weekly reports of budget variances; (8) annual budgets and quarterly updates; and (9) various other financial reports and memoranda.

168. Defendants' misconduct has occurred in each month that PMG mailed and/or wired the improper items or documents set forth in ¶ 167 above to and/or from the Partnership Properties or to Plaintiffs and the other Partners. ***

The Third Amended Complaint further asserts:

178. Pursuant to that pattern of racketeering activity, at various times from the inception of Carousel to the present, Defendants have created, authorized, and/or provided false and misleading financial information to the Partnerships, the Plaintiffs and the other Partners including, but not limited to, (a) the financial status of the Partnerships (including, but not limited to, the balance of the concentration account and the amounts due to and from "related parties" and the amounts due on unauthorized intra-Pyramid loans); (b) PMG's management of the Partnership Properties; (c) payment of real estate taxes on Partnership Properties; (d) monies to be held in trust for the benefit of the tenants or customers of the Partnership Properties; and (e) the transfer of Partnership assets to non-Partnership properties.

Plaintiffs allege that through this scheme defendants injured them by, *inter alia*,

-17-

converting plaintiffs' income to defendants' own use and benefit, thereby depriving plaintiffs of the use of that money; retaining assets and business opportunities belonging to plaintiffs; diminishing the value of plaintiffs' interest in the Partnerships; and, "as the ultimate goal" of the scheme, coercing plaintiffs to accept far less than the true value of their interests in the Partnerships.  Plaintiffs claim that R.J Congel and the Family Partnerships violated 18 U.S.C. § 1962(a)-(d), and that the remaining defendants violated 18 U.S.C. § 1962(c), (d). [6]

**RICO Cause of Action - Misrepresentation and Reliance**

The Court first considers whether, on this record, summary judgment is appropriate on the ground that plaintiffs cannot prove that defendants perpetrated a fraudulent scheme upon plaintiffs and other minority partners by providing false and misleading information.  Defendants argue that  there is no evidence that they provided false and misleading information.  Rather, they

---

[6]
The Third Amended Complaint alleges specific violations of the subdivisions of section 1962 as follows:

181.  This income that Defendants Robert J. Congel, Woodchuck Hill Associates, Riesling Associates, Madeira Associates and Moselle Associates, received as a direct result of this pattern of racketeering activity was, and is, used and/or invested in the continuation and operation of their described enterprise, in violation of 18 U.S.C. § 1962(a).

182.  This income that Defendants Robert J. Congel, Woodchuck Hill Associates, Riesling Associates, Madeira Associates and Moselle Associates, received as a direct result of this pattern of racketeering was, and is, used and/or invested in the continuation and maintenance of their interest and/or control of their described enterprise in violation of 18 U.S.C. § 1962(b).

183.  All of the Defendants knowingly and willfully conducted and/or participated, through a pattern of racketeering activity, in the conduct of the affairs of their described enterprise in violation of 18 U.S.C. § 1962(c).

184.  All of the Defendants knowingly and willfully conspired to and agreed to engage in the conduct described above, and performed those acts which they conspired to do in violation of 18 U.S.C. § 1962(d).

-18-

contend, the undisputed evidence proves that plaintiffs knew of, approved and benefitted from the business practices that plaintiffs characterize as part of the fraudulent scheme.  Defendants further argue that those practices were in all respects proper, and, in any event, amount to no more than breaches of contract.

As evidence that plaintiffs knew of the business practices in issue, defendants point to the year-end financial statements for each Partnership.  They urge that the financial statements disclosed both the existence of the concentration account and the fact that monies were loaned from the concentration account to related entities [7]; disclosed the exact amount of net loss to Crossgates and Buffalo from RDE in connection with Bonwit Teller, including both acquisition

---

[7] With respect to the existence of the concentration account and its use for intercompany loans and the amounts due to and due from the concentration account with respect to each partnership, defendants point to the following "note concerning Related Party Transactions and amounts due from the Concentration Account" which was included in the financial statements:

> The Management Company maintains a concentration bank account for the various projects it manages.  All disbursements for these projects are processed through this concentration account.

> During [the specified year], the Management company held excess funds from the Partnership in this account to fund other entities' expenditures.  As of [year-end], excess funds maintained were [specified dollar amount] and are presented as "Due from concentration account" on the balance sheet.

-19-

and operations losses [8]; disclosed the existence of the Management Agreements with PMG [9]; and disclosed the fees charged by PMG for management services. [10]  Defendants also rely on other documents, such as Supplemental Services Agreements authorizing charges above the 3% management fee, and periodic cash flow reports sent to plaintiffs which reflected such charges. They state that the allocations to the Partnerships of the costs funded by the Chase line of credit were also recorded in each Partnerships's financial records.

Defendants further rely on evidence of daily morning meetings and other contacts at which the Partnerships' financial matters were discussed.  For example, with respect to the acquisition and operation of Bonwit Teller, defendants submit evidence that plaintiffs were involved in the decision to purchase it and participated in daily morning meetings at which the matter was frequently discussed.  Likewise, the Portfolio sales effort, which gave rise to the Chase-related expenses allocated to the Partnerships, was conducted with plaintiffs' knowledge and participation.

---

[8]

The financial statements for these entities contained the following note:

> On March 19, 1990 the Partnership acquired a 33 ⅓ % partnership interest in Retail Distribution Enterprises (a general partnership). Retail Distribution Enterprises owns a 99% limited partnership interest in Bonwit Teller, L.P.

> The aggregate transactions of the Partnership's investment in [RDE] as of [year-end] is [a loss of a specified dollar amount].

[9]

The financial statements stated: "The Partnership has a management agreement with a related entity ('the Management Company')."  The Management Company is PMG.

[10]

The financial statements listed numerous items under the heading, under "Expenses."  One such item was "common area," which disclosed a lump sum in which the 3% management fee was combined with other expenses.  Other items, listed separately, were "leasing" and "marketing and promotion."

In addition, defendants rely on their expert reports to support their contentions that the financial statements and other documents accurately and appropriately reflected the Partnerships' affairs, that the interest and other calculations performed by PMG were correct and appropriate, and that the allocations of costs associated with the Chase line of credit were appropriate.  For example, they cite to the conclusion by their expert Stanley Perla, CPA, from Ernst & Young LLP, that "the financial statements for each of the Partnerships present fairly, in all material respects, the assets, liabilities, and partners'/members' equity/deficit for the Partnership at the end of the year(s) presented[.]"  Defendants also point to the findings by William D. O'Connell, CPA, of Deloitte & Touche LLP, that the use of a concentration account was common in the field and appropriate in this case; that the interest earned by and charged to each of the Partnerships by PMG was correctly calculated and was beneficial to the Partnerships; that PMG appropriately recorded the transactions in the books and records of RDE, Crossgates, PCO, and Buffalo with respect to investments in and losses from Bonwit Teller; and that the sales costs allocated by PMG to the Partnerships regarding the contemplated sale of Portfolio properties (the Chase line of credit) were appropriate.

In response, plaintiffs contend that, viewed in its entirety, defendants' conduct served to create an illusion of transparency and financial solvency, while concealing the true financial condition of Pyramid.  Plaintiffs state that in fact, since the early 1990's, Pyramid has been unable to meet its financial obligations.  They allege that the scheme allows defendants to manipulate the financial assets and manpower of the various Pyramid entities and, through PMG, "solve that day's crisis in order to create the illusion to the world of a strong, vibrant Pyramid" while leaving the remainder of Pyramid "a hollow shell."  According to plaintiffs, this continuous and ongoing fraudulent scheme "provided Defendants with the only means to keep and expand an empire

which, if made transparent, would have met its destiny long ago."

Plaintiffs rely on their expert report, dated April 16, 2003, prepared by William F. Chandler, Marianne L. DeMario and John Houck of Legal & Scientific Analysis Group, Inc. ("LSAG"). LSAG states its opinion that the financial records show "a pattern of intercompany transactions that do not respect the differing economic interests of the minority owners." For example, LSAG sets forth, with supporting evidence, its opinion that Crossgates' and Buffalo's investment in Bonwit Teller was not permissible under the Partnership Agreement, was improperly entered into for a number of reasons, and exposed Crossgates and Buffalo to unlimited risk. It shows that most of the funds from the Chase line of credit were used for the construction of Palisades. It further demonstrates that "the manner in which funds have been transferred and shared among entities typically involves several intervening transactions leaving an opaque trail and making it difficult, if not impossible, to understand and trace the economic consequences to each of the entities."

With respect to the concentration account, plaintiffs do not dispute that the concentration account amounts reported in the financial statements were "mathematically correct." Rather, they contend that the existence and use of the concentration account was not plainly disclosed in the financial statements, and that the disclosure in the financial statements that excess funds from the account were used "to fund other entities' expenditures" was insufficient to alert them to the true nature of its use. They introduce evidence that some minority partners were unaware of the concentration account or how it operated. According to plaintiffs, defendants represented that the concentration account was merely a means to pool all monies coming in from the Partnerships for overnight bank deposit and that the money was returned to each Partnership's account the next day. LSAG avers that in fact PMG borrowed millions from the concentration account, that the

account is overdrawn, and that PMG, along with WHA, transferred funds from this account to

Palisades, Carousel and Bonwit Teller.  There is evidence in affidavits and deposition testimony

that PMG returned to the Partnerships insufficient cash to pay vendors, that Partnerships were in

arrears in payments for essential services such as snowplowing and advertising, and that as a

result they occasionally had to pay premiums to vendors.  Real estate taxes and mortgage

payments were delinquent.  Plaintiffs' experts also state their opinion that plaintiffs were deprived

of millions of dollars of cash distributions to which they were entitled.

      With respect to the acquisition and operation of Bonwit Teller, plaintiffs admit that they

attended meetings where the subject of the acquisition was discussed, but submit evidence that

they were never provided information regarding the ultimate formation, ownership structure or

financial responsibilities in connection with its acquisition and operation.  They affirm that they

never received any tax benefits.  And they take the position that the references to the Bonwit

Teller transactions in the financial statements for Crossgates and Buffalo did not reflect certain

aspects of the transactions which operated to their detriment.  LSAG's report sets forth the

manner in which the Bonwit Teller transactions damaged plaintiffs.

      With respect to the Chase line of credit, plaintiffs allege that, although the proceeds were

expended on unrelated Congel projects such as Carousel and Palisades, "a substantial portion of

the fees, expenses, principal and interest was pushed down to the Partnership level and substantial

amounts of the repayment to Chase came from funds from the Partnerships."  Plaintiffs submit

evidence that R.J. Congel refinanced a number of Partnerships in order to repay Chase, although

such refinancing may not have been in the best interest of the Partnerships or the Partners, and

that he concealed or misrepresented the true purpose of the refinancings.  Moreover, Scott Congel

received millions of dollars as commissions for the refinancings.  As a result, the Partnerships

were left with substantially greater amounts of debt and millions of dollars of fees and costs, with no benefit to them.  LSAG estimates that the Partnerships incurred millions of dollars in avoidable fees and other costs relative to the Chase financing.

Plaintiffs also introduce evidence that the Management Agreement was not routinely disclosed to plaintiffs and other minority partners.  They point out that the 3% fee authorized by the Management Agreement was not disclosed as a distinct line in the financial statements but rather was included within the line item for common area maintenance.  Some plaintiffs testified that the fact that PMG imposed charges above the 3% management fee was not generally understood by plaintiffs.  The Supplemental Services Agreement upon which plaintiffs rely as authorizing charges above the 3% management fee was not mentioned in the PMG documents.  And plaintiffs rely on LSAG's conclusion that when all fees and charges are included, PMG's total management fees were above-market.

Upon a thorough review of the record, the Court finds that evidence presented by plaintiffs demonstrates that questions of fact exist regarding whether defendants perpetrated a fraudulent scheme upon plaintiffs and other partners by providing false and misleading information.  For example, relevant disputed questions of fact exist regarding what was actually disclosed in the morning meetings and other contacts; even if the minority partners agreed to the acquisition of Bonwit Teller or the marketing of the Portfolio, they may not have been informed of or agreed to the manner in which these were financed.  Also, while it is true that the financial statements referred to the concentration account, intercompany loans, management agreement and expenditures for leasing and marketing, these references were made in the most general terms and do not rule out concealment or misrepresentation of matters concerning the handling of the Partnerships' finances.  And even accepting that the year-end figures were accurately reported in

-24-

the financial statements, this does not obviate plaintiffs' evidence that defendants charged excessive management fees, failed to make funds available to the Partnerships for necessary maintenance, and diverted Partnership opportunities.  Further, the Court rejects the defendants' characterization of plaintiffs' evidence of fraud as amounting to no more than evidence that defendants failed to disclose breaches of the Partnership and Management Agreements.

The Court also rejects defendants' contention that, even if plaintiffs could demonstrate that the financial statements and other items mailed and wired by defendants contained misrepresentations, plaintiffs cannot show that they relied on those statements.  Defendants point to the testimony given by various plaintiffs in their depositions that they did not read, or "just glanced at," or "did not pay attention to" the financial statements (also referred to in the record as "year-end statements" or "compiled statements" or "tax statements") for the Partnerships. Further, defendants contend, no plaintiff made inquiries to PMG or the DiMarco firm (the Partnership accountants) during the times in question.  Plaintiffs do not rely, however, on certain particular misrepresentations; rather, it is their position that numerous misrepresentations were made every year, the cumulative effect of which was to conceal PMG's fraudulent conduct, to further the fraudulent scheme, and to create the impression that PMG was properly managing the Partnerships' affairs, thus making possible the continuation and expansion of the scheme.

**RICO Cause of Action - Section 1962(a)**

18 U.S.C. § 1962 (a) provides:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. ***

The basic purpose of section 1962(a) is to prevent racketeers from using their ill-gotten

-25-

gains to operate, or purchase a controlling interest in, legitimate businesses. *See Mark v. J.I. Racing, Inc*., 1997 WL 403179, *3 (E.D.N.Y.).  Thus, in order to recover for a violation of section 1962(a), plaintiffs must show (1) that defendants received income from a pattern of racketeering activity; (2) that they invested that income in the acquisition, establishment or operation of an enterprise distinct from the one from which the income was derived; and (3) that plaintiffs suffered an injury flowing from this investment of racketeering income distinct from any injury stemming from the original predicate acts of racketeering activity. *See, e.g., Ouaknine v. MacFarlane*, 897 F.2d 75, 82-83 (2d Cir. 1990) (stating that a section 1962(a) violation is not established by mere participation in predicate acts of racketeering; rather, a plaintiff must allege injury from the defendants' investment of the racketeering income); *Wiltshire v. Dhanraj*, 2005 WL 2239972, *2 (E.D.N.Y.) ("Put another way, plaintiffs must allege that defendants engaged in racketeering activity, derived income therefrom, invested that income in an enterprise, and, as a result of that investment, caused injury to the plaintiffs.").

The essence of plaintiffs' section 1962(a) claim is that R.J. Congel and the Family Partnerships "retained monies that should have been distributed to Plaintiffs under the Partnership Agreements and invested that money into other enterprises" such as PMG, PCO, EklecCo and S&R, thus injuring plaintiffs.  With respect to S&R, there is evidence from plaintiffs' expert, LSAG, that plaintiffs have been damaged as a result of defendants' diversion of potential corporate opportunities, specifically, the diversion to S&R of the goodwill and infrastructure developed by the existing mall Partnerships by building adjacent shopping centers, and that plaintiffs may also have been damaged to the extent that stores in S&R centers competed with Partnership Properties and siphoned off their customers.  As this Court noted in its February 1, 2001 Memorandum-Decision and Order (Dkt. No. 51) on defendants' Rule 12(b)(6) motions,

defendants' "investment of Partnership funds in S&R, and S&R's alleged appropriation of Partnership opportunities" satisfies the investment injury requirement of section 1962(a). Accordingly, defendants are not entitled to summary judgment dismissing plaintiffs' section 1962(a) claim with respect to S&R. *See generally Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 264 (2d Cir. 2004) *cert. granted*, 126 S.Ct. 713 (2005) (plaintiffs stated section 1962(a) claim stemming from allegation that defendants used profits gained from RICO enterprise to fund the opening of a retail outlet which competed with plaintiffs' retail outlet, thereby depriving plaintiff of business).

Plaintiffs do not articulate any other investment injury distinct from the predicate acts. It is well established that the injury causation requirement of § 1962(a) is not satisfied by allegations that the enterprise invested the racketeering income in its general operations, thereby permitting it to continue its pattern of racketeering and cause further injury. Reinvestment of funds into PMG, thereby permitting it to continue its fraudulent scheme, does not constitute a distinct investment injury, *see, e.g., Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 657 (S.D.N.Y. 1996), *aff'd* 113 F.3d 1229 (2d Cir. 1997), but rather, at most, constitutes injury from the manner in which PMG's affairs were conducted, that is, injury from the predicate acts. (See discussion of section 1962(c), below.) Nor can investment in PCO (Carousel Mall) or EklecCo (Palisades Center) constitute a distinct investment injury; in this respect, plaintiffs' alleged injuries arose from PMG's diversion of funds away from their proper uses, regardless of whether those funds were invested into PCO and EklecCo or used for some other purpose. Defendants are entitled to dismissal of the section 1962(a) claim except with respect to S&R.

**RICO Cause of Action - Section 1962(b)**

18 U.S.C. § 1962(b) provides:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Essentially, section 1962(b) prohibits the takeover of legitimate businesses through racketeering activity. *See, e.g., Mark*, 1997 WL 403179 at *3. To make out a section 1962(b) claim, a plaintiff must plead that he was injured by a defendant's acquisition of an interest in an enterprise, as distinct from an injury resulting from the pattern of racketeering activity, or commission of predicate acts. *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998) (finding that the plaintiff did not state a claim under § 1962(b) because the plaintiff "has not alleged any injury stemming from the 'acquisition or maintenance' of [the enterprise] by [the defendant], only injuries resulting from the commission of predicate acts").

Plaintiffs here have presented no evidence that R.J. Congel and/or the Family Partnerships obtained acquisition and control over PMG through racketeering conduct [11] or that plaintiffs were injured by such acquisition or maintenance. Rather, plaintiffs complain of injury from the manner in which defendants conducted PMG's affairs. (See discussion of section 1962(c), below.)

**RICO Cause of Action - Section 1962(c)**

Defendants further argue that plaintiffs cannot establish a violation of section 1962(c). 18 U.S.C. § 1962(c) provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]

---

[11]

Plaintiffs do not dispute that the Family Partnerships acquired PMG through stock ownership.

The purpose of section 1962(c), the most often charged RICO offense, is to prevent the operation of a legitimate business through racketeering.  *See, e.g., Mark v. J.I. Racing, Inc*., 1997 WL 403179 at *3  (citing DAVID B. SMITH & TERRANCE G. REED, CIVIL RICO, ¶ 5.01, p. 5-2 (1997)). As noted, a RICO plaintiff must show injury in his business or property "by reason of" the conduct constituting the alleged RICO violation, *see* 18 U.S.C. § 1964(c); *Sedima, S.P.R.L. v. Imrex Co., Inc*., 473 U.S. 479, 496-97 (1985), that is, he must establish "some direct relation between the injury asserted and the injurious conduct alleged."  *Holmes v. Securities Investor Protection Corp*., 503 U.S. 258, 268 (1992).  Here, then, plaintiffs must show a direct relation between the injuries asserted and defendants' alleged conducting of PMG's affairs through a pattern of predicate acts.

Plaintiffs claim that the injurious predicate acts were the mailing and wiring by PMG of misleading financial statements; monthly statements of the receipts, expenses and charges of the Partnership Properties; daily deposits of the receipts collected for the Partnership Properties; almost daily transfers of Partnerships' funds; monthly budget updates for the Partnership Properties; weekly leasing status reports; weekly tenant coordination status reports; weekly reports of budget variances; annual budgets and quarterly updates; and various other financial reports and memoranda.  Plaintiffs have presented evidence that the allegedly misleading mailings and wirings by defendants in the course of operating PMG's affairs furthered PMG's fraudulent scheme, concealed PMG's fraudulent conduct, created the impression that PMG was properly managing the Partnerships' affairs, and made possible the continuation and expansion of the fraudulent scheme.  *See, e.g., Mezzonen, S.A. v. Wright*, 1999 WL 1037866, *5-6 (S.D.N.Y.). Plaintiffs have also presented evidence that as a result of these mailings and wirings, plaintiffs allowed PMG to continue management of the Partnerships' affairs and to engage in additional

transactions such as the Chase line of credit and the acquisition and operation of Bonwit Teller, thus affording defendants additional opportunities to pursue the scheme to plaintiffs' greater detriment.

Moreover, plaintiffs have adduced evidence of a direct relation between the injury asserted and the injurious conduct alleged.  There is evidence to the effect that the mailings and wirings  "are a substantial factor in the sequence of responsible causation" of the injuries alleged. *Hecht v. Commerce Clearing House, Inc.* 897 F.2d 21, 23-24 (2d Cir. 1990).  For example, plaintiffs  rely on the opinion of their expert Marianne DeMario of LSAG that plaintiffs were damaged by PMG's charging of excessive management fees to the Partnerships; by PMG's siphoning of cash and positive cash flow from the Partnerships to fund Bonwit Teller and the costs of other Pyramid entities; by the loss of value to the Partnerships due to PMG's excessive management fees and lost expansion opportunities; and/or by PMG's conduct in allocating to them avoidable fees and costs relating to the Chase line of credit.  The record also contains evidence that the injuries were "the preconceived purpose" and the "specifically-intended consequence" of those mailings and wirings.  *In re American Express Co. Shareholder Litigation*, 39 F.3d 395, 400 (2d Cir. 1994).

Particularly in view of the complex nature of the scheme alleged by plaintiffs, the record evidence does not establish as a matter of law that PMG's mailings and wirings merely furthered, facilitated, permitted or concealed an injury which could have occurred independently of PMG's mailings and wirings; thus, the case at bar is distinguishable from *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp.2d 216, 219-20 (S.D.N.Y. 2002), and *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 587 (S.D.N.Y. 1995), relied on by defendants.  Nor, on this record, are defendants entitled to summary judgment on the ground that their losses stemmed

from "unlikely, extraneous, or intervening causes."  *Moore v. Painewebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999).

**RICO Cause of Action - Section 1962(d)**

Section 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  Defendants have not demonstrated their entitlement to summary judgment dismissing plaintiffs' claim under this subdivision.

**RICO Cause of Action - Other Issues**

Defendants have not established their entitlement to summary judgment dismissing the RICO cause of action on the ground that plaintiffs lack standing.  Where a partner in a partnership allegedly participates in wrongdoing with a third party, another partner may sue in his individual capacity and recover his own damages.  *See, e.g., Benedict v. Whitman Breed Abbott & Morgan*, 722 N.Y.S.2d 586 (2d Dept. 2001).  Nor is summary judgment on the RICO cause of action warranted on statute of limitations grounds.

**RICO Cause of Action  - Conclusion**

Accordingly, summary judgment is granted dismissing plaintiffs' RICO cause of action insofar as it is based on 18 U.S.C. § 1962(a) except for so much of that claim as concerns S&R.  Summary judgment is granted dismissing in its entirety plaintiffs' RICO cause of action insofar as it is based on 18 U.S.C. § 1962(b).   And summary judgment is denied regarding plaintiffs' RICO cause of action insofar as it is based on 18 U.S.C. §§ 1962(c) and (d).

## DISCUSSION – STATE LAW CAUSES OF ACTION

**Count II - Fraud**

Plaintiffs assert a common-law fraud cause of action based on defendants' alleged conduct in providing false and misleading financial information to plaintiffs concerning, *inter alia*, PMG's

management of the Partnership Properties, payment of real estate taxes on the Properties, and transfer of Partnerships' assets to non-Partnership entities. Plaintiffs claim that defendants knew or should have known that the representations were false, that defendants made the representations for the purpose of inducing plaintiffs to rely on them, and that plaintiffs did in fact rely on them to their detriment. Primarily for the reasons discussed above in connection with the issue of misrepresentation under RICO, summary judgment on the fraud cause of action is denied.

**Count III - Conversion**

The Court denies summary judgment dismissing the conversion cause of action. Defendants have not demonstrated the absence of a wrong which is independent of the alleged breaches of contract. They have not demonstrated the absence of clearly identifiable funds of which plaintiffs had the right to ownership, possession or control. With respect to defendants' argument that the funds in issue belong to the Partnerships, not the plaintiffs, the Court notes that plaintiffs seek to recover distributions to them of Partnership profits which they claim were wrongfully diverted by defendants. Defendants assert that any such claims are barred by the three-year statute of limitations; on this record, however, plaintiffs may be able to show that defendants are estopped from asserting a statute of limitations defense to the conversion claims. *See generally Transport Workers Union of America Local 100 AFL-CIO v. Schwartz*, 794 N.Y.S.2d 308, 309 (1st Dept. 2005).

**Count IV - Conspiracy**

Based on the above allegations and the allegation of a common agreement or understanding, plaintiffs claim that defendants conspired and engaged in a common scheme to defraud plaintiffs and to convert for their use funds which rightfully belong to plaintiffs. There are material questions of fact barring summary judgment on this cause of action.

**Count V - Aiding and Abetting**

Plaintiffs aver that defendants knowingly and willfully aided and abetted the scheme to defraud plaintiffs and to convert for their use funds which rightfully belong to plaintiffs, and that the scheme enabled R.J. Congel to use the income of plaintiffs' Partnerships for his own purposes, resulting in the loss to plaintiffs of millions of dollars in profits, assets and financial opportunities. Defendants have not demonstrated their entitlement to summary judgment on this cause of action.

**Count VI - Breach of Contract**

Defendants assert that the statute of limitations bars many of plaintiffs' claims based on alleged breaches of the Partnership Agreements by defendants R.J. Congel, the Family Partnerships, Tuozzolo, and Malfitano. Particularly in view of plaintiffs' assertions of fiduciary relationships among some of the parties, plaintiffs may be able to establish that defendants are equitably estopped from asserting a statute of limitations defense to these claims. *See id.* Summary judgment on this ground is denied.

**Count VII - Breach of Fiduciary Duty**

Plaintiffs claim that defendants R.J. Congel, the Family Partnerships, Tuozzolo, and Malfitano breached their fiduciary duties to plaintiffs. The record does not establish that these defendants are entitled to summary judgment dismissing the cause of action on the merits. The Court notes that Tuozzolo and Malfitano are partners in Berkshire and Independence.

Defendants also contend that the cause of action is barred by both the six-year limitations period, N.Y.C.P.L.R. 213, and the two-year discovery limitations period. N.Y.C.P.L.R. 203(g). *See generally Provident Life and Cas. Ins. Co. v. Ginther*, 1997 WL 9779, *2 (W.D.N.Y.) *and cases cited therein*. Plaintiffs may, however, be able to establish that defendants are equitably

estopped from relying on the statute of limitations defense.  In view of the nature and extent of the evidence herein, the Court denies summary judgment on this ground.

**Count VIII - Breach of Contract**

Plaintiffs claim that defendants R.J. Congel, Tuozzolo, WHA, and Riesling breached the Partnership Agreements for Berkshire, Independence and Buffalo by improperly purchasing the interests of plaintiffs Lugosch, Bersani, Askin and Tapella in Berkshire; the interests of plaintiffs Lugosch, Bersani and Charters in Independence; and the interest of plaintiff Steingraber in Buffalo.  These plaintiffs further claim that they are not in default of their Partnership obligations and that these defendants made improper and illegal demands for repayment of their capital accounts.  Plaintiffs seek a declaration resolving these matters in their favor.  Questions of fact bar summary judgment on this claim.

**Count IX - Breach of Fiduciary Duty**

Plaintiffs assert that defendants R.J. Congel, Tuozzolo, WHA, and Riesling breached their fiduciary duties in connection with Berkshire, Independence and Buffalo by improperly purchasing the interests of plaintiffs Lugosch, Bersani, Askin and Tapella in Berkshire; the interests of plaintiffs Lugosch, Bersani and Charters in Independence; and the interest of plaintiff Steingraber in Buffalo; and by making improper and illegal demands for repayment of their capital accounts.  Questions of fact bar summary judgment on this cause of action.

**Count X - Constructive Trust**

With respect to Berkshire, Independence and Buffalo, plaintiffs aver that by the actions alleged above, the Family Partnerships, PCO, and EklecCo knowingly and willfully received and retained assets and monies properly belonging to plaintiffs.  Defendants have not established their entitlement to summary judgment dismissing this cause of action.

**State Law Causes of Action - Other Issues**

The Court rejects defendants' contention that they are entitled to summary judgment on the state law claims because there has been no accounting.  As this Court noted in its Memorandum-Decision and Order of September 18, 2002, it is the general rule in New York that one partner cannot sue another concerning partnership transactions except after a full accounting.  *See St. James Plaza v. Notey,* 463 N.Y.S.2d 523, 526 (2d Dept. 1983).  The rule is not, however, mechanically applied where its underlying purpose will not be served.  *See id.*  Purposes for the rule include avoiding judicial management of day-to-day partnership affairs, avoiding piecemeal adjustments of the amount due each partner, *see id.*, and encouraging partners to "settle their differences among themselves or else dissolve and go out of business settling their affairs at that time by a final and full accounting with all partners joined."  *Schuler v. Birnbaum*, 463 N.Y.S.2d 523, 526 (4th Dept. 1978).  In view of the number and types of issues in the case at bar, requiring an accounting would not serve these or any other purposes.

There is sufficient evidence to raise questions of fact regarding plaintiffs' assertion that the Family Partnerships, PCO and EklecCo are liable as alter egos of R.J. Congel.  Defendants have not established their entitlement to summary judgment on the grounds that plaintiffs lack standing or that the claims are barred by the statute of limitations.  On this record, the individual defendants have not established their entitlement to summary judgment.  The other issues raised by defendants do not warrant summary judgment.

## REMAINING MOTIONS

**Dkt. No. 268**

Also pending is an appeal/motion for reconsideration by Moselle Associates, Madeira Associates, Riesling Associates, Woodchuck Hill Associates, James A. Tuozzolo and Robert J.

Congel (Dkt. No. 268).  They challenge the Order of Magistrate Judge Treece dated September 5, 2003 (Dkt. No. 265), insofar as it denied their renewed application for discovery of "Providence Place Mall" and "Commonwealth Management Group" documents.  Magistrate Judge Treece initially denied their request for the documents in an Order dated January 15, 2002 (Dkt. No. 147).  Movants contend that the documents are relevant.

A magistrate judge may issue orders regarding nondispositive pretrial matters, and the district court reviews such orders under the "clearly erroneous or contrary to law" standard. 28 U.S.C.  § 636(b)(1)(A); Fed.R.Civ.P. 72(a); *see Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990).  Moreover, a magistrate judge's resolution of discovery disputes is entitled to substantial deference.  *See Surles v. Air France*, 210 F.Supp.2d 502 (S.D.N.Y. 2002), particularly where, as here, the magistrate judge has been deeply involved in discovery matters in the case for years.

On review of the record, the Orders of January 15, 2002 and September 5, 2003, and defendants' arguments, the Court concludes that there is no basis to find that Magistrate Judge Treece's September 5, 2003 ruling is clearly erroneous or contrary to law.  Accordingly, the objection/appeal (Dkt. No. 268) is denied and the order is approved and affirmed.

**Dkt. No. 382**

In the final motion addressed herein (Dkt. No. 382), defendants seek amendment of the joint stipulation and order (Dkt. No. 320) regarding dispositive motion deadlines to allow them to serve an omnibus reply brief that exceeds the current page limit by approximately 10 pages.  Defendants' 33-page Omnibus Reply Memorandum of Law has been accepted and is part of the motion record (Dkt. No. 384).  Accordingly, the Court's records should reflect that the motion is granted.

-36-

**CONCLUSION**

It is therefore

ORDERED that the motions for summary judgment by Robert J. Congel (Dkt. No. 323);

by James A. Tuozzolo (Dkt. No. 324); by Robert Brvenik and Marc A. Malfitano (Dkt. No. 325);

by Scott R. Congel (Dkt. No. 326); by Madeira Associates, Moselle Associates, Riesling

Associates, and Woodchuck Hill Associates (Dkt. No. 327); and by EklecCo LLC and Pyramid

Company of Onondaga (Dkt. No. 328), are granted in part and denied in part as follows: summary

judgment is granted dismissing plaintiffs' RICO claims based on 18 U.S.C. § 1962(a) except for

so much of those claims as concern S&R; summary judgment is granted dismissing in their

entirety plaintiffs' claims based on 18 U.S.C. § 1962(b); and summary judgment is otherwise

denied; and it is further

ORDERED that defendants' objection/appeal (Dkt. No. 268) to so much of Magistrate

Judge Treece's September 5, 2003 Order as denied their renewed application for "Providence

Place Mall" and "Commonwealth Management Group" documents is denied and the order is

approved and affirmed; and it is further

ORDERED that the motion by defendants (Dkt. No. 382) to amend the page limit in the

Joint Stipulation and Order dated April 26, 2004 (Dkt. No. 320) to permit them to file an omnibus

reply brief that exceeds the page limit by approximately 10 pages is granted.

IT IS SO ORDERED.

March 31, 2006
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge